# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| John Doe 1 & John Doe 2, on behalf of themselves and a Class of all others similarly situated | § § § § | |
| *Plaintiffs* | § § | |
| v. | § § | Civil Action No. |
| Harris County, Texas; Lina Hidalgo, Rodney Ellis, Adrian Garcia, R. Jack Cagle, Tom S. Ramsey, all in their official capacities as members of the Harris County Commissioners Court; and Edward Gonzalez, in his official capacity as Sheriff of Harris County Texas | § § § § § § § § § § | |
| *Defendants* | § § | Jury Trial Demanded |

## PLAINTIFFS' ORIGINAL COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs John Doe 1 and John Doe 2, individually and on behalf of all others similarly situated as a Class of Harris County employees who are currently employed in the Harris County Jail or have been employed in the last two years (collectively "Plaintiffs"), file this suit against Harris County (the County), by and through the individual members comprising Commissioners Court (the Commissioners) in their official capacity, and the elected Harris County Sheriff (the Sheriff) in his official capacity (collectively "Defendants") acting and or omitting to act in their official

capacities for violating all Plaintiffs' Fourteenth Amendment equal protection and due process rights to be free from state created or increased danger. Defendants have committed acts and or omissions with a deliberant indifference to follow their ministerial duties under state and federal laws to Harris County employees assigned to the Harris County Jail Facilities.[1] The Plaintiffs show as follows:

## **PARTIES**

*Plaintiffs:*

1.     Plaintiffs are all current or former employees of Harris County who currently work or been assigned to work in Harris County Jail Facilities in the last two years. The Plaintiffs for their protection shall be referred to has Jane or John Doe; however, that is a pseudonym for the actual employees herein described. Plaintiffs all fear retribution, retaliation, discrimination, and disciplinary action to include termination for coming forward and identifying specific impermissible acts by Defendants acting in their official capacities. All Plaintiffs additionally seek to protect their identity under the Fifth Amendment and Fourteenth Amendments as well as pursuant to the state and federal whistle blower statutes.

---

[1] Harris County Jail Facilities for the purposes of this lawsuit includes all Harris County Jails and holding cells under the command of the Harris County Sheriff.

2.      A motion and supporting memorandum will be filed with the Court asking for Plaintiffs, to include all class members, to remain anonymous throughout the proceeding.

*Class Representatives*:

3.      John Doe 1 is a licensed peace officer and jailer. He retired at the rank of lieutenant from Harris County in March 2021 after serving thirty-seven years. Since his retirement, he has been employed by a third-party employee union and charged with monitoring jail conditions and to serve as an employee liaison with Command Staff on jail issues.

4.      John Doe 2 is a licensed peace officer and jailer. He has been employed by Harris County for twenty years and has served as a jail supervisor in the last five years.

*Class Members:*

5.      The testament of some class members is included in this complaint. Jane Doe 1-54 and John Doe 3-35 are all Harris County employees either currently working in the Harris County Jail or have worked in the Harris County Jail in the last two years. Class members work as jail supervisors, deputies, detention officers (DOs), medical staff, and civilian personnel. They have served Harris County between 10 months and 35 years or more.

*Defendants:*

6.      Harris County Commissioners Court is comprised of one County Judge and four elected Commissioners for each of the four precincts. "As the main governing body of Harris County, the Commissioners Court plays a critical role that is part administrative, part legislative, and part judicial. Its many responsibilities include adopting a budget; setting tax rates; calling for bond elections; building and maintaining county infrastructure such as roads and bridges; and overseeing county courthouses, jails, libraries, parks, and the Harris County Flood Control District."[2]

7.      Commissioners Court, by legislative mandate, is responsible for the ultimate oversight and operational standards of the Harris County Jail Facilities and for compliance with the directives promulgated by the Texas Commission on Jail Standards ("TCJS"). Tex. Loc Gov't Code §§351.001-351.002; Tex. Gov't Code §511.009. By legislative and constitutional law, Defendants are responsible for protecting the constitutional rights of all persons held in Harris County custody at the jail and other detention facilities and or employed by Harris County. *See Alberti v. Sheriff of Harris County, Texas,* 406 F. Supp. 649, 669 (S.D. Tex. 1975). At all times described herein, Defendants are acting under color of state law. Defendants are being sued in their official capacities for declaratory and injunctive relief having acted and

---

[2] *About Judge Lina Hidalgo,* (last accessed Sep 3, 2021) https://cjo.harriscountytx.gov/about.

or failed to perform their ministerial duties regarding the funding, staffing and regulatory compliance requirements for the Harris County Jail facilities throughout the county.

8.    County Judge Lina Hidalgo is the duly elected County Judge for Harris County, Texas. She is being named in her official capacity *ultra vires*. She has held this seat since January 1, 2019. The County Judge is the presiding officer of the Commissioners Court. Judge Hidalgo, at all times described herein, was acting under color of state law. She is being sued in her official capacity only for declaratory and injunctive relief.

9.    Commissioner Rodney Ellis is the duly elected Harris County Commissioner from Precinct 1. He is being named in his official capacity *ultra vires*. He has held this seat since January 9, 2017. Commissioner Ellis, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

10.   Commissioner Adrian Garcia is the duly elected Harris County Commissioner from Precinct 2. He is being named in his official capacity *ultra vires*. He has held this seat since January 1, 2019. Commissioner Garcia, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

11.     Commissioner Tom S. Ramsey is the duly elected Harris County Commissioner from Precinct 3. He is being named in his official capacity *ultra vires*. He has held this seat since January 1, 2021. Commissioner Ramsey, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

12.     Commissioner R. Jack Cagle is the duly elected Harris County Commissioner from Precinct 4. He is being named in his official capacity *ultra vires*. He has held this seat since October 3, 2011. Commissioner Cagle, at all times described herein, was acting under color of state law. He is being sued in his official capacity only for declaratory and injunctive relief.

13.     Harris County Sheriff Edward Gonzalez is the duly elected sheriff for Harris County. He has held this position since January 1, 2017. He is being named in his official capacity *ultra vires*. Harris County Sheriff Edward Gonzalez, at all times described herein, was acting under color of state law. He is sued in his official capacity only for declaratory and injunctive relief.

14.     Collectively, the Defendants are referred to as Harris County.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over claims raised in this complaint under 42 U.S.C. §1983 and §1988 and §1997 as well as 28 U.S.C. §1331, §1343, § 2201 and § 2202.

16.     Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1) and (2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and all parties reside in the Southern District of Texas.

## STATEMENT OF THE CASE

17.     Plaintiffs, on behalf of themselves and all those similarly situated, bring this lawsuit because of the Defendants continued intentional refusal to perform their ministerial duties to adequately fund and staff the Harris County Jail Facilities, including the 701 San Jacinto Jail ("701" or "701 jail"), the 1200 Baker Street Jail ("1200" or "1200 jail"), and the Joint Processing Center ("JPC") (collectively "the jail" or "Harris County jail"). Defendants continued intentional refusal to adequately fund and or staff the jail continues to occur even though they have actual knowledge of the well-known and blatantly dangerous conditions being created and directly caused by their intentional failures towards their ministerial duties to provide adequate staffing and funding for the jail facilities which has reached critical and historic deficiencies resulting in dangerous conditions and injuries to Plaintiffs.

18.     Employees, both civilian and in law enforcement, are forced to work in escalating levels of dangerous conditions that would be avoidable if the

Defendants performed their statutory mandated ministerial duties to properly fund and staff the Harris County Jail.

19. Defendants knowingly subject Plaintiffs to extremely dangerous conditions in the jail in violation of the U.S. Constitution through 42 U.S.C. §1983 and have committed conspiracy through 42 U.S.C. §1985 and §1986 to keep the jail understaffed and underfunded so that other discretionary County projects can be funded.

20. Defendants are well aware and know or have reason to know that the understaffing and underfunding of the jail poses a danger to Plaintiffs, that Plaintiffs are working extreme hours – including forced mandatory overtime – which put them and the inmates at risk, and that the mandatory minimum standards set by the Texas Commission of Jail Standards (TCJS) as well as federal requirements are not being met.

21. Plaintiffs have no reasonable recourse or other administrative or legal avenue for relief. Their cries for help and aid have gone intentionally unanswered by the Defendants. Injunctive and declaratory relief are the only means to the address failures perpetrated by the Defendants in order to force them to follow TCJS rules and guidelines and cease and desist from continuing to violate the Plaintiffs' constitutional rights.

22.     The Defendants have intentionally shown deliberate indifference to the hazardous, hostile, and dangerous working conditions Harris County employees are subjected to daily and they have refused to perform their ministerial acts necessary to remedy the situation.

23.     The issues in this case are not new issues for Defendants, the Harris County Jails have been the subject of litigation since 1972 regarding the inhumane conditions of the jail. *See Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir. 1995) (latest case in a long line of cases involving inmates trying to force Harris County to properly manage and maintain the jail.) This lawsuit is in many ways a continuation of that litigation, Defendants seem to need to be reminded that the Harris County Jail must be properly funded and staffed in order to avoid the inhumane conditions the *Alberti* plaintiffs suffered as well as the shocking inhumane conditions currently being suffered by Plaintiffs in this case. Harris County has an obligation to properly fund the jail for the safety of the employees and the inmates.

## **FACTS**

**I.     Defendants have a ministerial duty to meet jail standards set forth by state and federal law.**

24.     The Texas Commission on Jail Standards (TCJS) sets minimum jail standards that must be followed by each county jail in the State of Texas. Tex. Loc. Gov't Code §351.002 (Each county jail must comply with the minimum

standards and the rules and procedures of the Commission on Jail Standards). Harris County has no choice but to follow and abide by the minimum standards set by the TCJS. The jail standards create affirmative actions that Harris County must make under the law. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989).

25.    The TCJS is charged with setting minimum standards for the care, custody and control of inmates held at county run facilities such as the Harris County Jail. *See* Tex. Admin. Code §251.1.

**II.    Harris County has a history of failing jail standards**

26.    Since 1972, Harris County has been failing to meet jail standards which has resulted in complex and costly ligation that has unnecessarily burdened the taxpayers of the county and caused harm to inmates and jail staff. *See Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir. 1995).

27.    Harris County recognizes that staffing the jail is an essential function and not being able to staff the jail constitutes an emergency. Sheriff Tommy Thomas first declared an emergency under Tex. Loc. Gov't Code §157.022(b). Since, Harris County has continually functioned in a state of emergency in order to meet jail standards. *See* Sheriff Adrian Garcia emergency declaration letter (Jul 21, 2011) (declaration of emergency signed by Sheriff Adrian Garcia stating jail standards cannot be met without

declaring an emergency). The declaration of emergency is filed with Commissioners Court yearly in order to meet jail standards and staffing shortages. The Sheriff and the Commissioners – both past and present – acknowledge that they could not meet jail standards without declaring a state of emergency. No effort has been made by Defendants to remedy the situations that has led to the declared emergency. Even with the declared state of emergency, the Harris County Jail does not meet jail standards.

28.     Defendants know and are aware that Harris County cannot meet minimum jail standards. Defendants purposefully underfund and understaff the jail automatically resulting in an intentional mismanagement of the Harris County Jail facilities in such a way as to thwart their responsibilities to meet state and federal jail standards and knowingly putting the jail employees at risk without giving them proper notice or training. This conduct also has puts inmates at risk and harm resulting in increased deaths and injuries.

29.     Such willful acts by Defendants to chronically underfund and understaff the jail facilities, thereby not meeting minimum jail standards, constitutes an intentional abuse of power and a willful disregard for the substantive due process rights of their employees who Defendants have knowingly placed in shocking danger daily.

30.     On May 21, 2001, Harris County failed its annual inspection conducted
by TCJS due to fire and life safety violations. TCJS Inspection Report,
Inspector Shannon Herklotz, (May 21, 2001).

31.     On June 4, 2001, Harris County was ordered to repair or replace all the
two-way communication devises provided for inmate to jailer communication
throughout the facility as well as the smoke and fume removal system
undentifief in a failed inspection. Harris County failed to comply with the
TCJS order. Letter from TCJS executive director Terry Julian to Honorable
Robert Eckels, (Jun 4, 2001).

32.     On May 15, 2002, Harris County failed jail inspection at the 1301
Franklin Street Jail (no longer utilized). The facility did not provide adequate
two-way communication between inmates and jailers and had fire and life
safety violations. Letter from TCJS executive director Terry Julian to
Honorable Robert Eckels, (May 15, 2002).

33.     On May 30, 2002, Harris County failed jail inspection in the Criminal
Justice Center Intake and Holding Area (IPC) for various reasons to include
issues with fire and life safety. The facility could not be occupied until the
issues were addressed. Letter from TCJS executive director Terry Julian to
Honorable Robert Eckels, (May 30, 2002).

34.     On September 5, 2002, Harris County was notified that its jail facilities

failed a comprehensive five-day jail inspection for numerous reasons to

include, doors not having working locks, insufficient smoke detectors, and

unsanitary flooding. TCJS Occupancy Inspection Report, Inspector B. Wood,

(Sep 5, 2002); Letter from TCJS executive director Terry Julian to Honorable

Robert Eckels, (Sep. 5, 2002).

35.     On May 26, 2004, Harris County was notified that its jail facilities failed

a five-day comprehensive inspection conducted by TCJS inspectors. TCJS

Occupancy Inspection Report, Inspector R. Biehle, (May 26, 2004). Harris

County failed due to overcrowding, not meeting the mandated 1:48 ratio, and

inadequate smoke detectors. *Id.* Harris County was ordered by TCJS to reduce

the inmate occupancy of its dormitories in order to gain compliance, provide

smoke detectors throughout the facility, and to increase staffing to supervise

its jail population. Letter from TCJS executive director Terry Julian to

Honorable Robert Eckels, (May 28, 2004).

36.     On June 21, 2005, Harris County was notified that its jail facilities failed

a five-day comprehensive inspection conducted by TCJS inspectors. TCJS

Occupancy Inspection Report, Inspector R. Biehle, (Jun 21, 2005). Harris

County failed due to overcrowding and not meeting the mandated 1:48 ratios.

*Id.* Harris County was ordered by TCJS to reduce the inmate occupancy of its

dormitories in order to gain compliance and to increase staffing to supervise its jail population. Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Jun 21, 2005).

37.     In 2005, Harris County sought a population variance from TCJS to install 850 additional beds above its allowed capacity.[3] In a letter to the State Representative Rodney Ellis, TCJS Executive Director Adan Martinez stated that in 2005, Harris County sought a variance to add 850 beds to the three jail facilities while at the same time Harris County was in a staffing crisis and could not adequately meet the 1:48 ratio. TCJS Letter to Ellis. In 2005, Harris County was operating under a remedial order issued by TCJS that limited the jail population based on the available staff Harris County could provide. *Id.*

38.     On April 13, 2006, Harris County failed jail inspection and was cited for having overcapacity in pods, not having appropriate two-way communication between jailers and inmates, not drilling staff on fire and life safety, and not meeting the mandated 1:48 ratios. TCJS inspection report, Inspector Russell Biehle (Apr 26, 2006).[4]

---

[3] Brandi Grissom, *The Big House Isn't Big Enough, The Texas Tribune* (Aug 5, 2010) https://www.texastribune.org/2010/08/05/harris-county-seeks-permission-for-extra-jail-beds/; Letter to State Rep. Rodney Ellis from TCJS Executive Director Adan Munoz (Aug 3, 2010) https://static.texastribune.org/media/documents/Harris_County_Response_Letter.pdf.
[4] *Also see* Steve McVicker, *Harris County ordered to move inmates*, Houston Chronicle (May 4, 2006) https://www.chron.com/news/houston-texas/article/Harris-County-ordered-to-move-inmates-1852732.php.

39.     On May 4, 2006, TCJS ordered Harris County to send inmates to other

county jails because the Harris County jail could not meet jail standards of the

1:48 ratio for three years in a row. McVicker, *Harris County ordered to move*

*inmates*. Then Sheriff Tommy Thomas stated that there is a jail staff shortage

that led to the noncompliance. *Id.*

40.     Harris County operated with TCJS approved bed variances in 2006,

2007, 2007, 2008, 2009, and 2010. TCJS Letter to Ellis. Part of the rational

for the variances was to consolidate inmates in pods in order to reduce the

staffing needs throughout the Harris County Jail Facility. *Id.*

41.     In 2008, the US Department of Justice conducted an investigation on the

Harris County Jail under the 42 U.S.C. §1997b. The Justice department

concluded that the constitutional rights of detainees were violated and that the

Harris County Jail "fails to provide detainees with adequate: (1) medical care;

(2) mental health care; (3) protection from serious physical harm; and (4)

protection from life safety hazards."[5] The report specifically found that there

was not adequate training of detention staff to safeguard the civil rights of

inmates. *Id.*

42.     On April 20, 2009, Harris County jail facility was cited by TCJS and

ordered to reduce overcrowding in holding cells, and to ensure two-way

---

[5] United States Department of Justice (DOJ) Civil Rights Division, Letter to The Honorable Ed Emmett, (June 4, 2009)http://www.justice.gov/crt/about/spl/documents/harris_county_jail_findlet_060409.pdf.

communications were available at all times between a jailer and an inmate, ensure there is enough staff to supervise inmate work, as well as other violations. Letter from TCJS executive director Adan Munoz to Honorable Ed Emmett, (Apr 20, 2009); TCJS inspection report, Inspector George Johnson (Sep 3, 2009).

43. In 2009, Harris County failed inspection by TCJS due to broken intercoms and toilets as well as holding cells being used well over capacity.[6] Executive Director Adan Munoz stated, "[a]n inmate should be able to press the intercom and communicate with the officer controlling the floor. When an officer cannot hear an inmate in need that is a life safety issue." *Id.*

44. In August 2009, Harris County contracted with MGT of America, Inc. to "conduct a comprehensive assessment of staffing needs for the Detentions Bureau and portions of the Criminal Justice Bureau." *Staffing Study of Harris County Sheriff's Office Detention Facilities: Final Report*, MGT of American Inc., September 30, 2010. The report states "that there is an inadequate number of staff to perform critical operations and functions. Currently, HCSO compensates for the inadequate number of staff by having staff from all areas of HCSO work overtime in the jail facilities. While the use of overtime allows HCSO to comply with TCJS, the level at which staff are required to work

---

[6] Roma Khanna, *Broken toilets, intercoms cited in Harris Co. jail review,* Houston Chronicle (Apr 17, 2009) https://www.chron.com/news/houston-texas/article/Broken-toilets-intercoms-cited-in-Harris-Co-1619046.php.

overtime potentially creates conditions that severely hamper the efficiency and effectiveness of jail operations and may impair effective security for inmates and staff." It goes on to state "[m]ost of the jails currently manage inmate movement by pulling officers as required from other posts on the roster. This practice results in critical posts within the facilities being left understaffed or unmanned. The vast majority of there are posts responsible for housing unit supervision and their absence impacts the safety and security of the units and compliance."

45.     On September 4, 2009, Harris County jail facilities were cited by TCJS after a special inspection found the use of variance and temporary beds above the capacity granted by TCJS and noncompliance with medical orders. Letter from TCJS executive director Adan Munoz to Honorable Ed Emmett, (Sep 4, 2009); TCJS special inspection report, Inspector George Johnson (Sep 3, 2009).

46.     Major Mike Smith – the major over Harris County jail facilities – testified before the jail commission in August 2010. He stated that Harris County has "aggressively outsourced" about 1,500 inmates to other Texas counties and Louisiana in part due to overcrowding but also shipping inmates to other facilities costs the County less than it would to hire additional

personnel to work at the jail to accommodate a larger jail population and to cut the ballooning overtime budget.[7]

47.　　　On October 10, 2011, Harris County was cited by state inspectors for overcrowding and not meeting the **minimum** 1:48 ratio. Letter from TCJS Executive Director Adan Munoz to the Honorable Ed Emmett, Notice of Non-Compliance (October 10, 2011); TCJS special inspection report, Inspector Robert Green (Oct 10, 2011). Inspectors found twenty-five inmates in a cell approved for five inmates, seventy-six inmates in a cell designed for twenty-three, and only five jailers assigned to supervise 409 inmates as well as other overcrowding issues.[8] Sheriff Adrian Garcia stated that the conditions were due to staff shortages, and he has asked Commissioners Court for authorization to replace 300 open jailer positions. *Id.*

48.　　　On March 14, 2013, was cited by state inspectors for failing to adequately conduct inmate rounds. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (March 14, 2013); TCJS special inspection report, Inspector Anthony Mikesh (Mar 14, 2013).

49.　　　In 2015, State Senator John Whitmire called the Harris County Jail "unsafe and unhealthy" and Harris County's inability to prevent the spread of

---

[7] Brandi Grissom, *TriBlog: Harris County Jail Controversy to be Continued*, The Texas Tribune (Aug 5, 2010) https://www.texastribune.org/2010/08/05/harris-county-officials-talk-about-jail-crowding/.
[8] James Pinkerton, *County jail cited for dangerous overcrowding*, Houston Chronicle (Oct 10, 2011) https://www.chron.com/news/houston-texas/article/County-jail-cited-for-dangerous-overcrowding-2212138.php.

disease in the jail endangered inmates and the public.[9] Then Harris County Judge Ed Emmett stated that the Harris County Jail is like "a glass with a hole in the bottom […] It's not something you ever solve." *Id.*

50.     On March 11, 2016, Harris County Jail Facilities were cited for not providing adequate and timely medical care for inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Mar 11, 2016); TCJS Special Inspection Report, Inspector Anthony Mikesh, (Mar 11, 2016).

51.     On March 21, 2016, Harris County Jail Facilities were cited for not providing adequate and timely medical care for inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Mar 21, 2016).

52.     In 2016, then Sheriff Ron Hickman had to transfer money from HCSO law enforcement budget to cover jail overtime costs after the Harris County Commissioners Court rejected his request to hire 376 new personnel.[10] Sheriff Hickman stated in 2016 that the average jailer has only worked for Harris

---

[9] James Pinkerton, et. al., *Harris County Jail considered "unsafe and unhealthy" for inmates, public*, Houston Chronicle (Nov 21, 2015) https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Jail-is-unsafe-and-unhealthy-for-6649163.php.

[10] St. John Barned-Smith, Skyrocketing overtime, burned-out guards plague Harris County jail, Houston Chronicle (Aug 28, 2016) https://www.houstonchronicle.com/news/houston-texas/houston/article/Skyrocketing-overtime-burned-out-guards-plague-9189697.php.

County for two years, that jail staff are being burned out because of staffing shortages, and overtime making it hard for HCSO to keep staff. *Id.*

53.     On February 21, 2017, Harris County facilities were cited by state inspectors for failing to conduct appropriate rounds on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Feb 21, 2017); TCJS Special Inspection Report, Inspector Jackie Benningfield, (Feb 21, 2017).

54.     On April 3, 2017, Harris County Jail facilities were cited by state inspection for not providing proper two-way voice communication between inmates and jailers, for not conducting proper rounds, and for not providing inmates food during a 24-hour period. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Apr 3, 2017).

55.     On December 19, 2017, Harris County Jail facilities were cited by state inspectors for not performing adequate rounds on inmates as required by law and was cited for being understaffed. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Dec 19, 2017); TCJS special inspection report, Inspector Wendy Wisneski (Dec 19, 2017).

56.     In 2018, an investigation found that overtime costs were ballooning for the Harris County Jail. Sheriff Ed Gonzalez stated that the issue comes from chronic understaffing and the jail was losing more staff than Harris County is able to hire.[11]

57.     On August 28, 2018, the Harris County Jail was cited by TCJS for not performing adequate visual checks on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Aug 28, 2018); TCJS special inspection report, Inspector Wendy Wisneski (Aug 23, 2018).

58.     On December 3, 2018, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. Letter from TCJS Executive Director Brandon Woods to the Honorable Ed Emmett, Notice of Non-Compliance (Dec 3, 2018); TCJS Inspection Report, Inspector Jackie Benningfield, (Dec 3, 2018). Harris County failed due to unsanitary conditions and improper food temperature. *Id.* Harris County was ordered by TCJS to ensure there is no trash and insects in inmate living areas, and they were ordered to maintain standards for food temperature. *Id.*

59.     On February 13, 2019, Harris County was cited by TCJS for not adequately notifying the magistrate of inmates with suspected mental

---

[11] Robert Arnold, Million spent on overtime at the county jail, Click2Houston (Jun 29, 2017) https://www.click2houston.com/news/2017/06/30/millions-spent-on-overtime-at-county-jail/.

disabilities or are potentially suicidal as required by Texas law. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-Compliance (Feb 13, 2019); TCJS Special Inspection Report, Inspector Wendy Wisneski, (Feb 12, 2020).

60.     On December 9, 2020, Harris County was notified that its jail facilities failed a five-day comprehensive inspection conducted by TCJS inspectors. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-Compliance (Dec 9, 2020); TCJS Inspection Report, Inspector Byron Shelton, (Dec 8, 2020). Harris County failed due to failures in classifying inmates, deficiencies in jail's clinics, and late rounds. *Id.* Harris County was ordered by TCJS to create plans in order to correct deficiencies and to install additional cameras. *Id.* Letter from TCJS executive director Terry Julian to Honorable Robert Eckels, (Jun 21, 2005).

61.     On January 6, 2021, Harris County hired Shannon Herklotz, former inspector and deputy director for TCJS as the assistant chief overseeing the Harris County Jail Facility.[12] Harris County Judge Lina Hidalgo hailed the hiring of Chief Herklotz and stated "Meaningful reform to our criminal justice system means taking stock of our entire system, from top to bottom. The

---

[12] St. John Barned-Smith, Hannah Dellinger, *Harris County Sheriff Appoints former state jail inspector to oversee jail*, Houston Chronicle (Jan 6, 2021) https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Sheriff-appoints-first-civilian-to-15850883.php

responsibility of running a jail isn't simply about making sure people can't get out – it's about ensuring that processes are efficient and fair, that jail staff are safe, and that people leaving our custody leave at least as well as they came in." *Id.*

62.     On February 9, 2021, Harris County Commissioners (Defendants herein) unanimously passed a $3.3 billion dollar county spending budget for fiscal year 2021-2022.[13] The budget increased about 2% over the previous year's budget. *Id.* Roughly $2 billion dollars was allocated to the general fund. Harris County Proposed Budget 2021. By information and belief, overtime costs for jail employees were not factored into the budget for the Harris County Sheriff's Office although Defendants were well aware and had knowledge that the Harris County jail was seriously understaffed and underfunded and would accrue significant overtime costs, as it has in previous years. Defendants refused to address the deplorable conditions for staff and inmates in the Harris County Jail.

63.     On April 6, 2021, the Harris County Jail was cited by TCJS for not performing adequate visual checks on inmates. Letter from TCJS Executive Director Brandon Woods to the Honorable Lina Hidalgo, Notice of Non-

---

[13] Andrew Schneider, *Harris County Commissioners Approve $3.3 Billion Budget*, Houston Public Media (Feb 9, 2021) https://www.houstonpublicmedia.org/articles/news/politics/2021/02/09/391064/harris-county-passes-budget-for-2021-2022/

Compliance (Apr 6, 2021); TCJS special inspection report, Inspector Jon Luna (Apr 5, 2021).

64.     For twenty years, Harris County has been presented with significant evidence that its jails are failing and not meeting minimum jail standards, and yet, Defendants intentionally refuse to take any mandatory steps to fix the issues that is part of their ministerial duties. During this time period, chronic understaffing can be cited as the chief reason for Harris County's constant and consistent failures of minimum jail standards. Defendants will continue to turn a blind eye and ignore the significant and increasing dangers to staff and inmates in the jail and the horrific hostile and dangerous working conditions, unless Defendants are held accountable for failing to perform their mandatory duties.

### III.   Harris County has a mandatory ministerial duty in jail standards to protect staff, visitors, and inmates

65.     Tex. Admin Code §260.101 states that "Facility security shall be planned to protect offenders from one another, protect staff and visitors from offenders, and deter or prevent escapes. The level of security shall be commensurate with the degree of security sought to be achieved." Harris County fails this jail standard.

66.     According to the Offenders Management System (OMS) statistics of reported jail incidents kept by the Sheriff's Office, there were 918 assaults on

staff members committed by inmates in the first eight months of 2021. Harris County Sheriff's Office OMS Violent Incident Disciplinary Statistics for January 1, 2021 – September 9, 2021. There were 6,352 assaults between inmates reported during that same time period. *Id.* These numbers are only the reported incidents.

67.     Employees of Harris County working in the jail facility are resigning/leaving in large numbers due to increasing safety issues they experience while working at the jail. Defendants' actions and omissions are inadequate to protect the employees who work in the jail from the inmates or the protect inmates from each other.

68.     John Doe 10 knows to be fact that inmate assaults on each other are increasing threefold in the last year. Assaults on staff have doubled in the last year. The inmate on staff assaults have gone up when detention officers go into the pods alone in order to do CorreTrak[14] rounds. In these assaults, there is no provocation for the attacks. They are mostly an inmate blindsiding a staff member while they go to scan the CorreTrak rounds.

69.     John Doe 35 states that staffing is so short that there are not enough personnel to protect staff from the inmates. For example, the DOs and personnel that deliver and change out the inmates' laundry are being assaulted

---

[14] CorreTrak is an electronic devise the size of a cell phone that is used in the Harris County jail to scan barcodes set in the inmate housing area to record and log rounds being conducted.

ever week because there is not enough people to form a presence during these times. Inmates are throwing urine and feces on the detention officers often and the inmates are fighting the DOs and each other. There is no control over the floors.

70.     Jane Doe 33 works as a nurse in the Harris County Jail with over twenty years of experience working in the jail. Based on her experience working in the jail clinics, she has observed that inmate on inmate assaults are on a significant the rise. She has treated inmates who have been jumped by multiple inmates and the injuries the inmates are sustaining are severe. Inmates are being treated daily after being assaulted.

71.     John Doe 34 states that the inmates know that everyone is spread thin and know when staff do the rounds. The inmates know when they can get at the DOs. There was a vicious assault on a DO in June where an inmate waited for the DO to come in to do rounds, waited for the DO to go into the back corner the farthest away from the door, and then went and attacked the DO without provocation. It is on video. The DO went to the hospital. He sees it often where DOs are being blindsided by inmates and being assaulted.

72.     John Doe 21 is a military veteran who was stationed in Iraq before joining Harris County. Due to military training, he learned to constantly be on guard. On one instance in August 2021, an inmate rushed him as he was entering the

door to do rounds.  Since John Doe 21 was behind the door and used the door

to prevent the inmate attack.  John Doe 21 managed to get the inmate to the

ground and hold him down until help could arrive.  He had to go into the pod

alone but was ok because of his specialized military training, most DOs do

not have sufficient training or experience to be able to protect themselves from

inmate attacks.

73.     John Doe 28 states that no matter what was happening on the floor,

Corretrak rounds were first priority. According to the rules or policies, staff

are not to enter the cells without another person at the door; however, due to

critical staffing shortages, a second person seldom ever around or available.

74.     Jane Doe 13 states she was working the 4th floor of 701 while she was

pregnant. Going into the pods alone to do rounds while pregnant made her

scared and uncomfortable. There were never enough people to partner up with

or to be available as backup.

75.     John Doe 20 resigned from Harris County as a detention officer in August

2021. "Toward the end it was pretty rough." The brass (supervisors ranked

above him) kept contradicting themselves, harping on safety but there was

never enough staff to work safely.  People went in cells by themselves every

single day.  It was an accumulation of things that made him quit, but one of

the main things was a female employee that was assaulted on his floor because

she was in the cell by herself. CorreTrak was the main thing going on. They could never use "staffing" as an excuse for the rounds being late. When John Doe 20 took on more rounds than he could handle on time because there was not the staff to do rounds, he got reprimanded for being late on rounds and treated terribly.

76.     Jane Doe 31 states that more work has been created since they have moved male inmates onto the female floors because now there needs to be more escorts and rovers but there has not been an increase in staff. Harris County is just asking for trouble. The detention officers do not have control of the floors.

77.     Jane Doe 25 and Jane Doe 19 were formerly employed by the Harris County Sheriff's Office as detention Officers. In March 2021, the HCSO started to remodel the 7th floor of the 701 San Jacinto Jail. The 7th floor is a maximum-security floor for the facility. Though the HCSO stated that for security reasons, the floors under remodel would be cleared, Harris County forced the remodel to continue while inmates were still housed on the floor. While remodeling 7G pod, the contract construction workers were allowed to prop open the security doors so they could freely move in and out of the pod in order to do work. G pod is an open dormitory with approximately 50 inmates. The inmates were able to freely move throughout the pod during the

construction. There was no effort made to account for the worker's tools and supplies due to staff shortages. During this time, the pod control detention officer could not control the pod doors because the contractor removed the electrical panel in the pods. The removal of the control panels also removed the detention officer's ability to communicate with the Floor Control Center, (FCC[15]), supervisors, and other employees in case of emergency creating dangerous conditions for both staff and inmates. Employees were issued radios which had spotty reception inside the concrete structure. The electrical panels were removed for at least a month and in some cases longer before they were replaced, and the detention officer could gain full control of the pod. There were several occasions where inmates, including mental health inmates, would exit the door propped opened by the workers and be free to walk the halls without permission or escort. This situation led to unnecessary confrontation between employees and high security inmates.

78.     John Doe 14 states that the last time the cameras were installed at 701, the whole floor was shut down and there was no one on the floor so that the installation could go on without interruption; however, Harris County has chosen to have contractors inside the cells with inmates while having an

---

[15] The Floor Control Center monitors all pods and cameras on a jail floor. The FCC has override control over all the doors and control mechanisms on the floor. It also monitors the secured entrance into the inmate secured side and controls the doors from the unsecured side to the secured side. It also serves as the floor dispatch center for emergency protocols.

officer as an escort during this current camera upgrade. The pod officer is in the safety vestibule with a handheld radio that runs out of battery quickly and there is no way to know the battery is out until you use it, and it does not work. Then when the radio is dead, there is no way to call for help.

79.     John Doe 11, Jane Doe 4, Jane Doe 3, and John Doe 2 state that civilians are not being escorted when they go into the secured areas and that civilians, including nursing staff, are having to deal with inmates without any security from deputies or detention officers. All state that there is not enough staff to break away from other functions in order to escort civilian workers.

80.     John Doe 10 is a jail supervisor. He states that per training, civilians must be escorted into the secure side of the jails, to include the maintenance contractors. Due to staff shortages, the maintenance contractors are commonly let into the cell blocks by themselves without escort. It is important for them to have an escort in order to 1) keep the inmates from taking and accessing the tools the maintenance workers carry around and 2) for their own safety.

81.     Jane Doe 35 is a licensed nurse with Harris County. On or about July 27, 2021, Jane Doe 35 was walking through the clinic holdover area when an unescorted inmate stepped in front of her.  She moved to her left and the inmate moved in front of her again.  She tried again to move around the inmate but each time he stepped back in front of her, intentionally prohibiting her

from passing. Then the inmate moved behind Jane Doe 35 and put his arm around her neck in a choke hold with his elbow in line with the front of her neck.  Prior to the pandemic, Horace Strand taught nurses some basic self-defense moves, including how to get out of a choke hold.  He did this on his own and not at the direction of Harris County. Based on what she had been taught, Jane Doe 35 used both hands to pull the inmate's arm down and called for help. There used to be three detention officers assigned to that area; due to understaffing, on this date there was only one and he was behind the desk. That detention officer responded as the inmate was trying to take Jane Doe 35 to the floor.  The first detention officer called for another, and the two of them managed to get Jane Doe 35 away from the inmate. Jane Doe 35 had some redness on her neck where the inmate grabbed her and suffered some pain, but nothing permanent.

82.      Jane Doe 33 is a licensed nurse. She has worked in the Harris County Jail facilities for over two decades. When there is a medical emergency identified in a cell block, the medical staff will run a stretcher and other needed medical equipment to the cell block to respond. Presently, nurses are having to make stretcher runs without detention officers to escort them because there are no detention officers, deputies, or sergeants available. The inmate floors are commonly understaffed. Drug use in the jails has

significantly increased which has led to an increase in medical emergencies due to drug use. Jane Doe 33 has witnessed this increase first-hand. On one recent stretcher run, two nurses were transporting an inmate who had overdosed smoking K2 in the cell block.[16] She knows based on her medical training and seeing the types of cases the clinic receives every day, that drug use is on the rise in the jail facility. Some inmates who overdose on K2 can be overly aggressive, hallucinate, and or suicidal thoughts as well as ill reactions attributed to the toxic effects of the drugs. The overdosing inmates will often lash out at the medical staff and react violently. On one stretcher run, Jane Doe 33 and another nurse were transporting an overdosing inmate off the floor to the clinic via stretcher. The inmate suddenly rose up from the stretcher and went to attack the nurse pushing the stretcher at his feet, thereby blindsiding the nurse. Jane Doe 33, who is an older female, tackled the inmate in order to prevent him from striking the other nurse. There were no detention staff available to escort the medical staff on this stretcher run so no security was there when the inmate became violent. There is not enough security to protect the medical staff. Altercations are up, the inmates are fighting more and creating more trips to the clinic for these inmates.

---

[16] K2 is a synthetic marijuana that is a combination of dangerous toxins to simulate marijuana.

83.    Jane Doe 37 is a nurse employed by Harris County. She states that there are rarely enough personnel for the security of the medical staff. When she goes to a floor, there are often inmates without escorts right at the elevator doors. When nurses are assigned to take the medication cart to floors, due to the nature of the medications being distributed, it is essential for the medication carts and nurses to remain secure. Often nurses assigned to perform this assignment have to wait in order to distribute medications due to the lack of detention officer staffing to escort the nurses to the floors and to also remain with them until distribution of the medications to patients has been completed. This causes delay in care to the inmate and at times they do not receive their medications as scheduled by the prescriber. Nurses have had to wait as long as a couple hours for an escort. She states that there are times when medical staff need to respond to medical emergencies on inmate floors but there are not enough detention officers to meet and escort them to the emergency location. It is not a good situation and causes delay.

84.    John Doe 33 has been employed as a medical technician at the 1200 jail. On September 27, 2017, the on-duty nurse practitioner ordered a skull series x-ray on an inmate.  When the inmate came out of the holding cell he was agitated.  John Doe 33 explained to the inmate he was there to help him, and the inmate appeared calm down and the inmate was taken to the x-ray room.

The technician, the sole employee in that immediate area, was unable to leave the door ajar because of possible radiation exposure. John Doe 33 tried to put a stool in the door following the procedure, but the inmate kicked it away and threw the technician toward the x-ray console. The technician attempted to go toward the door, but the inmate pushed him back, then put him in a full chokehold with one arm around his neck and the other used to increase pressure on the first. The technician was able to free his right hand and use it to choke the inmate's neck, then move away from the inmate and call for help. The inmate managed to get on top of the technician and use his forearm to choke him again. The technician managed to kick the x-ray door, hoping someone would hear him. The technician believes the inmate intended to kill him. A nurse heard the ruckus and called for help. A sergeant and another deputy forcefully removed the inmate's arm from the technician's neck. The technician lost consciousness before the inmate's arm was removed, his face was swollen, and he regained consciousness on a stretcher. He was taken by ambulance to Memorial Hermann Hospital. The technician sustained major damage to the capillaries nears his eyes and cheeks which burst due to the intense pressure. He experienced hoarseness at least 5 days after the incident.

85.     Jane Doe 47 is a civilian working in detentions for federally funded grant programs. Though policy dictates that all civilians must be escorted while in

the secure area or while counseling inmates, she is routinely told that due to staffing shortages, there are no detention officers or deputies available to escort civilians in the secured facility. Understaffing can significantly delay her ability to achieve the goals of the federally funded grant programs. One day in the summer of 2021, she was counseling a group of inmates in the secured area of the 1200 Baker Street Jail. She was scheduled to counsel these inmates at this set time, and it was known by the facility that she would be meeting with these inmates because these inmates had to be released from their housing and, in cases, escorted to this meeting room. On this day, the facility went into a voluntary lockdown in order to conduct drug searches using a trained police canine. Though it was known that she was a civilian alone in a room with approximately 10 male inmates, the facility did not inform her to leave the room but, instead, she was locked in the room with the male inmates. Jane Doe 47 called her supervisor and called for assistance. No detention officer or deputy was allowed to come and release her because the command staff had ordered a building freeze (meaning no movement in the building) while the police canine was on site. Jane Doe 47 was able to leave the room after a significant amount of time. When she left the room, she was ordered to go back into the room by a detention supervisor. She refused the order and stated that it was against policy to lock her, a civilian, alone in a

room with inmates. The supervisor stated that the order came from the Chief and that she had to follow those orders and maintain the building freeze. After this incident, Jane Doe 47's supervisor, also a civilian, contacted the detentions command staff via email to protest that the social workers employed by Harris County were placed in unsafe conditions daily and that Harris County policy was not being followed concerning civilian employees and escorts. The command staff later stated that there were staffing shortages throughout the Detentions Facility and there were not enough staff to follow policy and escort civilians.

86.     Jane Doe 44 as a supervisor of civilian employees at the jail facilities has brought up the issues of civilian safety to the command staff. Floor supervisors have told her that there is not enough staff to escort civilian workers and not enough staff to escort the inmates. This is a huge safety issue, and she has sent several emails and tried to schedule meetings about the issue but has not received any answers or solutions to the problem.

87.     John Doe 5 states that the jail population has changed in the last couple years. Due to bond reform, the inmates that are in custody are there for higher level felony crimes. It is so bad it is hard to find inmates that qualify as inmate workers. Previously, those charged with murder and other high level violent crimes would only be on the maximum-security floor but now they are being

classified into general population. When you go on the floor, you do not know what you will encounter. Daily incident reports show that inmate-on-inmate fights and inmates being jumped by other inmates result in inmates having to be transported to the hospital. These accounts are all sent out in the Significant Event Bulletins (SEBs) that are created each day. Those bulletins show that inmate on inmate assaults are on the rise and that inmate attacks on staff are shockingly common.

88.     Defendants have access to the SEBs and are aware or should be aware of its contents.

89.     Jane Doe 2 is concerned with employee safety in the processing areas of the JPC.  The JPC was designed with an open concept where inmates sit in a large area until they are called to a desk for processing.  There are no doors or barriers between staff and inmates and the staff is greatly outnumbered especially with the current understaffing. The administration seems to take the attitude that because nothing has happened yet due to the acute personnel shortage, so everything is working properly but it is a concern to the people who work there every day as an obvious dangerous condition.

90.     Jane Doe 12 states that the JPC can be very unsafe when it is understaffed. It was not designed to function understaffed. When the JPC first opened the staffing plans called for many more people to work the different stations in

JPC than what JPC is working with right now. At times there is just one person

doing the job of five because of understaffing. It is dangerous. In the first week

of September 2021, an inmate was being booked into the JPC and jumped

over the counter in order to fight a DO. Fortunately, at that time it was shift

change and both shifts were present to handle the situation. If it had not been

shift change, the staff would have been overwhelmed. The jail needs help.

Something has to change quick because she does not know how much more

people can take. They do not feel that anyone cares about their safety and

well-being.

91.     John Doe 21 is assigned as a detention officer in the JPC. He is concerned

that there are not enough people to make the areas safe.  Sometimes there are

only two people working an area and they are behind a desk and unable to

rapidly respond.   To do their jobs, DOs must focus on computers and

paperwork and cannot always focus on the inmates who are in the open

concept seating. When DOs are AFISing inmates their attention is taken away

from the others in the area and these inmates can get very hostile.  If there is

a confrontation with one inmate, the others can get amped up and the staff is

badly outnumbered.  Rovers are needed in the open seating areas to watch the

other inmates, keep males and females from talking, and just to have an extra

body.  There is not enough staff lately to have those extra bodies.

92.     Jane Doe 19 was formerly employed by the Harris County as detention

Officer. In March 2021, the HCSO began renovations of the 7th floor of the

701 San Jacinto Jail. In early March, the construction contractors were

working in the single man cells in C pod on the 7th floor. The contractor was

installing cameras inside the single man cells. The contractor did not finish

the install before he left work for the day but the inmate who was housed in

the cell had to be placed back for the night. The inmate was able to take a part

the unfinished camera casing and make "shanks" of the material.[17] It was

common for inmates to pick up discarded screws left by the construction

contractors and sharpen the material to use as weapons.

93.     Jane Doe 45 is a civilian and states that when she was hired about a decade

ago, civilians were trained to not get on the elevator without an officer or

deputy present and the policy has gotten laxed and laxed as the years have

passed because there is just less and less people. She has been on the elevator

alone and then many inmates will get on and she will have to get off because

of the danger to her as there are no escorts. The elevators are always an issue.

They never seem to work properly. She has had it where the door is jammed

three days a week out of the five days she is works. She has been on the

elevators when the operators cannot open the doors. There were two officers

---

[17] A "shank" as used in this complaint, is a handmade weapon fashioned by inmates out of material found or stolen within the jail.

and an inmate on the elevator with her and it took about ten minutes. She does not get on the elevator now with unescorted inmates at all because untreated and unsupervised the mental health inmates are running loose much more. There are so many of them that they are in the general population. Too many inmates are walking around unescorted, and it is dangerous.

94.     Jane Doe 46 was on the elevator and there was a civilian and an unescorted inmate. The elevator stopped on three and the civilian got off. The elevator stopped and another unescorted inmate was going to get on. Jane Doe 46 said no, there is already an inmate on and asked for the inmate to not get on. She did not want to be outnumbered on the elevator. Neither inmate had an escort. The remote elevator operator told her no through the intercom, the inmate is going to get on and said that she needed to get off because the inmate was ordered to get on. The elevator operators run the elevators remotely and watch the cameras in the elevator. Jane Doe 46 does not feel there is any regard anymore for the staff's safety.

95.     Jane Doe 4, Jane Doe 3, John Doe 10, and John Doe 3 are all jail supervisors employed or formerly employed in the jail. On a daily basis, Harris County houses mental health inmates throughout the facilities. There is not enough space to house all the designated mental health inmates on the floor areas that are set up to house mental health inmates. Due to this, the

mental health inmates are housed in general populations. The staff that now supervise the mental health inmates housed in general populations are not given additional mental health training that detention officers and sergeants are given that work the designated mental health pods. Due to this, the detention officers and sergeants that respond inmates in general population that have mental health crisis are injured at a higher rate than when responding to incidents involving non mental health inmates.

96.     Jane Doe 4 states that when there is an inmate on the floor that is showing signs of mental distress, as a supervisor she would call the mental health unit (MHU) for a psychiatric evaluation. There have been numerous times when MHU states that they already are aware of that inmate; however, they do not have an opening for him in MHU, so he was placed in general population.

97.     John Doe 1 states that on a daily basis, inmates with obvious mental issues are mixed in the general population because there is not enough space to house all the mental health inmates in the areas designated for them, and mentally ill inmates are not distinguished from other inmates. Staff members, then, who have not received mental health training are left to deal with these particularly troublesome, and often dangerous, inmates. Many of the injuries employees suffer are at the hands of mentally ill inmates.

98.     John Doe 9 states that inmates that are exhibiting clear signs of mental illness are not being segregated and treated. They are being placed in the general population without any indication about their condition or potential volatility. This has resulted in rising inmate on inmate assaults as well as inmate on DO assaults. There is insufficient staff to create safeguards for the staff and to protect the inmates from each other.

99.     John Doe 29 writes a lot of psych reports because inmates throw or drink urine or show other obvious signs of mental illness.  The lack of adequate personnel or training creates unsafe conditions especially when dealing with these inmates. He has only worked as a detention officer for less than a year and has not completed his training but supervises these inmates by himself.

100.     Jane Doe 21 states that she encounters inmates with obvious mental illnesses housed in general population because the mental health unit has no empty beds.  Jane Doe 21 has very limited mental health training but is not paid the additional mental health stipend that comes with the additional training received by MHU DOs due to the increased risk.

101.     Jane Doe 17 states that detention officers are not supposed to go into a cell alone, but everyone does because there is no backup with staff shortages. When DOs call for assistance due to a fight, it takes a long time for rovers to come.  In mid-August 2021, an inmate bit Jane Doe 17's finger. There were

only two rovers and a new trainee on the floor that day. Jane Doe 17 got a tetanus shot and had to take medication for 30 days to prevent the possibility of a blood-to-blood exposure.

102.    Jane Doe 1 states that every area of the jail is running on skeleton crews with little work being able to accurately be completed. Inmate disturbances are on the rise. A lot of incidents go unreported because there is just not enough time to complete all the paperwork needed. The floor sergeants have to act as DOs and the lieutenants have to act like sergeants just to get the bare essentials of the job done and a lot falls through the cracks. There is not enough people with the current staffing shortages to get the job done.

103.    Jane Doe 49 states that on August 11, 2021, a man holding a gun in one hand and a magazine in the other came into the public bonding lobby of the JPC. He was covered in yellow caution tape and was waving the gun in the air. A deputy should always be stationed in the public lobby; however, that deputy position is always being rotated out because the JPC is so short staffed on deputies. Often the deputy is working overtime from another area and is not familiar with the lobby or other duties of that assignment. On this day, the lobby elevators that take the magistrate court staff to the second floor was down and the staff was stuck in the bonding lobby for about an hour. Due to the lobby being open to the public, it is essential for the security in the lobby

to be prioritized but often deputies are pulled from lobby security to do other duties in the JPC, creating a dangerous situation. There have been many times on night shift that there is no deputy present, even though the bonding lobby is open to the public 24 hours. Even after the incident with the gunman entering the lobby, there was no deputy stationed as security in the lobby on the night of August 28, 2021, because the JPC was so short staffed, the post is not considered essential.

104.     John Doe 5 states that there is a staffing shortage for certified peace officers to do hospital runs. Inmates that are sent to the hospital must have armed deputies escort them. Some inmates, due to their history, must have two deputies escorting them. The staffing is so low that deputies are being pulled off the housing floors to escort inmates from the hospital and deputies who serve as bailiffs in the courts are now being used. Deputies are being pulled from their regular duties and those other duties are not getting done. For example, on August 13, 2021, on the overnight shift, thirty-one certified deputies went out on hospital runs with inmates and or were at various hospitals with inmates and needed to be relieved. Centralized staffing was scrambling to find certified deputies on assignment to pull in order to send to hospitals to relieve staff guarding inmates.

105.    John Doe 35 states that the staffing of peace officers to make hospital runs has been terrible. Daily now the hospital runs need about forty deputies. There are not that many dedicated personnel for this purpose and deputies are being pulled from other places. There is a lot more hospital runs now than there were a year ago. On several occasions, including in the last weeks of August 2021, there have been inmates waiting for hours to go to the hospital after a doctor ordered that they be sent out. Inmates that have swallowed foreign objects like screws and razors have had to wait hours for a deputy to be available to escort them to the hospital. On one occasion on or about the last week in August, five inmates were waiting for deputies. The last inmate was sent to the hospital after waiting five hours.

106.    John Doe 12 is a certified peace officer. In the last week of August, he was sent to stay with inmate prisoners at the hospitals four of his five nights, though that is not his regular assignment. He returned to work after his regular days off and was sent to a hospital again on September 1, 2021. Often, he cannot get a deputy to relieve him to use the restroom on these assignments because there are too few personnel. In cases of emergency, he uses the inmate/prisoner's restroom in the room. He was the last deputy relieved twice one week in August, so he had to work past the 16-hours permitted by policy each night. He was relieved late again on September 3, 2021. On the days he

works past 16-hours, he only got two or three hours of sleep before having to return to work. One day last week he was sent to relieve a floor sergeant who was sitting with a prisoner because there were not enough certified deputies.

107.     Jane Doe 6 is a certified peace officer. She maintains that she and her peers are working in unsafe conditions while there is an acute personnel shortage. Since she is a peace officer, they routinely send her to guard inmates at various hospitals where they are being treated. Inmates charged with murder, aggravated assault on a public servant or similar offenses, or inmates with altered mental status, are supposed to have a **minimum** of two deputies with them; but with the understaffed personnel shortage, there is often only one. On one occasion about two years ago, an inmate with an altered mental status tried to disarm her partner. It becomes more dangerous when they work 16-hour shifts and are tired and less attentive. When she works a 16-hour shift she only gets about three and half hours' sleep before she must get up to go to work again. There are not enough personnel to get breaks to eat or use the restroom on 16-hour shifts.

108.     On July 14, 2021, an inmate being escorted in Ben Taub hospital tried to take the gun of the deputy that was escorting him resulting in the deputy

being shot in the hand.[18] The deputy did not have any backup and he was helped in subduing and handcuffing the inmate by hospital staff. Fortunately, the inmate failed in the escape attempt.

## IV.   Harris County must provide a sufficient number of jailer stations for each floor that inmates are housed to include staff restrooms

109.      Tex. Admin Code §260.118 states "A sufficient number of jailer stations shall be provided on each floor where inmates are housed. Staff toilets and lavatories should be provided in close proximity to jailer stations." Harris County does not meet this jail standard.

110.      Though under Texas Law the guidelines of the Occupational Safety and Health Administration (OSHA) does not apply to Harris County, federal law does state that employers are required to provide workers with prompt access to clean restrooms. "The sanitation standard is intended to ensure that employers provide employees with sanitary and available toilet facilities, so that employees will not suffer the adverse health effects that can result if toilets are not available when employees need them." Interpretation of 29 CFR 1910.141(c)(1)(i): Toilet Facilities, Memorandum to OSHA's Regional Administrators, U.S. Department of Labor: OSHA, Compliance Programs, April 6, 1988; *See* 29 CFR 1910.141. "Toilets that employees are not allowed

---

[18] Deven Clark, *Inmate involved in shooting that left HCSO deputy injured at Ben Taub has been identified: HPD*, Click2Houston (Jul 14, 2021) https://www.click2houston.com/news/local/2021/07/14/hcso-deputy-shot-in-hand-inside-specialty-clinic-at-ben-taub-after-prisoner-grabs-gun-during-attempted-escape-officials-say/

to use for extended periods cannot be said to be 'available' to those employees." *Id.* "Timely access is the goal of the standard." *Id.* These standards are set in order to protect workers from health complications that can occur when a bathroom is not readily available such as bladder problems, bowel issues, and urinary tract infections. *See* 29 CFR 1910.141.[19] While OSHA may not be directly applicable in this case, it is informative on what is considered basic sanitary standards for most workplaces.

111.    The Harris County Jail cannot appropriately staff the jail, causing understaffing throughout the jail complex. This leads to employees being left locked inside inmate observation pods without breaks for multiple hours even after calling for breaks and begging for the opportunity to take bathroom breaks. The pod control must be occupied 24/7.

112.    John Doe 1 states that employees have complained to him that they eat their meals in their pods because meal breaks and restroom breaks are more difficult or impossible to get. Harris County does not provide DOs breaks when they work 12-hour shifts to include no meal breaks. Employees only get breaks if another employee is available to relieve them, which with staffing shortages, does not happen with any frequency or consistency.

---

[19] *Also see Restroom and Sanitation Requirements*, United States Department of Labor, https://www.osha.gov/restrooms-sanitation; OSHA Restroom Break Laws, OSHA Education Center, 2021, https://www.oshaeducationcenter.com/articles/restroom-breaks/.

113.    John Doe 11 states that the bathroom facilities for the staff are substandard. On the 7th floor, the only restroom available was down for a week. On every floor, only one restroom for each gender on the secure side that is available for the detention staff. There is an additional restroom, one for each gender on the unsecure side.

114.    Jane Doe 15 states that on August 22, 2021, she called for relief to use the restroom and a rover came to relieve her.  After some rovers went home at 3:00 pm, Jane Doe 15 called again for a restroom break and there was no one available to relieve her. The rovers were held over from another shift and had reached their sixteen hours max hours for a day. This made the floor short on staff for the rest of the shift. As she has many times before, Jane Doe 15 crawled under a desk, covered herself with a plastic bag so she could not be viewed on the pod control center's (PCC[20]) camera, and urinated in a different garbage bag.  She states that it didn't used to be this bad all the time, but it has gotten worse. When Jane Doe 15 was pregnant several years ago, rovers would always come in a timely fashion to relieve her when she called. Currently, they may or may not respond now.  She has relieved herself in a plastic bag many times while working in a pod out of desperation. These

---

[20] The Pod Control Center (PCC) is a room with windows that look into inmate dormitories and cells where detention officers can have direct supervision on inmates yet be separated from them. A PCC must be manned 24 hours a day and a detention officer is barred from leaving the PCC for any reason unless they are relieved by another qualified staff member. If they leave the PCC without relief, the detention officer will be terminated.

unsanitary conditions the DOs work in are ignored. Jane Doe 15 believes now she has a bladder infection but has not had time to visit her doctor because the 12-hour shifts five days a week do not give her enough time to take care of her family and herself. Again, on August 23, 2021, Jane Doe 15 called for restroom relief; none came, and she resorted to urinating in a garbage bag again as she covered herself with another garbage bag.

115.    Jane Doe 3 reports that because of the staffing shortages that she developed multiple bladder infections due to having to hold her bladder for too long. She reports that she knows of at least two DOs that were not given bathroom breaks and urinated on themselves. Both DOs that were forced to urinate on themselves quit soon after due to the working conditions.

116.    Jane Doe 13 stated that it was very hard to get bathroom breaks even though everyone knew she was pregnant. There was only one person relieving people on the whole floor and you had to wait a long time for that one person to come around. There are never enough people to get all the work done.

117.    Jane Doe 25 is a former detention officer employed by Harris County. She states that she could not go to the bathroom because of the staff shortages. She worked in a PCC and was barred from leaving her post. Jane Doe 25 had been undergoing treatment for her kidney cancer. She informed her supervisor of her condition that she had to be able to use the bathroom because of her

cancer treatment. Jane Doe 25 agreed to return to regular work hours during and after her cancer treatment on the promise that she would be given adequate bathroom breaks; however, she was not allowed to have a bathroom break because the floor was short staffed.

118.     John Doe 3 states that detention officers often complain about being left in the pods and not receiving restroom breaks. One detention officer had to wait one and half hours in the pod after asking for a restroom break before being given one. Complaints have been filed to the county regarding the issue, but nothing has been done about it.

119.     Jane Doe 22 states that prior to going on maternity leave, she had to work at least two 16-hour shifts a week; later that changed, and she worked five 12-hour shifts. At work she often could not get relief to use the restroom, or after her baby was born, to pump her milk. On one occasion she started calling for a rover to relieve her at 9:00 am and relief did not arrive until nearly 6:00 pm; that was extremely painful. When emergencies happened in the jail, it could take a long time to get relief, and Corretrak round came first before anyone got relieved. Knowing it is difficult for rovers to relieve people in the pods, she limited herself to calling for relief to twice a day. When the employees enter the cell to do Corretrak rounds or count there is supposed to be another employee at the door, but they are not.

120.     Jane Doe 7 states that frequently DOs assigned to pods do not get personal breaks or even bathroom breaks when they request such relief. She states that a female coworker urinated on herself when she could not get relief from the pod. That detention officer quit after the situation. The majority of detention staff cannot get breaks and they have been close to urinating on themselves. Jane Doe 7 states that she has been close to urinating on herself on a number of occasions when she had called for relief for a number of hours. She recalls one occasion where she had to wait six and half hours after calling multiple times for a bathroom break. The average wait time she sustains on a weekly basis is three and a half hours.

121.     Jane Doe 17 states that on August 18, 2021, she called for restroom relief three or four times, and it took two hours for someone to relieve her.

122.     Jane Doe 54 is normally assigned to work in the JPC but throughout August she has been assigned to staff in 701 jail because they are short staffed. While in a pod in 701, she called for and could not get anyone to relieve her for a break.  She was on her menstrual period and got blood on her clothes with no way to clean up.

123.     Jane Doe 26 has worked for the Harris County Sheriff's Office for 25 months.  On August 23, 2021, Jane Doe 26 left her assignment on the 3rd floor

to relieve another employee assigned to the 4th floor who otherwise could not get relief to use the restroom.

124.    John Doe 29 has been employed at the 1200 jail for the past 11 months. On August 20 or 21, 2021, all the rovers were tied up and John Doe 29 had to wait two hours to get relief to use the restroom. When John Doe 29 gets relief, he is usually gone from his pod control center for less than the five minutes it takes for him to urinate or heat his food and return. He eats his food in his assigned pod control center. Other staff members do not like to work the 4th floor of 1200 because there are not enough rovers, and the floor is too busy. It is a high workload because the 4th floor primarily houses female inmates with some male inmates housed there also. Female inmates must be kept separate from male inmates and escorted each time they need to leave the floor. This demands a lot of rovers to be assigned to the floor but there are never enough rovers assigned.

125.    John Doe 32 started work at Harris County on July 5, 2021. He is an army veteran and served in Iraq. On one occasion after calling for rovers two or three times, he could not get relief to use the restroom for two hours. Finally, after he wet his pants and then urinated in a cup, a rover came to relieve him, but it was too late. He resigned on August 20, 2021. He just could not take the work environment and he did not want to put his life at risk.

126.     John Doe 31 has only worked for the Harris County Sheriff's Office for a month and a half.  His experiences are that he cannot get adequate relief to use the restroom two out of a normal 5-day work week.

127.     Jane Doe 21 states she often has problems getting relief to use the restroom.  On August 24, 2021, on the fourth floor, for instance, there were only seventeen people assigned to work her floor when there should have been twenty-one or more, and three of those assigned that day were unqualified trainees.  When the available rovers are conducting cell searches, or there are a lot of personnel off the floors in the clinic or elsewhere, it is difficult to get restroom relief.

128.     Jane Doe 16 states that like most employees assigned to the 1200 jail, she has difficulty getting relieved to use the restroom. When she makes floor-pages and no one responds, she pages again 15 minutes later, then repeats the page until someone relieves her, sometime 45 minutes or more after the first page, and sometimes only when she says her need for relief is an "emergency."  Sometimes when staff members are conducting cell searches, she calls the cell where the search is going on and asks one of them to relieve her, but that does not always work.  She has called the sergeant who promised to send someone but does not always follow through due to the understaffing.

129.     Jane Doe 20 states in September or October of 2020, while she was pregnant, she asked repeatedly for a restroom break.  She had made six or seven pages, and no one responded for more than an hour.  Another female detention officer was also making multiple floor pages for a restroom break. Jane Doe 20 called the FCC and was told the rovers were off the floor; so, she made a building page. The sergeant called her on the phone her she should not have made a building page but should have called her office instead. Jane Doe 20 had, in fact, called the sergeants' on duty but no one answered as they were all busy. Not being able to get reasonable restroom breaks is not uncommon, in part because the employees have all been told by supervisors and in emails that CorreTrak rounds are most important and come first, even before responding to a use of force.

130.     John Doe 13 is normally assigned to work the FCC on his floor. When he hears calls for restroom breaks, he calls two-man pods and tries to get one of them to give that person a break.  If the person leaves the two-man pod, the pod could be out of compliance but there was no choice. CorreTrak rounds take precedence over everything else and if the rounds are late someone gets written up so breaks have to wait.

131.    Jane Doe 14 states that on August 23, 2021, she was assigned to work the FCC and she had to repeatedly tell co-workers that there was not a rover available to give them a bathroom break.

132.    Jane Doe 11 states there are times when she does not get a meal break and has difficulty getting relieved to use the restroom. When she calls for a break, she is sometimes told she cannot be heard; other times she is told not to yell. Jane Doe 11 recently underwent surgery for a female issue and has not fully recovered yet. On or about Wednesday, August 11, 2021, she was unable to get restroom relief though she was bleeding because of her recent surgery. By the time she got relief, her pants were soiled, and she wanted to leave work to clean herself and get clean clothes. Her sergeant did not prevent her from leaving per se but told her, "See if you can stay," or words to that effect because the floor absolutely needed her. Jane Doe 11 felt nasty and uncomfortable but cleaned herself as best she could and remained at work. A different supervisor has told her CorreTrak rounds were more important than restroom breaks.

133.    Jane Doe 31 works as a detention officer in the jail and she has a hard time being relived for breaks because there is not enough staff on the floors. She has told her supervisors that it is very important for her to get relieved because she has very heavy menstrual cycles that are painful. Despite this she

cannot get relieved and monthly will bleed through her clothes. When this happens, she is told by her supervisors to go home and change her uniform and come back to work. She has asked to be transferred to a floor that is not as busy so she can get more timely relief during her monthly cycles but that was denied because there is not enough staffing anywhere. Now in order to avoid the embarrassment of begging people for a bathroom break, bleeding through her clothes, and not being able to have adequate menstrual hygiene, she is forced to call in sick on her menstruation days pursuant to her doctor's orders. Her supervisors get mad about her calling in sick, but she feels she has no choice. It has gotten so bad with restroom breaks that detention officers are paging for rovers through the whole building to find someone available to relieve them in a pod.

134.     Jane Doe 32 normally works a one-man pod and has problems getting a rover because of the short staffing.  It normally takes an hour if it is a slow day and occasionally takes up to three hours to get restroom relief.

135.     John Doe 8 states that a female came to his office on August 30, 2021, and said she had to wait two hours for a restroom break. She may only get one break a day on her 12 hour shifts and only after making multiple calls to the sergeants' office.

**V.    Harris County must provide adequate medical facilities but due to staffing, the jail clinics and medical care do not meet jail standards**

136.     The Harris County Jail has a population of approximately 9500 inmates. Harris County is required to provide adequate medical facilities for the care of the inmates, to include staffing of medical personnel; however, Harris County is failing and refusing to provide adequate staffing in order to provide proper medical care to the inmates. *See* Tex. Admin Code §273.2.

137.     Jane Doe 33 knows that Harris County has lost a lot of nurses and medical staff from the jail who have quit because of safety issues that occur due to inadequate staffing. It has been documented in their resignation paperwork. Presently, there are not enough nursing staff to work the clinics. The nurses are running on a skeleton crew. Even with the County bringing in temp medical staff, they still cannot adequately staff the clinics. This poses a danger to the inmates who are suffering from a true medical emergency.

138.     Jane Doe 37 is a nurse and states that the clinics have been understaffed throughout 2021. She has seen the clinic so understaffed that they could not meet essential staffing functions and should have been closed though it was required of course to stay open. Staffing shortages have been a continuing real issue and it has affected patient care and is getting worse.

139.     Jane Doe 39 is a detentions nurse and is assigned to the 1200 jail. Her major frustration is that her workplace is losing so many security and medical people. She believes the high attrition rate is due to people simply being tired

and worked too much. In the past, nurses had to work maybe a couple of years passing out pills on the medication cart; now, because of the turnover, she sometimes had to work a medication cart on the floors despite being there longer. The two hardest floors to work are the 2nd and 4th where an inordinate number of inmates are on Librium or Valium tapers. The nurses' jobs are made more difficult with that many people on drugs. Very few of the inmates will open their mouths and raise their tongues so the nurse can verify they have actually taken the prescribed drugs. Jane Doe 39 has seen more broken jaws from inmate-on-inmate fights than she had seen in all her previous years.

140.    John Doe 14 states that on one shift in the last week of August 2021, the medication cart did not finish giving out medications until about 1 am because we did not have anyone to escort the nurse and the cart.

141.    John Doe 11 states that in an eight-month period, the sewage pipes in 701 jail basement backed up three times and appears not maintained properly. Sewage flooded the basement facilities to include the basement control centers, law library, and the medical clinic.

## VI.    Harris County must provide safety vestibules and adequate, working doors that can be locked and unlocked.

142.    According to jail standards, Harris County must provide doors to inmate secure areas that can be locked and unlocked safely. Harris County has

failed to meet this jail standard. *See* Tex. Admin. Code §260.136; §260.148; §260.150; §260.152.

143. It is an ongoing and well-known issue with the pod door system going out and preventing the electronic locks from working. There have been many reported instances of complete system failures that prevent the security doors and electric locks from working. Numerous maintenance orders have been entered, yet Harris County will take multiple months to fix the issue, putting employees and inmates in continuing danger.

144. John Doe 5 states that the jail is not secure. In one week in August, Harris County had two different incidents where people on the outside got into the secure area of the jail. These kinds of mistakes happened because employees are overworked and are understaffed. The doors throughout the facility are being replaced but there are still ongoing issues. On the 5th floor of 701, the main door that connects the secured lockdown from the visitation side went down. It had an electrical issue and could not be controlled and it needed a master key to open it. The master key for those doors are kept in the basement and there is not enough of them. Due to this, instead of keeping the door locked and fetching and securing the master key, the door was left unlocked with tape. This is a security and escape risk. Some issues with the doors are electrical, some are mechanical from the doors sliding open for years

being just worn out. The inmates have the ability to open the secure doors because the maintenance was not kept up with and the doors are not properly adjusted. That has led to safety issues. The inmates pop their doors in order to fight other inmates and to fight detention officers. He watched a video the other day where an inmate popped the door in order to rush at a DO and fight him.



145.    John Doe 14 states that there are issues with doors not working, there seems to be more of an issue in the basement than on the floors; however, the system does shut down every once in a while, and then nothing works and it is never known when it is going to happen. The 6th floor was having their

---

[21] Picture of the door separating the secured side of the 5th floor of the 701 jail from the unsecure side.

cameras installed and the FCC was out of commission, a building page was made for deputy/inmate fight and people naturally ran for the stairs to respond, however the FCC had no control of the doors and responding officers had to go back down one flight of stairs, to the 5th floor, go through the safety vestibule there, and take the secure side elevator up to the 6th floor. That is time wasted in an emergency.

146.     Jane Doe 25 worked as a detention officer for the Harris County Sheriff's Office. At the end of June 2021, 7B pod inmates lit a fire on the 7th floor of the 701 San Jacinto Jail. The fire alarm went off, alerting the building of the fire. The elevators ceased because the fire alarm was going off. This was the time Harris County was remodeling the 7th floor of the San Jacinto Street Jail. The FCC personnel could not let responding personnel onto the floor to help. The keys in the FCC could only open the custody door but not the outside door that leads to the unsecure side. Help from other floors must come up the staff stairway which is on the unsecured side of the door. The 7th floor is the top floor of the 701 building and staff must come up to the 7th floor wearing the fire safety gear. The staff outside that responded to the alarm could not open the door to get into the secure side in order to respond to the fire. They did not have a key to open the door and the key in order to open the doors from the civilian side are kept on the first floor and unavailable. The

staff inside could not open that door because there was no key. The FCC could not open the door electronically because the control panels were removed as part of the remodel. The only way in or out of the secured side of the 7th floor was through the secure side elevators which would automatically stop working when the fire alarm was triggered.  Jane Doe 4 a jail supervisor, who worked on the 7th floor of the 701 jail during this time, states that this is an ongoing problem while renovations were occurring.

147.    John Doe 14 was assigned to pod 7B of 701 on the night of November 15, 2019. He began conducting rounds in 7B at approximately 22:00 hours. After concluding rounds in 7B1 he proceeded to 7B2. Once he entered 7B2, he noticed an inmate was at the phones. He continued to conduct rounds. As he approached the bottom tier round sheet, the inmate began to swear at him. John Doe 14 turned to inquire what was going on. The inmate yelled, "Y'all on some bull***t." When John Doe 14 asked what he meant he did not respond. John Doe 14 continued rounds and then he was jumped by the inmate from behind.  John Doe 14 was blindsided and on the floor being punched, kicked, and kneed several times for several minutes. The DO in the PCC was unable to make a page using the building intercom system and was unable to open the door because the system had shut down and was rebooting, as it had done several times in the past. The reboot was unexpected, and it would

always be a surprise when it happened. The DO in the PCC called the Floor Control Center (FCC); however, the computer there also went down, and they were unable to make a page for assistance. The FCC had to contact the CSC to make a building page. The FCC was unable to allow the responding officers from other floors onto the 7th floor secure side as they no longer had control of the doors. The sergeants on the floor and responding rovers were unable to open the door with a key because the door jammed, and they had a difficult time trying to pry it open. The DO in the PCC was ordered by a sergeant to not leave Pod Control Center (PCC) to assist. John Doe 14 believes it took the responding officers 8-10 mins to finally get inside based on his experience and talking about the incident with his friends that responded. By the time responding officers were able to open the door, the inmate had gotten too tired from assaulting John Doe 14 and had returned to his cell. The inmate told a responding Sgt., "If I wanted to, I could of killed him and there was nothing y'all could of done to stop me." After the incident, it was ordered that a third DO must be assigned to 7B but there was never a third person to fulfill that spot. The floor was already short staffed. When available, a rover would stand at the entrance of whatever cell block the round was being conducted and leave once the rounds were done. Harris County did not take steps to fix the door issues until 2021.

148.     John Doe 2 responded to the November 15, 2019, incident. The DO in

the pod control center was yelling for staff to help John Doe 14 as the pod DO

could only watch his coworker being beaten by an inmate. Staff could not get

into B pod because the doors were not functioning. In B pod there is always

an inmate on 30 minutes out time where they are allowed to be out of their

cell and use the day room area. They do this one at a time. The inmate who

was out was known to have mental illness. When John Doe 2 arrived on seen,

staff was yanking on the door trying to open the door. He ordered a DO to go

to the FCC to get the master key in order to open the door.

149.     John Doe 14 was taken to Memorial Hermann hospital in downtown to

be evaluated after he was assaulted. His right eye was swollen shut, he had a

split upper lip, and a bloody nose. He experienced pain in his knees, wrist, and

shoulders. He was experiencing blurry vision, headaches, and dizziness. The

doctors were unable to find any broken bones, so they cleared him to return

to work the next day. John Doe 14 sought treatment from his physician for a

second opinion. Harris County's worker's compensation insurance denied

coverage for John Doe 14's injuries and the worker's compensation insurance

did not cover John Doe 14's time off while he recovered from being beaten

by an inmate. John Doe 14 still suffered from knee and wrist pain. He would

also like to speak to a psychologist regarding his trauma, but that doctor's order was also denied by worker's compensation insurance.

150.     Detention officers do not get the same worker's compensation coverage as deputies though they can be in the same environment in the jail and subject to the same injuries. Often, detention officers have to go weeks without coverage for their injuries.

151.     John Doe 14 states that there was another incident in 7B, in the month following his incident. An inmate housed in 7B attempted to attack a floor worker that was picking up trash. The DO got in between the inmates and he was punched. He fell to the floor and the inmate then began to drag him to the inmate's individual cell. The pod officer made a page; however, seeing as the inmate was close to fully dragging the other officer in to the cell, he left the PCC and entered the cell block to rescue the officer.

152.     Jane Doe 4 was assigned as a jail supervisor on the 4th floor of 701. In pod 4D there was an inmate fight where an inmate jumped another inmate. The system failed and the detention officers could not get to the inmate for 30 minutes. The inmate had to be transported to the hospital. There is no training given to detention officers on what to do in this situation and where the emergency keys are. The department relies on the sergeant to be at every scene in order to give out this knowledge, but the sergeants are also understaffed.

With the constant turnover of staff, departmental knowledge is not passed on to new employees.

## VII. Harris County fails to keep the temperature in the jail facility in compliance with jail standards.

153.    Jail Standards states that the "[t]emperature levels shall be reasonably maintained between 65 degrees Fahrenheit and 85 degrees Fahrenheit in all occupied areas" and that there should be sufficient ventilation to provide fresh air. Tex. Admin. Code §260.154-260.155. Harris County fails this **minimum** jail standards.

154.    Temperature control is a major problem in the Harris County Jail. Maintenance requests are entered daily on some floors that are chronically out of compliance with Jail Standards temperature range.

155.    Jane Doe 3 worked as a jail supervisor on the 4th floor of 1200 jail. During that time the A/C did not work on that floor for about two years. That floor has no ventilation or windows. The walls of the building were sweating it was so hot. The floors would be wet from the sweat coming from the walls. Tape would peel from the walls. Another jail supervisor passed out from the heat and was sent to the hospital for heat exhaustion. During this time the staff and inmates were not provided water or fans. One pod that housed mentally ill patients would often fail the temperature checks as per jail standards but the maintenance contractor, Aramark, told her that it was failing temperature

checks, but Aramark would not put in portable units because the mentally ill inmates would break them. There were portable units, but they would not install them. The Sheriff's Office did install portable A/C units in the "Been There Done That" program pod that was a special program often visited by the Sheriff.

156.     Jane Doe 19 and Jane Doe 24 worked at the Harris County Jail 701 San Jacinto Street facility as detention officers. From at least July 2018 until the present the 7H dorm would frequently have temperature readings above the standards set by the Sheriff's Office. The temperature must be between 65-85 degrees but the temperature would routinely exceed that. The maintenance contractor, Aramark, would monitor the temperature but would never take actions to fix the situation. Aramark stated that the issue was due to the construction of the building. The temperature readings would be logged daily in the e-log. When the temperature was out of compliance, a maintenance request was submitted. It was an open dorm pod that had around fifty inmates. Temperature in the picket would be monitored and would exceed 90 degrees and the cell block was much hotter. Floor supervisors put in multiple requests about the heat. It was hot even when it wasn't hot outside because there was no air circulating in the building. There were no windows or ventilation.

157.     John Doe 2 states that pod H on the 7th floor of 701 gets very hot. The detention officers in the PCC would complain to him as a jail supervisor. It was a chronic issue and if the PCC was hot, the inmates in the pod were even hotter. The air did not move. He emailed maintenance and command staff about the issue. After nothing getting done about it, John Doe 2 took a laser thermometer and took readings inside the pod. He took readings from an inmate bunk that was along an exterior wall. The temp read in the 90s. He sent emailed a picture of the readings to maintenance. The maintenance personnel stated that they only have to take readings from the center of the room and that it did not matter if the bunk by the wall was hot. The work orders for the heat were never fulfilled and the pod was never serviced. The issue would continuously come up and the pod would be hot year-round, but it would be especially hot in the summer.

158.     John Doe 10 and Jane Doe 3 are both jail supervisors employed by Harris County. Both state that the 6th floor N, M, and L pods, at 1200 Baker exceeded that minimum jail standards for several months in 2020. The pods would frequently read as too hot through monitoring done by the maintenance staff and the HCSO compliance team.

159.     Jane Doe 20 states that on a particular hot day in May 2021, the 6th floor of the 701 jail registered temperature readings of 93 degrees.

160.     Jane Doe 45 is a civilian counselor. She often works on the 4th floor of the 1200 jail. There it gets extremely hot to where everyone is sweating. Everyone suffers. She gets overwhelmed by the heat and has to leave the floor because it is too hot. It has been that way for a long time, but she believes it could be fixed because she has also been there when it has been freezing. She thinks whoever is controlling it just does not do a good job.

161.     John Doe 19 checked in at 1200 and smelled an odor of drugs on September 1, 2021. He was then sent to the 701 jail, 5th floor because it was understaffed. It was hot there, and he sweated. It would have been hotter for the inmates. There was no T-card/arm band count done where he worked. Overtime and working conditions are the worst he has ever seen.

162.     Jane Doe 31 states that floor counts are not being done regularly because there is not enough staff to accomplish it. The numbers are being sent but the counts are not being done. She does not always know who is in the pod she is supervising because the process of marking inmates out when they go to court or medical has just broken down with the lack of staffing.

163.     John Doe 20 states that he and the others on his floor did T-card to armband counts whenever they could but Corretrak rounds and short-staffing made it almost impossible to do when it needs to get done.

164.     John Doe 14 states that there are issues with the air conditioning on the floors where the temperature is too high. When DOs placed a work order, maintenance asks for a reading of the temperature. The DOs gave them a reading. Maintenance then came to the pod at about three or four in the morning and do a reading. Of course, the temperature had dropped by then, so nothing is done about the hot temperature during the day. John Doe 14 is hard pressed to order the inmates to be properly dressed while in the dayroom area when the inmates are just standing there without a shirt. Sometimes he has a difficult time breathing because the air is so hot.

## VIII. Harris County is required to provide two-way communications between the inmates and jail staff at all times.

165.     Jail Standards dictates that "[t]wo-way voice communication shall be available at all times between offenders and jailers." Tex. Admin. Code §260.161. Harris County fails this standard.

166.     Harris County purposefully and knowingly created situations whereby employees and inmates would lose communication with each other for a period of days. Maintenance requests are entered for chronically broken communication systems; however, these maintenance requests go unanswered for days or weeks.

167.     John Doe 10 states that having communication with the inmates is an ongoing problem. The speakers for inmate communication commonly get

damaged or do not work. There are pods that have a chronic issue with speaker communication. It is very important for these speakers to work in order for the detention officers to speak to the inmates in order to give them orders on compliance and to check on their conditions and complaints.

168.     Jane Doe 3 states that when the 7th floor of the 701 jail was under renovation, the detention staff could not communicate with inmates held in the pods through the intercom system and the inmates had no way to communicate with the detention staff. The detention staff had to yell through the panholes to communicate with inmates. The floor was supposed to be cleared for the renovations. Due to overcrowding, the floor was not cleared. The renovations were supposed to last two weeks but the renovations lasted more than two months.

169.     Jane Doe 22 states that at the 701 jail the PA (public address) system does not always work. At times she could not hear pages and at times she could not communicate with inmates over the system. To communicate with inmates, she would knock on the window and write something for them to read.

170.     Jane Doe 20 states that there was a chronic problem of intercoms on the sixth floor being out of order. She would communicate with inmates in that area by poking her head outside the door.

**IX.    Harris County shall provide adequate fire safety equipment, detection, and staff training in order to protect staff and inmates from fires.**

171.    **Minimum** Jail standards requires that fire safety equipment be provided, and the staff be trained in its use in order to combat fire emergencies in the jail facilities. *See* Tex. Admin. Code §263.53- 263.56; §263.70. Harris County fails this jail standards.

172.    Harris County provides fire safety training for newly hired detention officers. Each new employee attends 4 hours of training in fire and life safety. It is then expected for floor supervisors to take initiative to drill and further train new employees on fire and life safety. Harris County does not provide enough trained jail staff to adequately deal with fire and life safety emergencies.

173.    The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. Disciplinary rule 1213 states "No inmate shall cause or set a fire of any kind." *Harris County Sheriff's Office Inmate Handbook*, Harris County, p.38 (revision date December 2018).

174.    Jane Doe 4 worked as a jail supervisor for Harris County. She worked on several floors in the Harris County Jail facility during her tenure. From April to June of 2021, she was assigned to the 7th floor of the 701 San Jacinto Jail facility, there were several fires a shift. The staff is expected to put out all

fires in the detention buildings. Detention officers are given fire training when they go through the academy but because of understaffing, there is little to no follow up training, such as equipment drills. The facility fire drills but the floors are so understaffed they cannot respond.

175.    Jane Doe 3 reports that from May 2021 to present, the inmates in 7B light fires in their cells at least once a day, sometimes more. Nothing has been done to prevent the inmates from lighting the fires. Jane Doe 4 made suggestions to the command staff that the inmates that start fires should be moved from B pod so they would stop setting fires, but nothing was done or any moving of the inmates was delayed.

176.    Jane Doe 28, Jane Doe 29, John Doe 24, and John Doe 25 state that in K pod on the 2nd floor of 1200 jail, seven inmates started fires and there was not enough staff to cover the event. The sergeant who was assigned to the floor had left the area. They called for help, but it took nearly thirty minutes for help to arrive.

177.    Jane Doe 39 states that K pod on the 2nd floor of 1200 jail is a "nightmare" pod because inmates there set frequent fires, sometimes two or three a day.  When rovers are called to put out fires, they have to leave the nurses that are managing the medication cart unescorted. This has happened to her and it is very unsafe.

178.     Jane Doe 49 is a civilian in the JPC. Harris County will conduct fire drills often where the alarm and lights flash. The civilians do not know when the alarms go off if it is a drill or if it is a real emergency. One time the alarm kept going off and it seemed to the staff that it was a real emergency and the Houston Fire Department arrived. The civilians went to exit the building, but they were ordered to remain at their desks because there was too much work to do. She felt very uncomfortable about this. The civilians have never been given proper instructions on what they should do when a fire drill occurs, regardless real or false. The few times she exited the building during a fire drill, she was instructed by a sergeant to submit a comp time slip for being outside during a fire drill (so her pay would be docked). In August of 2021, the fire alarm went off for several hours. The alarms went off throughout the building. The sound was deafening, and the lights kept flashing. Jane Doe 49 started to feel ill and tried to cover her face from the flashing lights. She finally demanded to be taken to the JPC clinic where it was found that her blood pressure was dangerously high, and she had to go to the hospital. Her and her doctors believe that the constant fire alarms in the building that day made her ill.

**X.    Harris County is mandated to provide an appropriate minimum number of staff in the jail to conduct rounds on the inmates.**

179.     Jail standards requires that Harris County provide enough staff to adequately provide for the care, custody, and control of the inmates 24 hours a day. Harris County must provide enough staff to conduct mandated rounds. Tex. Admin. Code §275.1. Harris County must at a **minimum** provide one jailer or deputy to have direct supervision of up to 48 inmates. Tex. Admin. Code §275.4. Harris County fails this **minimum** jail standard daily. When Harris County meets the minimum ratio it is unable to properly conduct inmate rounds, then Harris County is out of compliance.

180.     The maximum capacity of the Harris County jail is 10,566 inmates.[22]

181.     The staff shortages can cause rounds to be late and out of compliance. With such a large facility, there is not adequate staffing to meet all the duties and requirements necessary to stay in compliance with rounds. Chronic staff shortages often place the jail floors outside the 1:48 ratio. Harris County additionally does not appropriately document staffing numbers to the Commission on Jail Standards. The **continuous** lack of staffing creates egregious safety issues for both staff and inmates. Harris County is fully aware of its staffing issues.

182.     John Doe 1 states that at the beginning of 2021, Harris County detention employees received a disturbing email stating that CorreTrak rounds were

---

[22] Texas Commission of Jail Standards – Abbreviated Population Report for 8/1/2021, available at https://www.tcjs.state.tx.us/wp-content/uploads/2021/08/AbbreRptCurrent.pdf

first priority and ranked even above helping a fellow employee who was fighting with an inmate and inmate fights. "CorreTrak" is the name of the company and equipment that provides electronic documentation that an employee was making or had made an observation round at a particular cell or place. That email was rescinded months later but not after numerous employees were disciplined for not being able to keep up with rounds even though they were not given the help in order to accomplish it. Even with added overtime personnel, there simply is not enough employees to take care of CorreTrak rounds, escort nurses on the floor, take inmates to the clinic, respond to emergencies, answer inmate inquiries (sergeants only), and complete all the other duty-related tasks; and often employees could not get relieved to eat or take a restroom break.  Additionally, policy demands that when an employee enters a cell, another employee will stand at the door (to hold it open in case there is an emergency and more employee back-ups respond), but there wasn't enough staff available for this safety process.  Since the beginning of 2021, the problem has only gotten worse. Every day supervisors ask for volunteers to work past their original 12-hour shift.  The detention officer to inmate ratio sometimes falls below the state-mandated 1:48. In an effort to keep up with CorreTrak rounds, employees sometimes do not conduct the required proper T-card-armband counts, and inmates

returning from court, the clinic, and other places are routinely returned to their cells without being searched.

183.     John Doe 5 is familiar with the daily watch schedules (DWS) and supervises their implementation. When they do the DWSs, it is only a picture of time for that moment. The floor will meet the **minimum** 1:48 ratio at that moment. That number then changes  a couple of hours later but the DWS does not. There are times that throughout the day the jail floor is not in minimum compliance, but it does not reflect on paper. If the staffing shows to be right at the 1:48 ratio then if any DO leaves the floor to escort or to assist another area, then the floor could be out of compliance. These low staffing numbers give no flexibility. Based on his training and knowledge, 1:48 ratio should be direct observation; however, the jail is so short staffed. If there are 100 inmates in a four-sided pods, there should be multiple DOs in the that pod to watch those inmates but that is not happening. The **minimum** staffing numbers were last created in 2018. Those numbers were set with the Texas Jail Commission as an absolute **minimum** for the floors, but the numbers do not take into account what the floor needs to function well on a daily basis. Those are emergency numbers. Today, the floors are not even making those **minimum** staffing numbers. It can be deceptive when you look at the numbers because the floors can be in ratio, but the floors cannot function. For example,

on the 6th and 7th floors of the 701 jail, on those floor the inmates are maximum

security inmates and require two detention officers to escort them out of their

cells but these staffing numbers do not account for that. The CorreTrak rounds

only allow for a few minutes a round per pod and that just does not allow time

for the DOs to talk to the inmates, address problems, or to do tasks to meet

their needs. Just simple stuff like getting an inmate toilet paper or an extra

blanket just cannot be done with these low staffing numbers. The duties of the

employees have increased but the staffing has not increased. CorreTrak has

tripled the workload on the floor.

184.     Jane Doe 1 states that the staffing reports transmitted to the Texas Jail

Commission are always incorrect and are essentially fabricated because most

floors cannot stay in compliance throughout the shift. It is a shell game of

moving staff from one section to another to be counted on multiple floors to

make ratios for the paperwork to be filled out. This shell game activity is done

daily. Supervisors are being counted to make **minimum ratio** along with

overtime workers that will not be available the whole shift. It makes it appear

on paper that the jail is in compliance, but it is not.

185.     John Doe 34 states that the staffing numbers show the jail to be in ratio.

Only a couple times has he seen the DWSs out of ratio, though later the DWS

was amended to show that the floors was back in ratio. You can be in ratio

and not function. He does not know if they are actually making ratio or not but the jail is not functioning. The ratio is including the rovers, the sergeants, and the trainees at times. The ratio does not show the number of people needed to do the job.

186.     John Doe 35 is aware that the Harris County jail is in violation of jail standards. People are being moved around constantly in an effort to meet jail standards, but the standards are not being met. The safety of the staff and the inmates are in jeopardy because the jail is understaffed. For example, on September 7, 2021, a detention officer was up on the floor and he was assigned to escort an inmate to the clinic. As he was going to the clinic, another inmate who was not escorted to the clinic came up behind him and punched him in the back of the head, blindsiding him. The inmate that assaulted the DO should have had an escort but with short staffing, corners are being cut.

187.     Jane Doe 4 states that the Department often does not meet the 1:48 ratio. In order to make ratio, the department will count admin detention officers, sergeants, the building lieutenant, and on occasion, will have to count the captain of the building in order to make the **minimum** 1:48 ratio on paper. They often count people that do not have direct contact with inmates, will not respond to floor issues, and never directly supervise the inmates. When they count the auxiliary staff, those employees do not move to the floor in order to

actually supervise the inmates. People will be pulled from assignment and moved to the other jail building to staff; however, the person was counted in the first building and the second building. On some of the floors, there will be one detention officer with direct supervision of 110 inmates, meaning there will be one DO working a four sided pod to watch 110 inmates at once. The department relies on the count of other workers in order to state that there is direct supervision of the 110 inmates.

188.    Jane Doe 10 states the jails just keep getting worse. There is not enough staff to keep the DOs safe. The jail is not meeting jail standards and the floors are not making ratio. The DOs are all scared of getting fired for anything that they do that they are more likely to not act than to act in a situation. Morale is terrible.

189.    John Doe 27 is assigned to the 6th floor of the 701 jail.  The floor is always short on staff. On or about Thursday, September 2, 2021, an inmate assigned to his pod on the 6th floor was assaulted by another.  John Doe 27 was alone in a four-sided pod when normally there should have been two detention officers. The beating was brutal. The incident was captured on camera.  He thinks it took a long time for rovers to respond. The assaulted inmate was transported to the hospital with serious injuries. John Doe 27 is afraid the assaulted inmate is going to die from his injuries. He is also

concerned that he is going to get blamed if this is a death in custody but there was nothing he could do to help or prevent the attack on the inmate because of the conditions that are allowed to exist in the Harris County jail.

190.     John Doe 22 has been assigned to the 7th floor of the 701 jail in 2021. He states that for at least three days of each week in 2021, there were only two rovers working the floor. There should be a minimum of four rovers assigned to the 7th floor. With the rounds that need to be done and the inmates escorted to the clinic, it is impossible for the rovers to respond to any other calls such as inmate fights, inmate disturbances, or any other call. He has been told that if there is an inmate fight or a deputy/inmate fight, it is more important to do the CorreTrak rounds than to respond to pages. This puts officer safety at risk. It is a violation of policy for the detention officers to enter the cell blocks by themselves but with the staffing shortages, they have no choice but to in order to complete the tasks required under the staffing shortages.

191.     Jane Doe 3, a former jail supervisor, states that she knows that DOs are trained that for officer safety they should never enter a pod alone; however, they are commonly forced to enter pods alone due to staffing shortages.

192.     Jane Doe 2 is a jail supervisor in the JPC. In August 2021, JPC supervisors received notice that they must send enough personnel to the housing jails for them to meet the **minimum** 1:48 ratio.  The JPC has two

floors with various stations for processing inmates into and out of the jail system. The various stations include a search wall, intake, receiving, booking, pre-trial court, JP court, a clinic, classification, and releasing. The system is designed to have sixty-six non-supervisory employees to process people through the various stations. In August, fourteen detention officers resigned. With the current personnel shortage, the processing division starts with about fifty-nine on a good day; then some of those have to be sent to the 1200 and 701 jails, and certified deputies are sent to guard prisoners at hospitals. On August 28, 2021, JPC had only thirty-seven employees to work areas that require a minimum of sixty personnel after detention officers were pulled to work in 701 and 1200 housing, and all the deputies were sent on hospital runs. On August 10, 2021, there were only forty-three employees; on August 16, 2021, there were fifty-six. As a result of the understaffed manpower shortage, when employees showed up for the evening watch on September 2, 2021, there were fourteen peace officers standing in line in the receiving area to turn their prisoners over to JPC staff in order to book them into the jail. This has not been unusual in the last couple of months since JPC staff are being pulled to work housing and it is putting a strain on the JPC operations and security. This wait keeps the deputies and officers off the street longer and delays the new inmates being processed in and out of the jail. On that day there was not

enough staff to man every post in the JPC and several posts had to be combined for the shift. Every post had half the people that the **minimum** staffing requires, greatly outnumbering the staff to the inmates, sometimes putting three staff who are doing computer processing to move inmates through the system with the responsibility of supervising over 120 inmates at the same time. There is not enough staff to provide security to all the areas in JPC. It has become common for only one male detention officer to be assigned to the search wall in JPC.

193.     John Doe 23 is a detention officer assigned to the Joint Processing Center. He was assigned by his supervisor to work the "search wall," which is the area where newly received inmates are searched prior to being booked into the JPC. By policy, this is a two-man assignment so two detention officers can back each other up on combative inmates and armed inmates. Guns and weapons have been recovered during searches at this station. John Doe 23 was assigned to this post and told to work it alone due to staff shortages. He was told his backup would be the detention officer assigned as intake security that is located around a corner from the post. No other detention officer was put in the line of sight of the station. The policy violation was brought up to supervisors but because of staffing, no detention officer could be spared to fill the open position.

194.     Jane Doe 12 states that at the beginning of August 2021, an order went out stating that the JPC could not refuse to send staff to housing (1200 and 701). JPC was only refusing to send staff that would put their areas at risk but now they cannot hold their staff. The daily staffing is documented on the DWSs sheets on how many detention officers are sent to centralized staffing. The Houston Police Department (HPD) gives Harris County money in order to subsidize the staffing of the JPC with a contract. She does not think Harris County is meeting the terms of that contract because the staffing is not being utilized in JPC that HPD funding is providing.

195.     John Doe 18 states that the jails, including the JPC where he works, are unsafe because of the "staffing crisis."  There are too few people to work safely because the jails take a third of the JPC employees every day.  He is sure there will be an event where employees are injured; thankfully, it hasn't happened yet.

196.     Jane Doe 18 maintains that working any of the jails is "absolutely unsafe" because there are not enough staff.  She generally is assigned to the JPC, but in August 2021 she did work at the 701 jail for half a shift on the 5th floor. The area was under construction, and it took a full two minutes to unlock or lock the doors with a key.  That shift, the pod she was assigned had no intercom, so she could not make pages or hear others' pages.  She was given

a radio to call for help. She was told to keep her head down and mind her own business. She worked alone and did not try to enforce any rules on the inmates. She worked with one employee on the 5th floor that day that was on overtime and was working past 16-hours in her shift because she could not get relief. Jane Doe 18 was supposed to be relieved that day at 10:00 pm but relief did not arrive until 11:30 pm.

197.    Jane Doe 23 works at JPC. She and her peers were told repeatedly by "the chain" (their chain of command) that they would take the JPC down to one person in intake and one in releasing if need be to meet the 1:48 ratio at the jails. She remembers one time there were only four people working in intake and they had about 200 inmates to process. That is dangerous in an open concept situation.

198.    John Doe 10 has worked as a jail supervisor in the 1200 Baker Street Jail. The third floor of the 1200 Baker Street jail has been run with a minimum of fourteen detention officers assigned to the floor. That number involves reducing the number of two-man pods and only assigning one detention officer to the pod. The one detention officer will then be responsible to direct supervise ninety-six inmates at once.

199.    John Doe 4 is a retired jail supervisor who retired in March 2021. There are chronic issues with the understaffing of the JPC. The JPC needs a

**minimum** of sixty personnel to function on the inmate processing. It is a very technical job that takes specialized training. Sixty detention officers are considered a skeleton crew for all the intake, booking, releasing, property, pre-trial waiting, classification and clothing, hospital transports and hospital securities, PC courts, lockdown, and the intake clinic. When the JPC is understaffed, it creates a safety issue. The arrestees come off the street still high, drunk, and combative as they are moved through the booking process and creates problem when it is delayed. The JPC must meet the 1:48 ratio and to meet the quota, Harris County will count everyone in the building with a jailer's license to make the ratio. This will include detention officers and deputies that are on transitional duty but are barred from responding to emergencies. There are many times when lieutenants and captains are also included in the count in order to meet the **minimum** 1:48 ratio. Many people are counted that have no ability to respond to emergencies or disturbances.

200.    Jane Doe 8 has worked for Harris County for almost a decade and states that she believes the conditions in the jail are the worst it has ever been. It is a struggle to find people in order to meet the **minimum** 1:48 ratio in 1200 Baker. The floors may start off in ratio because people are doing overtime but, with 12-hour shifts, people on overtime only stay for four hours so the floors do not stay in ratio. The floors cannot function at the minimum ratio set by

the staffing plans. The tasks of the detention officers have increased but the staffing has not increased.

201.     Jane Doe 7 works on the fourth floor of the 701 Jail. On most days the floor is run with thirteen staff including the floor sergeants to direct supervise up to 700 inmates. There have been shifts were there have only been eleven or twelve staff members. Often the shift will start with fifteen and then an hour into shift Harris County will pull staff to work other floors, putting the staffing level at thirteen or fourteen individuals. To meet **minimum** jail standards, a floor with 700 inmates would need to be directly supervised by fifteen detention officers. She further states that to make count on the floors, Harris County has been placing trainee probationary employees on the floor and assigning them to a pod alone after only a few days of training. The department will include these trainee employees in the count to meet the **minimum** 1:48 ratio. She has witnessed trainees with only one or two days of training being placed in a pod alone and the trainees are told to just sit there and to not let any of the inmates out. Per policy, trainee employees should only be placed in two-man pods where they are partnered with experienced DOs. This was on the 6th floor where the inmates are kept in single man isolation cells. Jane Doe 7 believes that by knowingly placing probationary

trainees in positions to supervise inmates without receiving minimum training puts the lives of the detention officers and the inmates at risk.

202.     John Doe 15 has been a detention officer with the Harris County Sheriff's Office since 2013. Every shift he is assigned to work on a floor of the 701 jail. He works twelve hour shifts but is commonly held over to work sixteen hours. It is impossible for one person to do all the rounds on a floor in a shift. It requires multiple rovers assigned to do rounds but then they cannot do their other duties. Now rounds are conducted using a cell phone like device called CorreTrak. There is no accounting of these machines or of who is logged in doing the rounds. Detention Officers are barred from putting staffing shortages as a reason for a round being late, even if it is the reason a round is late because that would look bad. He has been told that by the command staff. There are not enough devises for each detention officer, so the CorreTraks are passed around from officer to officer and there is no accounting for who is doing a round. It is well known that there are staffing shortages at the jail and on the floors. He knows that there are some days when the floors are maxed on inmates but there is not have enough staff to meet all the functions of the floor.

203.     John Doe 2 is a jail supervisor. He supervised in the jail for two years. During that time, staffing was a chronic issue. There were several times when

there were not enough detention officers to make rounds so he made their rounds. There were numerous times when he and another detention officer had to finish the floor count without other detention officers because the floors were short on staff and other detention officers were needed elsewhere.

204.      Jane Doe 14 is normally assigned on the 4th floor. It needs a minimum of twenty-five people to staff the floor because male and female inmates must be kept separate and other staff members, particularly maintenance and medical, must be escorted. (That is not the case on all male floors.) Sometimes, however, the floor is staffed with as few as seventeen people. **The understaffing creates a huge safety issue.** When the floor only has three rovers, one is assigned to B, C, F, H, pods; one to K, L, M pods, and one to the remaining pods.  Those rovers must take female inmates to the clinic, take care of ATWs, courts, escort a nurse checking temperatures, another nurse checking Covid, and an assortment of other assignments.  Most importantly, rovers must conduct CorreTrak rounds that cannot be late.

205.      Jane Doe 4 states that the 3rd floor of 701 houses between 650 to 700 inmates. The floor needs a minimum of fifteen detention officers to function properly. It was common to have to run the floor with ten to eleven people on the floor. Ratio was not met with people that work on the floors and the County would have to count other staff like administrative staff in order to

meet the ratio on paper, but the ratio was not met in practice. The rosters are done in the morning, but they do not reflect who is actually on shift on the floor. The roster would show people that would be coming in at different times due to life issues or medical issues not being able to work 12-hour shifts every day. Also, once the roster is done, detention officers would then be pulled to go to other floors that have staffing needs, leaving the floor short.

206.     John Doe 2 states that some floors, such as the 7th floor of 701 can meet the **minimum** 1:48 ratio on paper without having enough staff to meet the needs of the floor and the inmates. The 7th floor is a high security floor and has several pods that are single man cells. The 7th floor has thirteen pods. Two of the pods observe four dormitories each, holding at least 96 inmates, requiring two DOs. One pod is a double lockdown pod that requires two detention officers. A person must be manning the pods 24/7. To minimally man the pods and FCC, requires seventeen employees. These minimum standards and 1:48 ratio do not take into account the actual needs of the floor and the needs of the inmates. The floor needs at least four rovers in order to function properly, rover positions are there for emergency calls, to do rounds, to respond to inmate fights, to feed the inmates, escort civilians and medical staff, to escort inmates to the clinic, to pass out inmate laundry, and to relieve pod workers. The floor really needs twenty-two detention officers to function

safely though there are times when it is staffed only with enough people to man the pods. Due to the fact that there is a need for more people on the 7th floor above the needed ratio, the extra bodies will be used to meet inmate count on other floors. Harris County will do the **minimum** 1:48 ratio counting all the inmates in the building and all the staff in the building as opposed to looking at who has direct supervision of an inmate.

207.     John Doe 14 states that on a continuous basis individuals are assigned to pods of ninety-six inmates or more with only one officer, or if there are two officers, one is constantly being called out to assist on the floor, either escorting inmates, conducting rounds, or assisting on a different floor because that floor does not have rovers. He has been assigned to a multi-sided pod alone to supervise 106 inmates at one time. When he started, rovers did everything on the floor, from escorting inmates, walking the nurse, escorting maintenance when they were on the floor, feeding the inmates, and having one rover dedicated to keeping the floor workers busy throughout the night; however, with the new rules that were implemented by the jail commission, CorreTrak, and understaffing that is no longer the case. **The staffing has not kept up with all the extra duties detention officers have.** The inmates are getting bolder, and they no longer fear consequences for their actions because

they know that the floors are understaffed and if push comes to shove, they'll be removed from their housing for a couple of hours and that's it.

208.     John Doe 30 has been a detention officer with Harris County for the last ten months.  He asserts that the 1200 jail is unsafe because of insufficient staffing. John Doe 30 points out that when staff enters inmate dormitories that have open housing for inmates, they are alone with a large group of inmates. Policy requires that staff members entering inmate cellblocks at least with another staff member at the door, but there are not enough people for that to happen. He went through training and was taught that for officer safety he should enter these cellblocks with a partner but that does not happen in reality because of staffing issues. John Doe 30 is aware that a fellow staff member was assaulted and injured on the 5th floor by a group of inmates. The floors are understaffed, and inmates often have, or at least seem to have, control of the jail and he states it seems that they always get their way to the detriment of the staff. Recently John Doe 30 witnessed an incident where an inmate threatened a staff member and the sergeant moved the staff member, not the inmate. There were no consequences for that inmate.

209.     Jane Doe 15 has a CorreTrak monitor in her PCC that sometimes does not work properly. At times when the CorreTrak system is not working properly, a green circle will appear. Sometimes the green circle will turn off;

sometimes it will not. When it does not, Jane Doe 15 must turn it off to reset it, and when that occurs, she may be late on her rounds.

210.     Jane Doe 7 states that on August 24, 2021, the 6th floor of 701 ran with only two rovers for the floor. Normally there are six. Each pod had only one detention officer though two pods (F and J) should be two-man pods because they monitor four dormitories. The sixth floor has twelve pods plus the FCC and the N cells (isolation cells). There are approximately 700 inmates housed on the 6th floor at any one time. With the floor having sixteen detention officers, the floor made ratio if all the DOs and inmates are counted collectively but the floor could not function. There were not enough people to work the two-man pods that monitor ninety-six inmates and only one detention officer was assigned. One rover had to constantly do rounds while the other dealt with inmate fights, inmates flooding their cells, and other duties. The pods are tiered, so he had to walk up and down a flight of stairs in each pod every hour for the whole twelve-hour shift. He walked at least 288 flights of stairs in a shift. Even going at his fastest, he could only do rounds in six pods before the rounds were out of compliance. That is going to each CorreTrak scanner and scanning the round, not taking any time to look at the inmates or have any meaningful inspection of the inmate's condition.

211.     John Doe 13 is normally assigned to work the FCC on the 3rd floor of the 1200 jail. At one time he was told that the number of employees required to safely work his floor was seventeen. Over time that number has dropped to sixteen. Today, it is fifteen, and that number includes trainees who are also used to bolster the roster to make it look like more people are working. That number also includes employees who are on FMLA[23] and are limited to an 8-hour workday, so they come to work later or leave earlier. The 3rd floor has worked with as few as twelve detention officers. There should be at least two rovers just to keep up with CorreTrak rounds, not counting all the other duties that are required for rovers.

212.     John Doe 6 is currently assigned to a housing floor at the JPC. The floor has worked short-handed but within the 1:48 state-mandated ratio for some time. About a month ago, however, he and other jail supervisor received an email that originated with Chief Shannon Herklotz informing them that when admin (centralized staffing) calls asking for people to help, they must send them, no matter what. The email indicated that the jails at 1200 and 701 periodically fall below the **minimum** 1:48 ratio. On August 24, 2021, he only had eleven detention officers: nine assigned to pods and two rovers. The maximum inmate capacity at Housing at the JPC 3rd floor is about 500 and it

---

[23] FMLA, as used in this complaint, stands for a bundle of benefits used by employees of Harris County based on the federal statute 29 U.S.C. 28 informally named the Family and Medical Leave Act (FML).

normally hold about 500 inmates. When anybody leaves the floor to escort an inmate to the clinic or a purple band inmate anywhere, the floor will fall below the accepted ratio on the floor. Due to this new method of taking people from floors where they are needed, there is no wiggle room for emergencies. Now when there is an emergency, we make a building page so someone from Booking, Releasing, or Processing can come aid because the personnel on the floor are so shorthanded, they cannot handle any inmate disturbances.

213.     Jane Doe 12 states that every day is a fight for staffing and where people are going to be. As jail supervisors, they are always fighting to keep the staff in order to keep their areas safe but everywhere is short. Safety is being put at risk every day. She is afraid that it is going to take a catastrophic incident to make Harris County care about safety.

214.     John Doe 14 states that employees are being moved and reassigned from everywhere to help with staffing, **but they are not trained for the jobs they are assigned to do.** For example, detentions officers from the JPC are being moved for a shift in 701. Some of the JPC detention officers have never worked the jail, they do not know the floor set-up, and they are unfamiliar with the equipment and how it's used. For instance, on August 31, 2021, two individuals from JPC were reassigned for a shift to 701 but neither of them had ever worked at 701. They could not access out folders to submit

paperwork, they did not know that they could call OMS to get access in order to do rounds and did not know when or where to send inmates when they were called. John Doe 14 does not blame them because they were assigned to work JPC and that is all they know. "However, if an emergency were to occur and they are not able to find their way around to open doors on the computer or if, God forbid, they get locked out, what happens then?" John Doe 14 recalls an incident where there were two officers in a pod, one who was assigned to 701 and another from 1200. The officer assigned to 701 conducted the rounds however when he went into one of the cellblocks he was attacked by an inmate. The other officer did not know how to work the doors to allow individuals in while in override and ended up leaving the pod control center and going to assist the officer. Fortunately, neither of the officers were severely injured and they were able to go home that day.

215.     John Doe 7 asserts that because of the personnel shortages, he and the other people assigned to the 701 jail are working under conditions best described as hostile. Supervisors are bombarded with emails, threats, instructions to write people up for late rounds or being tardy; everything is a write-up or letter of reprimand; there are no verbal warnings.  Management does not want to know what happens on the floor and do not want to hear how short the floors are.  He remembers that it used to be the policy that employees

would not enter a cell alone, someone would always have their back standing at the door; but that is impossible with the personnel shortages. When fights break out detention officers may have to respond alone; John Doe 7 sometimes must respond alone. When it comes to inmate confrontations, John Doe 7 realizes he is probably on his own because his coworkers and subordinates are resigning. **Management does not want to hear** that rounds are late because the floor is so short-handed, but that is the truth.

216.    Jane Doe 27 states that the administration stresses the importance of conducting rounds over all other activities. On August 24, 2021, the 6th floor at the 701 jail was so short-handed that rounds were significantly late. The roster may not have an accurate number of employees listed because people who should not be shown as part of the work crew, including trainees, are shown as part of the count.

217.    Jane Doe 50 states that in the last week of August 2021, she saw an inmate arrive at the clinic without an escort. Unfamiliar with the surroundings, he did not know which way to go; she does not know who sent him. Compared to the IPC where she previously worked, a "structured place," where inmates turned toward the wall when females walked by, the 1200 clinic is "unsettling." Her "heart melts" over the recent lack of discipline.

218.     John Doe 11 states that he has seen a detention officer counted for the ratio on one floor at the start of shift, and then an hour or so into shift, that employee is moved to another floor and then counted to meet ratio on that floor. In his current position, John Doe 1 is not considered jail personnel, but he does have an office in the jail facility, and he knows that he is counted to meet jail standards even though he is not assigned to the floor. All rover pages on the floors happen often and they have increased by thirty or forty percent.

## XI.   Harris County shall make a physical count of each inmate at frequent and regular intervals, no less than once per day.

219.     Jail standards mandates that "[i]nmates shall be physically counted by a jailer at frequent and regular intervals, no less than once per day." Tex. Admin. Code §275.5. Harris County policy state that inmate count shall include a comparison of T-Card/armbands.

220.     John Doe 1 states that in the early 90s then Sergeant David Kaup suggested placing an index card box at every cell and putting a "T-card" (short for transfer card) in every box for each inmate in the cell, then move that card with the inmate as they are moved to another cell. That suggestion was adopted and later the policy was changed to conduct count on every shift by comparing T-cards to armband, thus ensuring every inmate was in the place s/he was supposed to be.  That remained the policy for two decades.  Today,

though the policy has not changed, in some cases count is conducted without comparing T-cards to armbands because of the acute personnel shortage.

221.     John Doe 9 states that inmate counts are not being done on every floor at beginning of every shift because supervisors are unable to conduct proper counts. There is not enough manpower to perform all the critical duties now required for the job.

222.     Jane Doe 11 states that Harris County jail policy requires staff to conduct inmate counts on each shift by comparing T-cards to inmates' armbands, but the count is no longer being conducted in this manner.

223.     Jane Doe 20 states that detention officers do T-card/armband count when they can, but often cannot because of acute staffing shortages.

**XII.  Harris County does nothing to prevent the flow of drug contraband into the jail thereby creating a toxic work environment for staff.**

224.     Jail standards mandates that "[f]or the protection of jail personnel and inmates" searches for contraband must be conducted. Tex. Admin. Code §275.6. Harris County fails this **minimum** jail standard.

225.     Drug use in the jail is rampant and pervasive. The secondhand toxic effects of being in the proximity of so much drug use in a closed, not vented environment, causes negative effects on the jail staff.

226.     The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. Disciplinary rule 1524 states "No inmate shall make,

obtain, trade, use, sell, or possess any drug, drug paraphernalia, narcotic, or controlled substance not issued to them." *Harris County Sheriff's Office Inmate Handbook*, Harris County, p.39 (revision date December 2018).

227.    Synthetic marijuana, also known as Spice, K2, ad MDMB, is a synthetic marijuana. It is chemical based and manmade. The components of the drug can be very toxic and can cause adverse side effects including rapid heart rate, seizures, vomiting, agitation, violent behavior, confusion, delusions, psychosis, hallucinations, brain damage, and death.[24] Studies have found that secondhand synthetic marijuana smoke can carry the same toxic properties as firsthand smoking of the drug and can cause the same damage to a person's lungs as secondhand tobacco smoke.[25]

228.    John Doe 5 states that there are not enough people to do the basic functions of the floor like cell searches. It used to be rare to find contraband but now when a search can be done, a great array of items are found. On the 4th floor, B pod houses around 100 inmates. In a search of that pod staff found eight different shanks, porn, tattoo rigs, and drugs. That is a lot of contraband to find in a pod. This used to not be a regular thing. On the 7th floor a search

---

[24] Health Studies – Understanding Chemical and Radiation Exposures: About Synthetic Cannabinoids, Centers for Disease Control and Prevention, (Page last reviewed: March 23, 2021, sourced August 21, 2021), https://www.cdc.gov/nceh/hsb/chemicals/sc/About.html/#symptoms.
[25] *See* Jason M. Wiebelhaus, et. al. *Inhalation Exposure to Smoke from Synthetic "Marijuana" Produces Patent Cannabimimetic Effects in Mice*, Drug Alcohol Depend. Jul. 1 2012, available at *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3501554/* ; Centers for Disease Control and Prevention, *Marijuana and Public Health: Can Secondhand marijuana smoke affect nonsmokers, including children?*, page last reviewed March 7, 2018 *https://www.cdc.gov/marijuana/faqs/secondhand-smoke.html*

was conducted of B pod, which is double lock down for violent inmates and the N cells which are special isolation cells for the worst inmates in the jail. In those pods the search team found various drugs, altered equipment used to make fires, and altered razors that can be used as weapons. The basic functions of the job are not being done.



[26]

---

[26] Eight shanks found in cells searches of B pod on the 4th floor of 701 jail and drug contraband.



229.    Jane Doe 1 states that a recent cell search in August 2021 found many serious weapons and contraband that have been allowed to infiltrate the jail due to lack of staffing. The employees are seriously overworked and unable to attend to all the requirements and policies designed to protect staff as well as inmates.

230.    Jane Doe 4 states that there is not adequate manpower to do proper cell searches. The understaffing means that when a sergeant wants to order a cell search, there will not be the manpower to actually do it. It is important to do cell searches in order to find drugs, weapons, and contraband. It is a safety

---

[27] Drugs and other contraband found during cell searches on the 7th floor of 701 jail, B pod and N cells.

issue for the inmates and the staff. If cell searches are not done, it creates a dangerous situation. The department developed a cell search team to do cell searches; however, according to the schedule, they will not go to the maximum security floors for several months. On Sundays, inmates are given razors. There is not enough staffing to do an adequate count of razors turned in and inmates routinely withhold the razors to use, including to be used as weapons on themselves, other inmates, and staff. Inmates who withhold razors are not disciplined because "it would look bad on the staff" who does not have the manpower to do adequate cell searches to account for every razor that is given out weekly.

231.　　John Doe 11 does not believe there is enough staff on the floors to conduct adequate cell searches. The floors cannot do searches based on TCJS rules because there just are not enough people with all the other tasks the detention officers have to do. Harris County has to rely on the containment team to do cell searches, but it is not a quick process when issues are identified. He also states that Harris County only assigns one contract worker to inspect contractors when they enter the secure side of the facilities. It is impossible for this deputy to do a proper inventory of the tools and equipment being brought into the jail when they go in and out.

232.     John Doe 34 states that cell searches are not happening because there is

not enough people. The jailers are just trying to get things done on paper but

the job is not getting done. They only have time to go in and scan the rounds

but they do not have time to do the rounds right. They do not have time to do

the cell searches right. Everyone is just trying to keep their heads above water.

233.     Jane Doe 33 is a nurse working in the 701 jail. When she is at work, the

smoking of drugs in 701 is so bad that nurses are getting sick from the smell.

The nursing staff are being called on more codes due to the smoking of drugs

and overdoses on drugs. It has stretched the nursing staff to the point where

they cannot treat inmates who have chronic problems.

234.     John Doe 11 states that synthetic marijuana is a big problem in the jail,

and it is being smoked regularly by the inmates. Synthetic marijuana is toxic,

and it is an illegal substance. There is a big problem with drugs being

smuggled into the jails. There is not training for the detention officers on

recognizing drug and gang activity. In August 2021, an inmate died from an

overdose of MDMB, a synthetic marijuana in pod 4B in 701 jail. Deputies and

detention officers complain everyday about the toxic smell. There was a time

period recently when there would be a daily documented overdosing of drugs

by an inmate in the jail. It is so pervasive that when you enter some inmate

floors, you can see a haze of toxic drug smoke. The smoke affects us as the

employees. The staff gets headaches and other health issues. Respirators and other safety gear are not provided to protect the staff from the toxic smoke.

235.     Jane Doe 13 states that while she was pregnant, she would smell the drug smoke. She would complain to her sergeant but there were not enough people to come relieve her so she could take a break away from the drug smell.

236.     Jane Doe 4 states that the secondhand smoke from the inmates smoking would aggravate her medical conditions. The drugs are a real issue, and nothing is done about it. Her subordinates would complain about the drug smoke, about it being a bad smell, asthma issues, and headaches. The DOs would ask for cell searches to be done but there was not enough staff to do searches.

237.     Jane Doe 20 states that just about every floor at 701 has a drug problem as inmates burn K2 to get high.  The odor of K2 is in the air outside the elevators on nearly every floor.  That odor gives employees headaches.

238.     John Doe 17 believes that drug smoke in the jail is toxic. It is really getting to him and he thinks it is starting to affect his health.

239.     John Doe 13 states that there is a lot of K2 usage at 1200; sometimes it smells like a smoke factory. Part of the problem is the floor staff do not have the time to do thorough cell searches like they used to do them.

240.     John Doe 7 states that like on every other floor, there is a K2 problem on John Doe 7's floor.   On August 25, 2021, they found three inmates incoherent in a cell.  The detention officers conducted a cell search but did not find anything.

241.     Jane Doe 54 states that she was assigned to 701 jail in late August and some of the officers got sick from the drug smoke. One DO had a nose bleed and some had headaches.

242.     John Doe 26 states that the drug smoke is so bad in the pods that he believes he has developed lung conditions and has a hard time breathing.

243.     Jane Doe 41, a nurse, states there is a problem with inmates smoking drugs in the cells. The smoke makes her cough and makes her throat and eyes burn.

244.     Jane Doe 30 states that there is a horrible smell in the jail from the drugs burning and it gave her a migraine headache, made her eyes water, and made her cough.

245.     Jane Doe 23 states that K2 smoke is prevalent at 701 and so was visible dark mold in the ceilings and vents.

246.     Jane Doe 22 states that the constant odor of K2 is the main reason she quit because she is breast feeding her baby and the odor gave her headaches and congestion.  She resigned in August 2021.

247.     Jane Doe 46 is a civilian case manager. The drugs in the jail hinder her ability to do her job. It is horrible. It is hard to smell smoke every time you get off the elevator. It is impossible to know what drugs people are on who are walking around unescorted. There are also a lot of inmates with mental illness who are allowed to walk around unescorted. It is dangerous and it scares her.

248.     Jane Doe 53 states that she normally works as a floor rover; her duties include relieving other detention officers for breaks. Sometimes during this ten-to-fifteen-minute relief period, she smells so much K2 or other drugs that she gets lightheaded and goes home with headaches. Detention officers occasionally find pieces of wires sticking out of electrical plugs that the inmates use to light their smoke.  They also make wicks and alter hotpots to get a light.

249.     Jane Doe 9 is a nurse and states that on or about August 17, 2021, Jane Doe 9 responded to an inmate that had ingested K2 or some other drug, fell, and cracked his head. He was lying in a pool of blood.  By the time she arrived the inmate had taken off all his clothes below his waist and someone had covered him with a blanket. That inmate was removed from the cell on a stretcher.

250.    Jane Doe 45 works with inmates with substance abuse problems. The drug problem in the jail affects her work. Pod 6M in 1200 jail is a substance abuse program and you can smell the scent of smoking drugs from the other pods. It is counterproductive to what she is trying to accomplish with the inmates in the substance abuse program. She states that when she complains in order to protect the inmates in the program and the sergeant told her that they try and catch it but when they do cell searches, they cannot find anything. Some of the inmates in the program have said that the secondhand smoke will trigger their addiction and their craving making it harder for them to go through the program.

251.    Jane Doe 39 states that nurses, like herself, are called on multiple stretcher runs because inmates take drugs and are high and out or hard to control.

252.    Jane Doe 38 went on a stretcher run earlier this year where an inmate was smoking a substance and was belligerent and fighting on the stretcher. He growled, kicked, cornered her, and tried to bite her. It just so happened a DO decided to go with them into the cell. The DO grabbed the inmate's legs and kept him from kicking her.

253.    John Doe 14 states that there has been an increase of inmates smoking K2. It is paper laced with some form of chemical that when smoked gives

individuals a high. Inmates are receiving it, as an inmate told them, through the mail and can be purchased on the internet, and when it comes to the jail it is disguised as legal mail. Inmates have also gone to smoking paper laced with Clorox, consume, or simple green and then douse the paper in left over coffee to disguise the smell (all cleaning chemicals found in the jail). Some inmates have had adverse reactions to this new drug and have been sent to the hospital due to it. There were four incidents in the span of twenty-four hours in mid-August and nothing was done after rovers were called to escort the inmates to the clinic. No cell searches were conducted after all the inmates got sick from the drug contraband. Policy states that a cell search should have been conducted but if this is occurring throughout the building and an officer must escort the inmates down to the clinic and stay with them until they're cleared, how can DOs keep up with their jobs? There are not enough people. He has been told by a lot of officers that they are getting headaches, feeling dizziness, and/or nauseas from inhaling the smoke from the pods. Some officers are exposed for the whole 12-hour shift. Some DOs have wanted to ask for an E1(form to document a workplace injure) but are hesitant because by the time they get one and go to the doctor, the symptoms are gone but everyone is worried about the long-term effects. He is one of those people and he is unsure on how to proceed with this kind of working condition. He wears a mask

however the mask has little effect when it comes to the smoke. He was never told that he had to be subjected to secondhand smoke as part of his job duties. On August 31, 2021, there were two to four stretcher runs on his floor from inmates overdosing on drugs and the inmates were wheeled out in an almost comatose state. From the time the inmates leave the floor a detention officer has to stay with them until they were cleared by the clinic staff to return to housing. Lately, the doctor will order a psych evaluation for the inmates that overdose and the inmates then have to be escorted to 1200 and the DO has to stay with the inmate until they are seen. On August 31, 2021, the inmates were not seen by psych and they were also not released to return to the floor.  MHU told the officer that there were eight other inmates ahead so they wouldn't be seen tonight. That is a long time to have an officer sitting on an inmate off of the floor but that is how the system is set up. An officer is lost to the floor for hours and the officers are not being replaced to do the needed duties on the floor.

254.     Jane Doe 28, Jane Doe 29, John Doe 24, and John Doe 25 are MHU detention officers and have each experienced adverse reactions to the drugs inmates smoke in the cells, including headaches, and burning in their throats. The inmates smoke so much in the cells the smoke sometimes seeps into the PCC.  The cells dedicated to housing MHU inmates stay full most of the time.

F-pod is divided: one side is for MHU and the other for general population. This creates a problem for the detention officers because inmates pass meds and razors that MHU inmates are not supposed to have to that side. John Doe 25 has asked the sergeant if he can get the general population side changed to MHU but thus far that has not happened.

255.   Jane Doe 27 states that in October, November, and December 2020, Jane Doe 27 worked in a unit that gathered intelligence on inmates by reading certain inmates' mail and listening to their phone calls. As a result, she has a better than average knowledge of how inmates receive and move contraband. Inmates' families buy liquid K2 or Super Blue from Amazon (it is not illegal to sell, purchase, or possess). These liquids are sent to inmates in the mail by putting it on paper and allowing it to dry. If one inmate is selling this substance to another, the current going rate is $5 for a single line, or $7 a double-sprayed line. For the inmate to achieve a high, the substance must be smoked, and that process emits a strong odor. Technology is available for inmates to get their mail on a screen (similar to email). Alternatively, inmate mail could be opened, photocopied, the copy given to the inmate, and the original destroyed.

256.   John Doe 1 states that employees of a contractor in the jail are suspected of smuggling contraband to inmates. Inmates are getting K2 and other drugs

in the mail and smoking it. The smoke has sickened several inmates and staff members, and one inmate is suspected of dying from exposure. Employee and inmate injuries have increased, and the county's workers comp carrier routinely fails to authorize legitimate claims.

257.     Jane Doe 1 states that understaffing has directly led to the increase of drug use in the jail. There is no staff available to do cell searches and to properly supervise the inmates. In the last two weeks of August 2021, she is aware of thirteen inmates that have gone to the hospital because of adverse reactions to drugs they got in the jail. Two inmates have died in that time period. In the month of August 2021, a total of      thirty inmates have been taken to the hospital due to drugs and four have had serious overdoses to the chemicals the inmates are smoking in the jail. An increasing number of employees are becoming ill due to the long hour being exposed to the chemical smoke. To compound the problem, the ventilation system in the jail is broken and it is unable to filter the drug smoke that permeates the jail.

258.     John Doe 5 states that there is a huge drug problem in the jail. It is K2 but it is also the cleaning supplies in the jail that are being smoked. It is put on paper with coffee and then sold among the inmates. There have been several inmates who have died from drug overdosing in the jail. When he started in the jail, when they smelled the smoke and fire from drugs, they

would do detailed cell searches but now, a floor only has two rovers, if they go do a search, then no one is doing rounds. There is not enough personnel to do cell searches. Harris County needs to go to paperless mail but that program was denied by Harris County Commissioners Court. The County was not willing to pay for the technology.

## XIII. Harris County does not provide adequate sanitation to keep staff and inmates safe from COVID-19

259.     Jail standards requires that Harris County take necessary steps to provide a sanitary environment to meet the needs of the jail facility. During the time running the jail under the COVID-19 pandemic, Harris County has failed to meet this jail standard. Tex. Admin. Code §279.3.

260.     Jane Doe 25 and Jane Doe 19 were formerly employed by the Harris County Sheriff's Office as detention Officers. L pod is a single man lockdown pod that houses 48 inmates. The pod was designated for COVID quarantine so inmates could be kept separated due to the nationwide health emergency. Only one detention officer was assigned to supervise the pod. The inmates would be let out of their single man cells one at a time to use the pod telephone, use the shower and facilities, and to use the commissary kiosk. No effort was made to sanitize the common areas after the use by a quarantined inmate. The detention officers assigned to the pod would request sanitation and cleaning supplies, but those requests were denied. Harris County would

not provide cleaning supplies in order to sanitize after the inmates and did nothing to prevent the spread of COVID-19 among the inmates.

261.     Jane Doe 7 was assigned to escort a yellow jumpsuit inmate (super maximum security inmate) who at the time was suspected of having COVID, to the 701 Clinic, and later to the 1200 ICU. Yellow jump-suited inmates must be shackled before they are removed from the cell, and she had to unshackle him when he reached his destinations. Additionally, she handled his low-rider (temporary bunk) and mattress. Jane Doe 7 caught COVID from that inmate and was away from work for a month.

262.     John Doe 14 states that a couple of weeks back he and the other detention officers were running out of masks for the inmate workers, and they couldn't find any in the building. This of course was during the time that most of the workers were being quarantined due to one or more having the Covid. About four or five co-workers on the floor have come down with Covid in the past month. Officers are also being docked of their personal time while they are out for having Covid. A lot of individuals return still feeling the symptoms, tired, dizzy, headache, trouble breathing, etc. because they run out of time and or they're told in a not so direct way that they may be milking it. One detention sergeant who got COVID was able to trace to which inmate she got sick from but her time was docked until she argued the workers compensation denial.

Employees have enough stress as it is with not being able to spend time with their families or loved ones, to also make them fight the system to get rightfully compensated or covered for injuries they get during the course of doing their duties is too much.

**XIV.  Harris County must implement a system for inmate discipline**

263.     Harris County must provide firm, fair, and consistent discipline to the inmates and must provide an inmate grievance process to address inmate concerns. Tex. Admin. Code §283.1; 283.3

264.     The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. The handbook states that inmates must abide by the rules of the facility and major infractions of disciplinary rules will result in disciplinary action, loss of privileges, and possible criminal action.  *See Harris County Sheriff's Office Inmate Handbook*, Harris County, pgs. 34-35 (revision date December 2018).

265.     Harris County takes no action to discipline inmates when they break disciplinary rules, including serious crimes. This lack of discipline creates an enhanced and foreseeable danger to jail staff.

266.     John Doe 5 thinks that the inmates attacks on DOs is up because the rules in the jail are not being enforced. The disciplinary process is a failure. There are no repercussions for the inmates. There is not the staffing to go

through all the inmates' discipline. Based on his knowledge and experience, he estimates that eighty to ninety percent of the disciplinary cases against inmates are dismissed. The inmates know that and they know nothing will happen when they are disciplined. Inmates used to have certain sanctions like losing visitation or good time credit. Now they only lose their commissary but then they just get it from the other inmates.

267.    Jane Doe 4 states that as a jail supervisor, she is pressured to not file state charges against inmates who commit serious offenses because Harris County does not want inmates to remain in the jail. Punishing inmates for serious infractions would only delay their transfer to Texas Department of Corrections. There was one incident in the summer of 2021 where an inmate spit on several staff members while he was being escorted. A detention officer complained. The first thing the supervising Lieutenant stated when she heard of the incident was to not press charges on him because it would extend the time the inmate was in the jail. The inmates know there is no consequences for their actions. She would file disciplinary reports about rule infractions in order to keep track of incidents, but nothing ever happened with them. About seventy percent of discipline reports against the inmates are dismissed. If an inmate is found to have broken an inmate rule, commissary is taken away. Harris County will not allow the Sheriff's Department to discipline inmates

for rule infractions because the County makes money on the inmate commissary which is the only funds used for certain unfunded inmate programs and for inmate supplies. The inmates know that they will not be disciplined for rule infractions and are emboldened, act out, and lash out at the staff.

268.    John Doe 11 knows that it has been suggested that Harris County develop a Loss of Privilege pod where all the inmates are on loss of privileges for discipline. Harris County refuses to do this. Instead, inmates who do receive loss of privileges, are kept in the same pods as inmates with privileges. The inmates will still get their privileges from the other inmates so there is no comprehensive discipline.

269.    John Doe 17 believes the behavior of the inmates just keeps getting worse. In June 2021, an inmate threw feces mixed with urine at him through a panhole. Afterwards, there was no way for him to clean his clothes or to leave and get clean clothes. He had to stay and work after that because there was no one to relieve him. He was not able to discipline this inmate after the incident.

270.    The Harris County Sheriff's Office Inmate Handbook defines disciplinary rules. Disciplinary rule 1109 states "No inmate shall take part in any sexual act to include but not limited to: sexual assault, sexual abuse,

sexual intercourse, masturbation of oneself or another, anal sex, oral sex or manipulation or stimulation of any person's private parts. The touching, directly or through the clothing, of the genitalia, breasts inner thighs or buttocks of another person." *Harris County Sheriff's Office Inmate Handbook*, Harris County, p.37 (revision date December 2018).

271.    Jane Doe 33 believes this is the worst the jails have ever been and she has worked for Harris County for over two decades. An emergency medical code was called in pod 7F1 in 701. When a code is called, the nursing staff rush to the inmates in their cells or pods in order to render aid. Jane Doe 33 went into the pod. One nurse responded with the stretcher but was too scared to enter the cellblock. She was so scared; she was asked to stay outside. Jane Doe 33 rushed to the inmate who she was told was in distress. She had been told the inmate had a seizure and went to the ground. When she went to access the inmate, the other inmates in the pod surrounded the staff. The inmates draped blankets over their heads to hide themselves masturbating. Jane Doe 33 could clearly see the inmates masturbating. She asked them to back away and to stop. Normally, inmates are not allowed to have their blankets during the day, but the rules have become very laxed. One detention officer was in the tank with her, but they were outnumbered by aggressive, masturbating inmates. The inmate who stated that he had suffered a seizure was a young

male. According to Jane Doe 33, a medical professional with decades of experience and training, the inmate was not showing signs of having a seizure and was coherent. He later changed his story to say that he fell. Fifteen to twenty minutes later, the same code was called for the same inmate. It was clear to the nursing staff that the inmates were faking illnesses in order to get the nurses in the tank to sexually assault them. The head nurse for that day demand the sergeant escort the nurses into the tank on the second call. The inmate who had a seizure later recanted his symptoms but was checked out and cleared by the clinic. Jane Doe 33 fears that if the inmates are allowed to continue this behavior, a staff member will be attacked and raped. She knows that the Chief over the jails knows of the issue, but nothing is done about it. She sees and hears reports from civilian medical staff of being grouped, grabbed, and sexually assaulted daily and nothing is done to keep the civilian staff safe and or to discipline the inmates. A friend of hers that passes out medications in constantly dealing with inmates putting their penises through the panholes of doors to try and touch her hands while she is handing out medication. This nurse also constantly has to deal with inmates masturbating in front of her. Due to the lack of consequences for the inmates' actions, the nursing staff in scared to go into the pods to treat inmates.

272.    Jane Doe 42 has only worked as a nurse in the jail for Harris County for less than a year. Two months ago, she went to the 5th floor to pass out inmate medications. When she walked into the 1-side inmates started grabbing their blankets. She did not know where her rover was and was concerned that the inmates were standing all around her.  She banged on the window to get the attention of the detention officer. On the 2-side she saw at least six inmates masturbating.  Her rover returned to her location and she told him she was not going to pass put medications while that was going on and left the cell. When she went in the 3-side there were two more inmates masturbating under blankets. When that happens, she normally just repositions herself. When she did, she stepped too close to a panhole and felt the inmate inside touch her buttocks.  She confronted the inmate and asked, "Did you really just touch me on the a**?" The inmate responded, "Oh, Oh, my bad."  She turned to and told the D.O. that was at that time in the cell with her that the inmate touched her buttocks.  The DO either did not see it happen or pretended not to. From what the DOs have told her the detention officers do not feel like they can do anything about the inmates without being a part of an investigation and nothing happens to the inmates anyway. Jane Doe 42 walked out of that cell and went to the next pod.  She wrote a report that day but does not believe anything was done about it.  The offending inmate is still in jail and talks to

her when she passes out medications. She told the inmates on 2A and 2B that if they didn't stop she was going to leave (and they would not get their medications).

273.    Jane Doe 37 states that nurses, like herself, have to deal with being sexually assaulted on a daily basis. Inmates will masturbate in front or at the nurses constantly, including in the clinic.

274.    Jane Doe 20 was assigned as a rover on the 6th floor of 701 on June 10, 2021. She went to do CorreTrak rounds in Cellblock 6F. That cellblock has four pods designed to hold twenty-four inmates each. Jane Doe 20 had made CorreTrak rounds in the first two cells and was in the third (6F2-3) when she was assaulted. The QR codes have been moved inside the cells, so she had to physically enter the cell to do her job. According to policy, there should have been another detention officer at the doorway when she entered the cell, but there was not because the jail is too shorthanded. 6F2-3 is a two-tier cell. She had reached the top of the stairs when she noticed an inmate had his hand inside his pants and was masturbating. She told the inmate to take his hand out of his pants. It appeared the inmate was going to comply, but moments later she saw him approaching her through her peripheral vision. The inmate stated something to the effect of, "I'm going to get some, some kind of way." The inmate grabbed Jane Doe 20's left breast. She tried to push him away

and he tried to grab her vagina. Jane Doe 20 circled around the bunk to get away from him, but he jumped through the bottom bunk and grabbed her pants from behind. Jane Doe 20 tried to punch the inmate but missed and struck the concrete pillar and broke her right hand. Another inmate got between her and the inmate that was trying to rape her and she was able to go downstairs. As she exited the door the responding rovers were coming in and she identified the inmate that had assaulted her. She was told by Harris County that in order for charges to be filed she would have to write a report before going to the hospital. That took a while because she had to type with one finger. When that was done, she went to the 701 clinic. The staff there wrapped her hand in ice and sent her to the Memorial Herman emergency room. At the hospital she learned her hand was broken.

275.     Jane Doe 7 worked on the 6th floor at the time of the assault on Jane Doe 20. She states that the inmate that assaulted Jane Doe 20 was well known for masturbating in front of female staff but staff felt powerless to have him moved or disciplined for his actions. After the assault, however, he was moved to another floor.

276.     Jane Doe 30 states that when she was assigned in the jail in August as a rover from her regular assignment in JPC, the Inmates lined up at the window to masturbate in front of her.

277.     Jane Doe 16, Jane Doe 26, and Jane Doe 32 all state that inmates constantly masturbate in the presence of them and other female employees. Employees write the inmates up, but nothing happens to them.  In the summer of 2021, Jane Doe 26 wrote up an inmate for masturbating in her presence and a sergeant told her that was "what she signed up for." Jane Doe 32 states that each time it occurs, she would write up a disciplinary case against the offending inmates but nothing ever happens.

278.     Jane Doe 21 states that inmates masturbating in front of her, and other female personnel is a frequent occurrence.  The last time she encountered a masturbating male inmate was on or about Wednesday, August 18, 2021. Jane Doe 21 was standing in the elevator lobby with male inmates and it was taking a while for them to return to their cells because cell searches were in progress. In an apparent attempt to move things more quickly, one of the males being transferred to the floor displayed his penis and masturbated.  Jane Doe 21 called for a male detention officer to move that inmate to a holding cell. However, not all inmates that expose themselves to females are put in holding cells or even charged.  Some supervisors discourage writing them up because seemingly nothing is ever done.   Classification personnel, the people responsible for transferring inmates, often refuse to move them, even if the masturbation is a repeated offense.

279.    Jane Doe 23 states that when she worked overtime in 701 from the JPC, she was subjected to inmates masturbating. Most all the time she wrote disciplinary cases on the offending inmates.  She also wrote "Unauthorized Contact" cases on inmates who were disrespectful by making comments that she looks good in uniform, "I'll be your husband," or "I can do better for you." In the short time that she has worked in the jail, one inmate did try and grab her by the waist, but she was able to realize it in time to call out and stop him.

280.    Jane Doe 11 states that on August 25, 2021, an inmate told Jane Doe 11, "You can bring you're a** in here and you'll see what I'm charged with, and I'll beat you're a** too."  Rather than go in the cell and chance an altercation, Jane Doe 11 had a male employee make rounds in that area. She has had inmates masturbate in front of her. It is common knowledge that nothing much if anything is going to happen to male inmates who expose themselves to female staff.

281.    Jane Doe 27 states that in the twenty-four months she has worked for Harris County, approximately eight inmates have masturbated intentionally in front of her.  Unfortunately, Classification routinely refuses to move that inmate.

282.    Jane Doe 7 states that inmates have masturbated in front of Jane Doe 7 many times, particularly in 701 jail pod 6J. On August 24, 2021, two inmates

were masturbating in her presence.  One of them said, "do something about it b***h, I don't care if rovers come or not."  A few months prior to that, eight inmates masturbated in her presence simultaneously; she was surrounded by inmates masturbating in the four cellblocks.  In that instance, the sergeant told her, "you know we're not moving them for that," so she told the sergeant to move her.  On the day the eight inmates were masturbating, she wrote disciplinary cases on those she could identify, but she could not get all eight, though she had witnessed masturbation including full penises and ejaculation. The inmates she observed masturbating already had too many state charges for the District Attorney's Office to accept another misdemeanor, so nothing was done.

283.    Jane Doe 35 is a nurse and states that when she would hand out medications on the floors, inmates masturbated in front of her routinely. Nurses and psych employees assigned to 2C at the 1200 jail are subjected to males masturbating routinely.  The psychologist used to see those inmates for psych evaluation but stopped seeing them because masturbation is not "self-injurious behavior."  When Jane Doe 35 first started working for the HCSO at the old 1301 Franklin St. jail, this conduct was not permitted, and she loved her work and looked forward to going to work every day.  Now she is looking forward to retirement.

284.    Jane Doe 41 has worked as a nurse in the jail.  As she delivers meds to inmates on the floors, they masturbate in front of her every day.  Sometimes as she tries to give an inmate his medications, he has his penis in his hand.  Rovers, particularly the younger ones, sometimes pretend they did not see the inmate masturbating.  The rover is supposed to be at the door when meds are delivered, but sometimes the inmates tell the rovers to move, and sometimes they do move out of the way.  Jane Doe 41 has seen four or five inmates standing at the window masturbating simultaneously.  She has also seen inmates on the upper and lower levels masturbating simultaneously.  When panholes in the separation cells are opened, sometimes an inmate will put his penis on it.  Inmates also masturbate when nurses respond inside the cell for emergency medical codes.  When one DO told a masturbating inmate to move, the inmate continued that activity and responded, "let me get it."  This is a daily problem.

285.    Jane Doe 36 is a nurse and delivers about 1000 pills a day to inmates on the floors.  On or about April 21, 2021, she was pushing a medication cart through the clinic when an inmate slapped her on her buttocks.  When Jane Doe 36 pushes a med-cart around the housing floors, inmates routinely masturbate in front of her.  To avoid this, she tries not to look into the cells any further than she has to (the inmates come to the door to get their meds).

A month ago (on or about July 30) an inmate told the female detention officer that was escorting her to step aside. When she did, the inmate ejaculated.

286.    Jane Doe 43 has worked as a psych-tech for Harris County about a year. When she goes to the floors to do her job she routinely sees inmates masturbating.

287.    Jane Doe 9 states that when she has been assigned to B-pod, masturbating inmates was a regular occurrence any time they saw a civilian female (Aramark employees, nurses) enter the cell.

288.    Jane Doe 53 states that she sees inmates masturbating almost every day and writes disciplinary cases the majority of the time. Those cases are often dismissed. She has learned that if she charges a masturbating inmate with "engaging in a sexual act" the case will be dismissed because that is the wrong charge. So now she charges them with "engaging in sexual activity," the correct charge. On one instance after an inmate masturbated, she tried to handcuff him. The inmate pulled away and pushed her and another female inmate, causing her minor injury.

289.    Jane Doe 34 first started working as a nurse for Harris County in the 90s, left for a time, and then came back. The inmate threats, the lack of security, and the danger caused her to leave again in August 2021. When she was assigned to work the medication cart her stomach was already in knots

before she could get to the floors because it was so stressful. The last time she delivered meds to 7F the inmates heckled her saying fowl stuff the whole time. The DO told them to move but they came back and surrounded her. Another inmate told her he knows what she drives and when she comes to work. He said he would be "watching" her when he gets out of jail. An inmate stuck his arm out of the panhole and cupped his hand around her buttocks. Another inmate was hiding in an effort to throw urine on her because she could not give him the meds he wanted. She insists that the detention officers write a report for that incident. An inmate in double-door lockdown pulled an agency nurse's arm through the panhole and broke it. That nurse never returned. It had gotten to be too much for her and she resigned.

290.     Jane Doe 51 is a civilian assigned to the jail. She is afraid to leave her clinic office because inmates are out of control. They always look at her in a sexual way, talk about her "a**," and put their hands inside their pants.

291.     Jane Doe 50 has been a civilian assigned to the jail. Around the last week of July 2021, she saw a detention officer escorting about 5 inmates from Classification to the clinic. The last inmate in line, a Hispanic male, pulled out his penis and shook it at her. She notified the escorting detention officer and identified the offending inmate. She does not know whether the DO wrote a disciplinary report on the offending inmate. Inmates are routinely lined up

in the hallway outside her office. When she passes them they often grab their crotches.

292.    Jane Doe 48 is a civilian assigned to the jail. As she leaves her office and walks to the restroom or elsewhere down the clinic hallway, inmate make comments about her "a**," asks whether she has a husband, tells her they will be looking for her when they get out, and grab their crotches through their jail jumpsuits. Jane Doe 48 believes detention officers are afraid to say anything to the offending inmates.

293.    Jane Doe 46 is a civilian and was coming out of an office on the 6th floor of the 1200 jail. There were trashcans across in the hallway that are very large, almost the size of a dumpster. She saw an inmate by the trashcan. He was acting like he was looking for something in the dumpster. When she came back to the office the same inmate was standing by the trashcan masturbating watching her with his penis fully exposed. She screamed for someone, but no one was around. She then went to look for a DO and couldn't find anyone. She was running up and down the hall screaming. She finally was able to find someone. She was scared. She did not know what the inmate had planned by being there. She later learned that the inmate had been there waiting for her to come out. He was shown on the cameras hiding behind the big trashcans for more than fifteen minutes watching her door. He was already there for an

aggravated charge so the DA would not accept charges when Jane Doe 46 ask

to pursue charges. He was moved to 701 jail.

294.     Jane Doe 45 is a civilian working in the jail. She was coming out of an

office on the 6th floor of 1200 and there was an inmate hiding behind the large

trashcan in the hall. The hall trashcans are so large that they are more like

dumpsters. The other female employees in the office were scared to go out

into the hall because there was an unescorted inmate hiding behind the large

trashcan. The inmate had been there lingering outside their door for a while.

Gwen had waited enough and went to find a DO and had an issue finding

anyone. She yelled and called, and it took her some time to find anybody.

Finally, she found a DO to remove the inmate from the area. The inmates will

need to go to medical or somewhere else and there is no DOs to escort them,

so they are allowed to walk around and go where they are not supposed to be.

The civilians who must work in the jail feel in danger. Morale is terrible in

the jail. No one is getting the support that they need. It just keeps getting worse

and worse every day.

295.     Jane Doe 46 is a civilian case manager. She was walking from the 6th

floor offices with two other female civilians. An inmate approached them in

the hall and as he was passing them, he popped a female colleague on the top

of her head. They screamed for DOs but there were no DOs around. The

inmate was laughing, charging at them, and teasing them. He was focused on the female who he had hit on the head. Finally, sergeants came out of the sergeant's office and took the inmate away. As the inmate was being led away, he was fighting to get at the female he had assaulted. The sergeants took the inmate to the holding cells but did not put him in for some reason. Then they brought the inmate back towards the female civilian. Then the inmate started talking provocatively at the civilian employee. They were all upset by the encounter, especially the female civilian that was targeted. The inmate was not moved from the floor and the Assistant District Attorney would not take charges against the inmate. Jane Doe 46 and the other civilians often talk about whether anything would happen to inmates that did things to the staff. Rarely is something done. The staff does not feel like they are getting the protection they need to do their jobs and feel safe.

296.     Jane Doe 44 is a civilian manager. She manages civilians who must work in the jail. She went to the captain to ask about escorts and she was told that there were not enough detention officers to escort civilians. She told him that the inmates needed to be escorted like they were supposed to be and that would prevent them from attacking civilians that have to work in the jail. Of the inmates she encounters in the hallway, she estimates that 80% are supposed to be going to medical but then wander around. There never is any

follow up on the issues her employees experienced, like when they are attacked or sexually assaulted. She asked if she could give the civilians whistles for when they are in danger, but that request was denied. Her biggest fear is that one of her employees is going to get hurt. She believes it is essential for the civilian workers to have access to the floor to run the programs such as drug counseling and life skills classes, but the inmates have more access than the civilians. The programs are important because it reduces the recidivism rates of the county. The county needs these programs. All the inmates need these programs, but the jail environment right now does not help the civilians fulfill these needs. The conditions in the jail are not what the civilian staff signed up for. When they were hired, they believed that they would be secure, supported, and safe working in a law enforcement agency. They are not supported voicing their concerns on safety and working is unsafe.

297.   Jane Doe 38 has been employed as a nurse in the jail for some time. She said working conditions are "so much worse now." "You know when a 19-year-old jacks off on a [woman her age] or pulls it out on the table, it's a joke to them." Detention officers sometimes allow inmates to crowd around the nurses even though there is not enough staff to control the inmates. Some of them have blankets around them and they are masturbating. She sees inmates masturbating at least twice a week in clinic. The inmates know we

cannot say or do anything to them.  Inmates 17, 18, and 19 years old come to the clinic and say they have chest pains because they know the medical staff has to see them, then they start masturbating. A couple of times when Jane Doe 38 was checking inmates' vital signs they touched her breasts, then acted like it was an accident.

298.    Jane Doe 39 frequently observes inmates masturbating. On one instance Jane Doe 39 left the cell without handing out meds to any inmates because one of the inmates was masturbating in close proximity to her. A detention officer met her in the hallway thereafter with the remaining unmedicated inmates and she gave them their meds. Seeing inmates masturbate is nearly a daily occurrence when she works a medication cart.  On one occasion she was handing out meds and an inmate stuck his penis through the panhole and refused to move it. Lewd comments usually follow masturbation events.  Jane Doe 39 wears loose-fitting scrubs because she has a big bottom and wants to thwart unwanted attention.

299.    Jane Doe 40 resigned from Harris County as a jail nurse in April 2021. About a week before she left, she made a stretcher call to one of the floors. The inmate on the stretcher grabbed her buttocks.  When she brought it to the attention of the on-scene DO, the inmate twisted her arm until the DO intervened and handcuffed him.  Criminal charges were filed.  She has also

been grabbed by inmates sticking their arms through their panhole.  Inmates masturbated in her presence "all the time" in the clinic and on the floors. When they did, she would try to look away.  She states that working the medication cart was horrible.  Inmates threatened to rape her, go to her house, and kidnap her.  Seldom is anything done about these threats. In one instance she complained in vain because the offending inmate had already been sentenced to go to prison and the threats would not add anything to his sentence.

300.     Jane Doe 28, Jane Doe 29, John Doe 24, and John Doe 25 are MHU detention officers.  They see inmates masturbating multiple times every day. Sometimes inmates stand on tables when they masturbate.  Jane Doe 28 said inmates make lewd comments when they masturbate, like, "I got something for you here."  Some of the inmates fake emergencies then put their penises through the panholes when nursing staff arrives.  MHU inmates are the most volatile, but they keep moving staff out of the area to cover for areas that are short.

301.     John Doe 20 states that masturbation in front of female employees was an almost a daily occurrence.  They used to pull the offenders out and put them in separation because masturbation made the females very uncomfortable, but that is not done anymore.

302.     John Doe 14 states that towards the end of 2020, a female DO was conducting rounds on the 7th floor F pod and an inmate came up behind her and placed his penis on her back. There were only two rovers assigned on the floor at that time. Other staff was off the floor. There was no one to respond to the incident and nothing was done. On September 8, 2021, a female DO entered a pod due to a page regarding a medical emergency. An inmate had fallen and it was suspected he was having a seizure. She entered the pod alone and ordered the inmates in the open dormitory to move back and the inmates complied. She then went to the fallen inmate to check if he was ok. An inmate came up behind her, reached between he legs, and slid his hand from front to back caressing her vagina and buttocks. John Doe 14 stated he saw her visible shaken by the encounter. The next day on September 9, 2021, a female DO was in a pod conducting count. An inmate became argumentative and grabbed the DOs buttocks. There was a struggle with the inmate and a page went out for rovers to respond. The inmate fought with responding detention officers. The masturbation is ongoing any time the nurses come with the medication cart. The nurses get so harassed that sometimes they just leave. He wrote the inmate up when he masturbated at the door at the nurse, but nothing was done to the inmate. He continually masturbated at the female officers and he was finally moved after several encounters. It is all demoralizing to the staff

because you see inmates assault or violate the staff or other inmates and nothing is done about it.

303.    John Doe 10 is a jail supervisor employed by Harris County. He knows that inmate grievances in the last year have doubled. Inmates have filed grievances with Harris County that they are in personal danger because of lack of staffing and the facility not meeting the 1:48 ratio. They have complained that there are not adequate cleaning supplies, and that the A/C does not work in parts of the building. Their grievances are not addressed by Harris County.

## XV.    Harris County does not adequately monitor jail standards in order to gain compliance.

304.    Jail standards requires compliance with the standards set by the Commission of Jail Standards. *See* Tex Admin Code §297.1 – 297.3; §297.5-297.6. Harris County does not take the necessary steps in order to monitor compliance, follow up on violations, and keep the jail in compliance.

305.    John Doe 5 states that the jail is not meeting jail standards daily. The compliance reports show that there are repeated violations every day and that some of the issues are chronic. There is no follow up on issues and somethings just continue to sit out of compliance.

306.    Jane Doe 4 states that the compliance team will inspect once or twice a week to inspect for compliance on jail standards; however, the compliance team does not check if the floor is meeting ratio at any given time. The

compliance team will look at security/PREA rounds, fire and life safety equipment, hot water availability in the showers, inspect the sinks and mops, inspects the toilets, inspect the intercoms, inspect the radio/TV/telephones, inspect the electrical outlets, inspect the lights, inspect the air temperatures in the pods, inspect the smoke detectors/sprinklers, inspect the doors/panholes/security screws, inspect for graffiti, inspect for gnats, and inspect for cleanliness of cells. The compliance team is not charged with fixing issues. The compliance team will give any issues to the floor sergeants to write maintenance requests. The compliance team does not do any follow up on issues. Compliance issues are documented on Compliance Reports.

307.     John Doe 2 states that the compliance team would identify violations and turn in the list to the floor sergeant. Some issues are facility issues and not floor issues. They do not generate work orders or maintenance orders. They do not do any follow up. They do not look at ratio compliance. They do look at round compliance. The compliance team is designed to catch issues with the facility, and they do identify the issues but they do not have the power to fix chronic issues.

## XVI.  Harris County does not adequately train personnel to work in the jail facility creating a chaotic and unsafe environment

308.     Newly hired detention officers receive minimum training before they are assigned to work with inmates in the Harris County Jail. Detention

Officers are often not trained on how to run floors, supervise inmates, or to adequately meet jail standards while being understaffed.

309.     John Doe 1 states that employees have reported to him that trainees are being put on the roster to make it appear the jails are meeting staffing requirements, are being utilized for tasks for which they have not been trained and are missing valuable DTO training.

310.     John Doe 2 states that the training procedures for new employees is set up to be that when someone is hired as a detention officer, they do a four-week orientation. During this training only two days are spent in the jail facilities shadowing other detention officers. Then a new hire receives a temporary jailer license from TCOLE. At that point, the new hires are considered trainees. They then spend two weeks in a training program where they are paired with a detention training officer (DTO) that are taught on how to train the detention officers. After the two weeks of DTO training, the new employee is no longer considered a trainee but still holds a temporary jailer license. TCOLE guidelines state that a person holding the temporary jailer's license must complete jail school and get their jailer's license within a year. The new employees go to the HCSO academy for 4 weeks to complete jail school and get their full jailer's license from TCOLE towards the end of their one year. While new employees are trainees, the trainees are not supposed to

work on their own or be counted in the ratio. John Doe 2 states that while he
was a supervisor and the floor was short, it was common for the administration
to want to place a trainee and a DTO in a two-man pod together without a
second DO. He would tell them that was against policy and not allow it on his
shift, but he does not think that every sergeant stood up to the administration
on these points.

311.     John Doe 2 states that each detention training officer (DTO) must go
through a 40-hour training course certified by TCOLE to be considered a DTO
and to receive incentive pay for acting as a DTO. There was a total of forty-
one DTOs at the end of August 2021 that were actively training new
employees. Of those forty-one, only three had completed the 40-hour training
course required to be a DTO. The DTOs have not been sent to complete the
course because the jail schedule cannot afford to lose these employees from
the schedule for a week due to understaffing; however, the DTOs are expected
to train the next line of detention officers even though they have not been fully
trained for the job.

312.     John Doe 8 is a jail supervisor. He has also been involved in new hire
and DTO training. He is aware that trainees are being used to fill the roster to
make the 1:48 ratio.

313.     Jane Doe 26 has worked for Harris County for 25 months.  During her "training period" she was assigned to escort inmates to the clinic and work with nurses on the med-carts but was not trained to work in a pod.  On her first post-training day, she was assigned to work in a pod.  She told the on-duty supervisor she did not know how to work a pod and asked for someone to work with her for a day to show her how.  Jane Doe 26 knew how to open the doors, but not much else; but that request was denied.  Jane Doe 26 did not know how to call out on her phone; until someone showed her, she had to wait for someone to call her.

314.     John Doe 31 has only worked for the Harris County Sheriff's Office for a month and a half.  For the first two weeks John Doe 31 attended orientation; for approximately two more weeks he worked with an DTO.  John Doe 31 learned de-escalation, how to write reports, and how to get to the tunnel and other places in the jail complex.  During his training he did not learn much about the county computer system or how to access OMS.  Approximately two weeks ago he was assigned to work alone in a pod control center though he wasn't trained on it.

315.     Jane Doe 14 is concerned that trainees with a little as two days on the job are left working alone and even allowed to go into cells alone; some have been involved in use of force incidents.

316.     John Doe 29 states that on August 22, 2021, there was a fight between a staff member and an inmate and there was only one rover to respond.  A trainee had to be left alone in the floor control center due to the staffing shortages.

317.     Jane Doe 9 is a detentions trainer (DTO). In two weeks, she can normally train a new employee on what they need to know; but her trainees are sometimes taken from her and utilized for other things.

318.     Jane Doe 21 is a DTO.  Last year she failed a trainee because he had locked an employee in a vestibule with an inmate, made several other serious mistakes, and she believed he was a liability.  That trainee was assigned to another trainer and he, too, failed him for similar reasons.  The detention command kept him on the job nevertheless, likely because they are so shorthanded.

319.     John Doe 14 says that trainees are not supposed to be left in pods by themselves, however he has seen when they are put in pods by themselves due to staffing or sent to walk the med cart by themselves. It is done until the floor gets staffing sent from centralized staffing but that can take several hours until there is someone to relieve a trainee – if anyone comes at all. There is not anyone available to do it. The training officers on the floors are rovers so the trainees are not trained in the pod, which is where they will be placed. There

is no standard of what a detention officer must learn when with a training officer.

320.     Jane Doe 38 witnessed a trainee escorting an inmate to the clinic alone on September 1, 2021.  They count trainees toward the roster, but they send them to the clinic with inmates.  Jane Doe 38 is a nurse and responded to a cell recently with a stretcher and the lights were off in the cell and the detention officer did not know how to turn them on.  When other detention officers arrived, they explained that the man in the FCC was a trainee.

321.     John Doe 7 states that he has received emails from command staff stating not to use trainees in pods by themselves, but they use trainees to make the personnel count look better. There is no choice when the people are not provided to run the floors.

322.     John Doe 18 works in JPC but will get loaned out to 701 jail often when they are short. He has not been fully trained to work housing; his knowledge hardly exceeds opening the doors and watching the inmates. Supervisors tend to "throw new boots to the wolves" (by not properly training them) and they end up quitting.

323.     Jane Doe 54 is normally assigned to JPC but gets placed at 701 due to staffing shortages. She has been assigned to a location with a computer

systems she has not seen and she has not been shown how to operate it. She was not able to actually work that assignment but was placed there anyway.

324.    Jane Doe 30 works at JPC as a detention officer. In August JPC staff started being assigned more frequently to the housing jails. The first time she was put in a pod at the 701 jail she told the sergeant she did not know how to open the cell doors. He told her the person she would be relieving would take five minutes to show her how to operate everything. She did not do a T-card/armband count. She did not know how to work the speaker in the pod, so she communicated as best she could through the window basically reading lips.

325.    John Doe 9 has seen the conditions for all jail employees become critical due lack of manpower and training. This is leading to more encounters with inmates and inability to address threats to staff or other inmates. Inadequate staffing is leading to critical aspects of the job not being done. Ongoing training has been reduced to five-minute videos on the internet. OMS system is time consuming and difficult to use as not always readily available.

326.    John Doe 5 states that the jail does not have the ability to send people to training due to being so short staffed. Sometimes when he is reviewing personnel, he and supervisors will identify a problem that would be best handled through training, but they have lost the ability to send jail staff to

training. Only online classes are available for detention staff. Additionally, there are no training supervisors, no one monitors the trainers to make sure that everything is being done and that the DOs are ready to go on the floor. There is no standard for the training of the detention officers by the DTO. There is also no real training for the supervisors when they are assigned to the jail. There is nothing given to them on what they need to do and how they need to do it. It is all done on the fly and by the hope that someone else will show them what they need to do. No training on the paperwork and no standard. When he came into the jail as a supervisor, he was just thrown into the assignment, and he had to figure it out as he went. He feels like he has had to design his position, not because it is new but because there is no one to show him what to do or give him clear directives.

327.     John Doe 34 states that Harris County is asking staff to do things that they are not trained to do, they are not giving them the backup that they need, and the employees are completely worn out. The staff is fatigued and are not functioning. There is not enough people to do the jobs on the floor. The detention officers, deputies, and civilian staff are all in danger. The jail is not in control. The inmates are not safe. It is a dangerous environment, but it does not have to be. To do the job safely and have control of the floors, we are nowhere near staffed. The training right now is just the minimum needed for

new hires to get their TCOLE license. The ongoing training and the training

new employees need to master the job is not happening. How the County has

treated the detention officers has been the straw that has made him think about

retiring. It is awful and it needs to be fixed. He does not think the jail has ever

been as dangerous as it is right now for everyone inside the doors.

## XVII. Harris County overworks employees by implementing unsustainable mandatory sixty-hour (and greater) workweeks

328.    On April 25, 2020, as part of the COVID-19 declared emergency and

additional staffing shortages, the Harris County Detention bureau moved to

12 hour shifts for the 701 San Jacinto Street Jail and the 1200 Baker Street

Jail. It was told to employees that it would be a temporary move and would

not be permanent. Email from Chief Shannon Herklotz to all criminal justice

command staff, Memo to CJC Staff re: 12-Hours shifts, Feb 26, 2021.

329.    On February 26, 2021, Harris County announced that the 12-hour shift

schedule for the 701 San Jacinto Street Jail and the 1200 Baker Street Jail

would be permanent. *Id.* It was also announced that in time, Detention

Officers would receive an extra day off per pay period. The memo stated that

the "leadership team recognizes that the number of hours required of our

Detention Officers is simply too much for anyone to sustain over an extended

period of time. In order to help our teammates reestablish a healthier work-

life balance, we are striving to create a schedule that will eventually allow all

Detention Officers to take off three days per week. The key to making this happen is hiring and training more staff, which will take time. This plan also requires us to increase our staff retention rate, which we know can only be accomplished when our current staff members feel valued and well cared for. To put it bluntly, we need you to want to stay here. To that end, our leadership team is committed to doing everything in our power to find opportunities for Detention Officers to have three days off, whenever possible." *Id.*

330.    By information and belief, detention officers did not receive a third day off in a work week to make up for the 12-hour shift schedule.

331.    On May 13, 2021, a memo was sent to all jail staff from Harris County stating that attendance issues have only gotten worse at the jail and it is impossible to implement a work schedule of four 12-hour shifts. Email from Chief Shannon Herklotz to all criminal justice command staff, *CJC Attendance Issues*, May 13, 2021. The email blames the inability to transition to four 12-hour shifts on the employees who utilize their accrued legal benefits such as sick time. *Id.* The email states that all detention officers will be able to bid for one additional day off a pay period thereby working five 12-hour days one week and four 12-hour days the next week, but this will only be implemented if people stop using their accrued county benefits such as sick time.

332.     On June 17, 2021, in an email, Harris County revoked the promise of an extra day off in a pay period stating that the jail is too short staffed. Email from Chief Shannon Herklotz to all criminal justice command staff, *Rescinding of 3rd Day Offer (Final)*, June 17, 2021. The email states that the third day off in a pay period was meant to be a "reward" by gifting employees "an extra 24 days off per year," but that with resignations, terminations, and the "abuse of sick time" it cannot be done. *Id.* This email does not acknowledge the original promise of four 12-hour shifts. The email states that Harris County is "currently at critical levels when it comes to safely staffing our jails" and that lack of staffing possess "a serious safety issue not only for the inmates but for our team members." *Id.*

333.     Throughout 2021 there was a systematic policy in Harris County to shame employees who utilized their accrued time off benefits and to try and force employees into not using their vacation, sick, and comp times due to the understaffing of the jail. However, Harris County saves money by employees not utilizing these benefits and by not hiring new employees.

334.     To this date, detention officers working the 701 Jail and the 1200 Jail are scheduled for five 12-hour shifts a week and are still subject to mandatory overtime to work up to 16-hours. Employees who call in sick, even after they

have worked forty hours in a week, are docked a sick or comp day. They are often written up and disciplined when they try and use their accrued time.

335.    John Doe 5 states that forced overtime is not going away. How long can people work five 12-hour shifts a week? People are being overworked. When they went to 12-hour shifts the expectation would be for an extra day off per pay period but that cannot happen because of the understaffing. The DOs were told they would have more off time to sell them on the 12-hour shifts but the administration went to 12-hour shifts knowing there was not enough people to fulfill the four-day workweek when it was implemented in 2020.  Getting more days off and less overtime was how it was sold but it is impossible to make that work with the staffing that was in place when 12-hour shifts began, and it is even more impossible now with even less staff. The jail will not be able to go to it until there is more people. Just in the last week of August, he knows of three jail sergeants and one jail lieutenant who have resigned or retired. One sergeant put in her resignation letter that she was leaving due to lack of staffing and unsafe conditions. The employees are tired, and they are worn down and broken.

336.    Jane Doe 15 is a single parent with a daughter, so working five 12-hour shifts is particularly difficult.  She gets off work about 6:00 pm, and by the time she gets home takes care of her daughter it is often midnight.  Then she

gets up at 4:00 am, gets her daughter up at 4:30, and gets to work by 5:30 or 5:40 each morning. Jane Doe 15 resents the fact that her sergeants do not appreciate her. She came to work during floods and the 2021 freeze; but if she has car trouble for has to take off for a sick child, the supervisors are not understanding and treat her poorly. Sometimes supervisors demand a doctor's note when she or her daughter were sick but did not need to be seen by a provider. Harris County should understand she has a life outside the Harris County jail. She also states that she sometimes goes outside alone and cries because she feels overwhelmed with 12-hour shifts. At the end of her shift, she goes home, eats sometimes, cares for her children, and goes to bed, sometimes without even bathing. Then, she gets up the next morning and starts the process all over again. Jane Doe 15 has a peace officer license and is applying at several constables' offices.

337.     Jane Doe 7 states that she personally knows at least five employees that put in their resignations in the last two weeks of August. They are leaving because of lack of staffing, lack of restroom and lunch breaks, and the increased workload.

338.     Jane Doe 26 states the Harris County Jail is not safe, in part because employees working constant 12-hour shifts do not get sufficient sleep. She did not suffer from mental problems prior to her employment at the Harris County

Sheriff's Office but now suffers from depression. Rather than cry in front of other employees, Jane Doe 26 calls in sick when she is depressed. When she calls in, she is normally told to bring a doctor's note when she returns. Because of her attendance, though she had a doctor's note, Jane Doe 26 was suspended for 30 days. Jane Doe 26 did not receive written notice of her suspension in person but was told of the time of over the phone and received written notice after the fact. Following her suspension, Jane Doe 26 visited her therapist only to find out that her insurance did not cover the visit because of her suspension.

339.     John Doe 30 states that due to constant 12-hour shifts, staff members "have no life" outside the jail. John Doe 30 gets approximately four hours of sleep each night.

340.     Jane Doe 53 is on FMLA, not to avoid long hours of work, but because her grandmother is quite ill. By being on FMLA, she can call off to treat her grandmother without receiving disciplinary action. Jane Doe 53 is raising her nephew that she cares for and calls him her child. After caring for the child and her grandmother, Jane Doe 53 only gets four or five hours of sleep a night when she works 12 hours shifts.

341.     Jane Doe 20 states that she went through a difficult pregnancy in 2020 and she had to use sick time for doctor visits. Supervisors made her bring

doctors' notes each time she was sick; additionally, one sergeant told her to quit calling in even though he knew she was pregnant.  Since her doctor visits were in conjunction with her off days, she was accused of taking three-day weekends (after working 48 hours in four days that week).  Jane Doe 20 was issued and signed a letter of reprimand for missing too much time, even though she had the sick time and comp time to use and even though she was working more than 40 hours in a workweek.  Now, when working 60-hour weeks, Jane Doe 20 does not get sufficient sleep.  To get to work by 6:00 am, she must wake up at 3:30 or 4:00 am.  Then she has to leave work exactly at 6:00 pm to pick her daughter up from daycare on time.  By the time she takes care of her family, she often gets as little as four hours sleep.  When requested to work past her 12-hour shift, Jane Doe 20 refuses.  One supervisor told she needs to do whatever to take care of her family, but she needs to stay additional hours "like everybody else."

342.     Jane Doe 11 has submitted FMLA paperwork and wears a medical bracelet for cancer, grand mal seizures, and fiber myalgia and working constant 12-hour shifts is particularly difficult for her.  Nevertheless, when there are acute shortages, she has been asked to work additional hours but has to refused.  Supervisors have threatened to write her up for refusing to work the additional hours.  During the freeze (Valentine's week, 2021) when a lot

of people failed to show up for work, Jane Doe 11 was ordered to remain at work and she refused because she needed medication that she did not have with her. She went home, got her necessary medications, and returned to work. Jane Doe 11 states that due to her medical issues, she cannot get enough sleep working five 12-hour shifts. Her supervisors treat her poorly because she must miss some work due to her medical issues. Jane Doe 11 suffers depression over job stressors, particularly how supervisors treat her. Sometimes the stress causes her to cry, and on one occasion she contemplated committing suicide by shooting herself or taking pill overdose. Jane Doe 11 has cried many times about how supervisors treat and how little concern they have for her welfare.

343. John Doe 7 states that by the time he gets off late, gets home, eats and bathes, he normally gets about six hours sleep.

344. John Doe 13 states that he averages about six hours sleep each night. He gets up around 3:30 am in order to get to work on time. Nearly every day Admin or the sergeants ask for volunteers to stay over and work late.

345. John Doe 14 states that staffing is an issue on the 6th and 7th floors of the 701 jail. Practically on a daily basis now the sergeants are freezing the floor, meaning no one is allowed to leave the floor, even though they've been relieved, until the floor is staffed, and they get the ok from centralized staffing.

There was an incident where one of the DO who worked the night shift 6 pm to 6 am and was kept until noon, which had him working for a total of 18-hours in a 24-hour period. Of course, the individual called in for their shift that night because of lack of sleep. People who work 6 am to 7 pm are being kept due to call-ins and understaffing.

346.     Jane Doe 9 states that she is single and lives alone. She tries to be in bed every night by 10:00 pm but doesn't always make it. She sets her alarm to get up at 4:10 am.

347.     Jane Doe 7 has a lot of accrued comp and vacation time and her personal time off (PTO) is important to her. When the jails were working 8-hour shifts, only six people per shift were allowed to be off on PTO. When the jails went to 12-hour shifts, that number did not change; but since the two shifts have approximately 50% more staff, it is even more difficult to get legitimate time off. Jane Doe 7 has to request time off far in advance to get PTO, particularly if those days include a major Holiday. Employees are berated by emails for calling in sick. Jane Doe 7 has been told to schedule her doctor visits at times when she is off; but she works 6:00 am to 6:00 pm, Monday through Friday, so there is no chance she can see a doctor on her off time unless she goes to an emergency room. Some months ago, the jails went from having to work two or three 16-hour shifts with two or three 8-hour workdays to now five 12-

hour days. In the last week of August, Jane Doe 7 received an email indicating that employees will be held over, as needed, on their Tuesdays and Thursdays because staffing is even shorter now.

348.    John Doe 21 works 16-hour days two or three times a week assigned to the JPC. One those overtime days, he only gets four and a half hours of sleep. He knows the inmates at the 701 jail are smoking something because he can smell it and it gives him a headache.

349.    Jane Doe 2 states the JPC starts short every day now, then some employees call in sick, and then the jails take staff from them to make the ratio. The single biggest problem JPC supervisors have is employees calling in sick because they are tired and cannot otherwise get a day off. When the JPC supervisors received an order to send people to the jails to help with staffing there, some of the employees flatly refuse to go there to work. Inmate workers (trustees) used to be used to do certain tasks like pass out sandwiches to incoming inmates, but because of COVID, they can no longer utilize them; thus, employees must feed the prisoners as well as the other tasks that there are not enough people to do. The pre-trial (probable cause) and JP courts are constantly behind schedule. Unlike employees assigned to the 1200 and 701 jails who work 12-hour shifts, JPC employees are scheduled to work three 8-hour shifts and two 16-hour shifts each week, and some of them volunteer for

a third overtime shift. K-time (overtime from another HCSO bureau) is available for patrol deputies but that is mainly volunteer. Court deputies are scheduled for mandatory overtime.

350.     John Doe 9 states that long hours are taking an emotional and physical toll on DOs. Morale is at the lowest it has been in the twenty plus years he has been with Harris County. There is not enough people to work to do all the required tasks that are being piled on. Jail standards are violated daily as insufficient staff is unavailable. DOs are exhausted and mentally fatigued. Mistakes are inevitable due to insufficient manpower, and it has led to a takeover by the inmates through their manipulation of the situation.

351.     John Doe 3 has worked for Harris County for decades and has never seen morale in the jail so low. It is from the long hours and the low staffing. The jail has been chronically understaffed for decades but it has never been so bad.

352.     John Doe 1 states that employees reported to him that the lack of sufficient help and mandatory overtime caused undue stress; one employee even reported having a work-related ulcer.   Other job stressors included no back-ups when needed, a public address system that worked poorly (hence, no backup could be summoned), untrained peers, and peers who were reluctant to act because they feared disciplinary action for using force.

## XVIII.   The working conditions in the jail are so bad, Harris County employees are quitting at a high rate.

353.      Based on the monthly HCSO separation reports, in 2021, 177 detention officers of all ranks (detention officer, detention sergeant, and detention lieutenant) have resigned from the Harris County. That number does not include employees who were terminated or retired – Harris County lost a total of 231 detention officers of all ranks in 2021. Of the detention officers who resigned, the average time in service at Harris County was only 2.5 years. The below chart shows the monthly attrition numbers based on the monthly separation reports created by HCSO.



354. Based on the list of new hires of detention officers, only 177 new employees were brought in 2021 as of August 2, 2021. Harris County is not able to keep up with the current attrition rate.

355. By knowledge and information, the Harris County Sheriff's Office calculated in 2016 that they were not able to hire at a fast enough rate to keep up with the employees they were losing through resignations, retirements, and terminations in the Harris County Jail. According to the study, Harris County detentions bureau hired 321 new employees. This number includes clerks and support staff. Harris County detentions lost 379 employees through attrition. These numbers do not include employee movements within the Sheriff's Office. That is a total loss of 58 employees. The attrition rate has not improved since that study in 2016 and, if trends continue, are only getting worse.

356. John Doe 1 conducted an informal study approximately 25 years ago where he contacted other law enforcement agencies or unions across the United States and calculated their attrition rate. He found that Harris County had the worst attrition rate in the country. He sent his findings to then Sheriff Tommy Thomas and presented his findings to the then County Commissioners. After seeing the current attrition rate in 2021, John Doe 1 believes this is the worst it has ever been.

357.     Jane Doe 1 is a jail supervisor with Harris County. She has made the decision to retire and part of that reason is the fact that she does not have sufficient personnel to do her job properly, people are quitting faster than replacements can be hired, and subordinates assigned to her are getting hurt because of the acute personnel shortage and no one seems to care. Six detention officers had to be medically treated on or about August 10, 2021, because they were assaulted by inmates. A transfer list she saw on the third week of August indicated ten or twelve detention officers in her work area had quit or been fired. Employees who work 60 hours a week and have significant accrued comp time are disciplined if they miss work but cannot get time off. Jane Doe 1 was told when she became a high-ranking jail supervisor, she would be able to make a difference; but because of the personnel shortage, she cannot make a difference. She is out of debt now and has just had enough.

358.     Jane Doe 49 states that within a years' time, the department in the jail where she works with other civilians has lost ten or more staff from resignations. The staff is tired of the verbal and mental abuse the civilians endure. The clerks in the bonding and releasing are considered essential for emergency. The area is so understaffed, they are working on skeleton crews. It is impossible for the shifts to fill all the positions without forcing people to stay overtime from another a shift. Everyone has to do 16-hour shifts about

two days a week. The supervisors are under extreme pressure to fill all the essential positions and have no choice but to force civilians to accrue overtime.

359.    John Doe 17 resigned in August 2021 because he just couldn't see a future with Harris County. The understaffing made doing the job difficult. He knows for a fact that on some floors it was almost impossible to get a restroom break. He always was a rover so he didn't have to worry about that.  He and the employees he worked with did T-card to armband counts as often as staffing would allow but Corretrak rounds were priority.  K2 smoking was an increasing problem; so bad that it could sometimes be smelled on the free world side (unsecure side), and insufficient staffing made it difficult to do much about it.  He knows that trainees were sometimes used to fill the rosters. He was able to find better and safer opportunities at other agencies.

360.    Jane Doe 4 was a jail supervisor. She states she resigned this summer because the department put the jails supervisors at increased liability and gave them too many duties that put them at risk. She believes that the department forced the employees who work the jail to lie on a daily basis about the 1:48 ratio and to not put in the reason for a round to be late, the staff is told to lie about the reason and to not report the real reason, which is understaffing.

361.     John Doe 5 says that there is a staffing shortage for certified peace officers to do hospital runs. Inmates that are sent to the hospital must have armed deputies escort them. Some deputies, due to their history, have to have two deputies escorting them. The staffing is so low that deputies are being pulled off the housing floors to escort inmates from the hospital and deputies who serve as bailiffs in the courts are being used. Deputies are being pulled from their regular duties and those other duties are not getting done. For example, on August 13, 2021, on the overnight shift, thirty-one certified deputies went out on hospital runs with inmates and or were at various hospitals with inmates and needed to be relieved. Centralized staffing was scrambling to find certified deputies on assignment to pull in order to send to hospitals to relieve staff guarding inmates.

362.     Jane Doe 27 is a deputy assigned to the Courts Division. When Chief Herklotz sent an email to deputies assigned to the courts division (including those who do not actually work in a court) stating that court deputies would be assigned forced overtime assignments on their off days, three deputies with more than thirty years tenure turned in their retirement papers. A major then asked for the number of people assigned to courts that are eligible to retire (have eighty or more retirement points: age plus number of years of service). There are forty-three deputies who are eligible to retire. Right now, the

deputies that are being forced to work overtime are being assigned to do hospital runs but they could be assigned anywhere in the jail facility since HCSO is in a staffing crisis.

363.     Jane Doe 5 states that Harris County is forcing deputies in courts to work overtime, weekends, and holidays in order to staff the jail. Harris County alerted deputies on a Friday evening in August that they needed to work weekends at the jail. The deputies who workdays are being mandated to work night shift on the weekend and then work the day shift during the week. There is no notice given. A deputy had to miss a family funeral, miss vacations, and other life events. The courts deputies are being asked to do hospital runs. They are not asking for volunteers; they are forcing overtime. No consideration for single parents or family lives. The courts were already shorthanded even before the four new courts were installed to go through the large court backlog. This situation is getting worse with deputies being pulled to work in the jail and escort inmates to the hospital. Deputies that are eligible to retire are taking their retirement because they are overworked and are then being forced to work overtime on their off days. She has never been forced to work an off day before this year. Deputies are working six and seven days a week. Being short staff in courts is a security risk because bailiffs are left alone in the court now dealing with inmates and the people coming in on bail. They

have a responsibility to provide security; however, they are being left alone when they used to work with partners, so the courtrooms were never left without a deputy present.

364.   John Doe 5 knows the attrition rate is really high. The jail cannot keep up with people quitting with the current hiring. Harris County needs to put money in recruiting and do mass higher again like they did in the 1990s. To keep people, the shifts need to be adjusted. The five 12-hour shifts are not sustainable. We have been doing it for years now and there is no end in sight. Commissioners Court does not budget for the overtime even though they know there is going to be overtime, so the money has to be taken from the other departments in the Sheriff's Officer. That means no cars for deputies to patrol in, no high-water equipment, there is no money for additional investigators in violent crime, and the list goes on. The jail being so poorly funded by Harris County is a drain on all of Harris County law enforcement and not only puts the jail staff and inmates at risk, but it trickles out to all HCSO employees and the public who cannot get a patrol deputy to respond when they call 911.

## CAUSES OF ACTION

The allegations contained above are incorporated by reference as if fully set forth.

I.   **Violations of 42 U.S.C. §1983**

365.    42 U.S.C. § 1983 provides that a person who, acting under color of law, subjects or causes to be subjected any United States citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution, shall be liable to the party injured in an action at law.

366.    At all relevant times and regarding all relevant actions of the Plaintiffs as alleged in this Complaint, the Defendants were acting in their official capacities, under color of state law, and pursuant to the official policies, practices, and customs of their Governmental Offices and or individually *ultra vires*. In this case, Harris County was acting by and through the Commissioners' Court and performing mandatory ministerial duties that purposefully and knowingly underfunded the Harris County Jail, putting it in crisis. The Commissioners Court deflected money that should have gone to the jail was purposefully diverted to non-essential and non-mandatory projects.

367.    Defendants, acting under color of law, have subjected, and caused Plaintiffs to be subjected to, the deprivation of their rights, privileges, and or immunities as secured by the Fifth and Fourteenth Amendments. Specifically, Defendants have violated Plaintiffs' right to due process of law and exposed them to extraordinary harm without authority by creating an environment that perpetually fails to comply with the TCJS minimum standards.

368.     The Supreme Court has generally held that the government has no duty to act to protect citizens from harms committed by third parties. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) (holding that the state had no duty to act affirmatively to protect its citizens in a case where a boy was killed by his father who was a known abuser to the child welfare authorities). However, *DeShaney* did give rise to the state-created danger doctrine, by creating a narrow exception to the general rule that state actors are not liable for harm caused by third parties when the state "renders [an individual] more vulnerable to [harm]." *Id.* at 201.

369.     Almost every circuit court in the United States has found the state-created danger doctrine to exist.[28]

370.     Conduct found to support the state-created danger doctrine, under substantive due process, is when the conduct of the government shocks the conscience. *DeShaney* at 199-200. Conscience shocking behavior has been described as conduct that "violates the decencies of civilized conduct;" conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency;" conduct that "interferes with rights implicit in the concept of ordered liberty;" and conduct that "is so egregious,

---

[28] The First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have outright accepted the "state-created danger" theory as a valid avenue of protecting a citizen's substantive due process rights. There appears to be a split in Circuits on what is required to form a special relationship between the private individual and the state actor and how the state actor creates the danger to the individual. *See* Chemerinsky, Erwin, The State-Created Danger Doctrine, 23 Touro L. Rev. 1 (2007) (discussion of the state created danger doctrine).

so outrageous, that it may fairly be said to shock the contemporary conscience." *Doe v. Covington County School Board*, 675 F.3d 849, 867-868 (5th Cir.2012); quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 & n. 8. Many cases that have applied the standard have involved the use of extreme force by police officers or other state actors. *See Checki v. Webb*, 785 F.2d 534, 535–36, 538 (5th Cir.1986) (state trooper intentionally used his vehicle to terrorize motorist and passenger); *Shillingford v. Holmes*, 634 F.2d 263, 264–65 (5th Cir.1981) (police officer intentionally struck tourist because he was photographing the police officer and fellow officers apprehending a boy on the street during a Mardi Gras parade), abrogated on other grounds by *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir.1993); *see also Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1071, 1075–76 (11th Cir.2000) (student blinded in one eye when a coach intentionally hit him in the head with a metal weight); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir.1998) (rape of a woman at her house by a police officer after he stopped her for a traffic violation); *Hemphill v. Schott*, 141 F.3d 412, 418–19 (2d Cir.1998) (police officer provided assistance to a third party in shooting the plaintiff). As one court has summarized, "[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of

state law, even violations resulting from bad faith to something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir.2010) (citation and internal quotation marks omitted).

371.    Plaintiffs fully acknowledge that the Fifth Circuit has steadfastly declined to recognize a state-created danger doctrine of § 1983 liability. *See McClendon v. City of Columbia*, 305 F.3d 314, 326, n. 8 (5th Cir. 2002); *Beltran v. City of El Paso*, 367 F.3d 299 (5th Cir. 2004); *Lester v. City of Coll. Station*, 103 F. App'x 814, 815 (5th Cir. 2004); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010); and *Cook v. Hopkins*, No. 19-10217 (5th Cir. Nov. 8, 2019).

372.    However, in nearly every case where the Fifth Circuit has denied the state-created danger theory of liability, the Fifth Circuit has still run through a hypothetical test of potential factors and noted that the case on hand would have failed the state-created danger test and that the Fifth Circuit did not need to adopt the state-created danger doctrine.

373.    Therefore, it is not accurate to say that the Fifth Circuit has outright denied the state-created danger doctrine, rather it is more accurate to say the Fifth Circuit has failed to adopt a state-created danger theory of liability when the ultimate outcome would still result in the claim being rejected.[29] In other

---

[29] *See McClendon v. City of Columbia*, 305 F.3d 314, 334 (5th Cir. 2002) (Parker, J. dissenting) (Circuit Judge Parker's dissent provides a detailed history of the state-created danger doctrine in the Fifth Circuit.)

words, the Fifth Circuit is waiting for a case where the state-created danger theory of liability should apply before determining if the Fifth Circuit will adopt an official state-created danger test.

374.     Under the dicta of the abovementioned cases, a theoretical Fifth Circuit state-created danger theory of liability would require Plaintiffs to show that the state "created or exacerbated the danger of private violence against an individual" as well as show that the government acted with "deliberate indifference" to the danger. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010). Deliberate indifference requires that the state actor both knew of and disregarded an excessive risk to the victim's health and safety in a way that shocks the conscience. *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004) citing *McClendon v. City of Columbia*, 305 F.3d 314, 326, n. 8 (5th Cir. 2002). Deliberate indifference is not negligence, it requires the state actors to have knowledge of the consequence of their actions. Additionally, Plaintiffs in the Fifth Circuit may also need to show "the state actor is aware of an immediate danger facing a known victim." *Lester v. City of Coll. Station*, 103 F. App'x 814, 815 (5th Cir. 2004). Therefore, even in the Fifth Circuit state actors may become liable for failing to protect its citizens including the employees of the Harris County Jail.

375.    Therefore, to establish a claim under the state-created danger doctrine in the Fifth Circuit, a plaintiff must prove that:

     a. the harm ultimately caused was foreseeable and fairly direct;

     b. a state actor acted with a deliberate indifference that shocks the conscience;

     c. a relationship between the state actor and the plaintiff existed such that the plaintiff was a foreseeable victim of the state actor's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

     d. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

376.    Plaintiffs are the immediate, direct, and foreseeable victims of Defendants' failure to properly and adequate fund and or staff the jail facilities and the harm the Plaintiffs are subjected to is foreseeable and direct. There is a direct and natural link between the Defendants' underfunding and understaffing of the jail and the harms complained of by the Plaintiffs.

377.    Harris County has used its authority to create the danger. Defendants well aware of the danger, and they are aware of how their actions and or omissions directly affect the jail and the Plaintiffs. Defendants are acting collectively and by agreement and or understanding, with deliberate indifference to the dangers of the jail and the impact of their actions or

omissions have on the jail. Harris County has been underfunding the jail for two decades and Defendants have absolute notice that their actions and or omissions led to violations of jail standards and constitutional violation because the same actions have caused that result for decades. These actions have spiraled into the extreme, dangerous, and inhumane crisis the jail is in today for both employees and inmates.

378.　　Defendants, who have the ultimate ministerial responsibility for maintaining the staffing functions though oversight and providing financial support, have completely and intentionally failed by treating Plaintiffs as fungible machinery designed to work in terrible conditions with known dangers created by inadequate staffing and operational funding until the employee breaks. Then the employee is simply replaced with another untrained and inexperienced employee. Defendants do not see their detention officers as people but just as machines that are to be abused and then discarded.

379.　　Defendants' intentional actions towards the jail and its employees shocks the conscious as Defendants have failed to perform their obvious and mandatory ministerial duties to properly fund and staff the jail. In a lot of ways, the central issue in this case is relatively simple: how far can the Defendants torment their employees until it shocks the conscience? How

many injuries, deaths, and abuses of both detention officers and inmates will the law tolerate before it shocks the conscience? Or is it as Defendants will undoubtedly suggest, without stating, the law will tolerate a nearly unlimited amount of suffering because the employees can simply quit. However, if all the employees are in the same situation and the law dictates that each must simply quit in order to avoid harm, then all employees must quit. And if all employees must quit, then no one should choose to become an employee of Harris County. If this is the case, then there will be no one to work the jails even though Defendants are mandated to fund and operate the jail. As the facts in this case show, Harris County is on the brink of this, not having any employees to work the jail due to the Defendant's refusal to perform their ministerial duties. The Defendants must be supervised by this Court to ensure that they perform their non-discretionary duties so that employees can work in a reasonably safety and humane environment that is properly staffed and maintained. It is on this point that the Plaintiffs are seeking their relief, to have the working environment of the jails improved back to the minimum standards and not to wait until the jails become a cataclysmic failure. Defendants will blame the Plaintiffs for the conditions in the jail and attempt to pass blame on the Plaintiffs for high profile jail deaths when the blame is squarely on the

Defendants that have understaffed and underfunded the jail creating environments that harm both employees and inmates.

380.     Additionally, the inherent risks of public employment of Sheriff employees in the jail do not preclude claims of state created dangers due to Defendants' failure to perform the essential elements of their ministerial functions, i.e. funding and staffing of the jail. The state-created dangers doctrine is a legal construct that is designed to reach governmental entities when other avenues of the law are precluded. Should the Plaintiff be unable to prevail on its state-created dangers theory, then misery and suffering will continue to plague the Harris County employees who work in the jail both now and the future, as well as causing harm and danger to the inmates Harris County is mandated to keep in their care, custody, and control. Harris County must have employees to perform the essential functions of the jail but with the conditions that Defendants keep the jail, it is inordinately dangerous. It is currently impossible for the Sheriff's Office to hire and keep staff in order to meet the constitutional and statutory obligations Harris County has to maintain at the jail with the continued lack of basic funding and staffing.

381.    While working in the jail environment is inherently dangerous, the inherent dangers of the job are still mitigated through mandatory safety standards, including inmate to jailer ratio standards.[30]

382.    In order to provide a minimum set of standards to keep both inmates and detention officers safe, the State of Texas has created jail standards through the Commission of Jail Standards, codified in the administrative code. These standards are only a minimum bar for compliance. Jail standards were chiefly created in order to set a minimum standard to assist counties in avoiding liability from inmate lawsuits and to prevent interference from the federal government.[31]

383.    These rules and standards are thoroughly known to Defendants, and they are aware that they frequently fail to meet these standards. Defendants falsify and manipulate reported data in order to give the perception they are meeting standards. Defendants by agreement and concerted action funnel money that is absolutely necessary to meet jail safety standards away from the detentions complex to other pet projects of the Harris County Commissioners. Defendants have now for years promulgated this fraud and deception in and have declined their ministerial duties by intentionally underfunding the jail,

---

[30] Joe Russo, *Workforce Issues in Corrections*, Dec. 1, 2019,  https://nij.ojp.gov/topics/articles/workforce-issues-corrections (last visited Aug 28, 2021) (Excessive workloads and high inmate-to-officer ratios are related to a variety of negative outcomes and can hinder an organization's ability to retain staff).
[31] Texas Commission on Jail Standards: Agency Strategic Plan 2019-2023 (Jun 7, 2018). https://www.tcjs.state.tx.us/wp-content/uploads/2019/08/TCJS2019-2023StrategicPlan.pdf.

putting detention staff and inmates in a dangerous environment, leading to a high likelihood of injuries. Defendants routinely file emergency declarations attesting to their inability to meet minimum jail standards and then does nothing to fix the conditions that prevent Harris County from meeting jail standards or from being in a constant state of emergency. By being in a constant state of emergency, Defendants are acknowledging their inability to meet minimum jail standards and, yet they continually refuse to improve conditions that would take the Harris County Jail out of a state of emergency. An emergency condition lasting decades can no longer be called an emergency and the conditions are no longer unexpected. The behavior of the Defendants is so systemically destructive to the jail, the employees, and the inmates, it is shocking that it has been allowed to continue.

384.    Judge Posner has provided the best summary to the harm that the Plaintiffs are seeking redress:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

## II. Defendants have conspired to underfund and understaff the jail

385.     Plaintiffs specifically incorporate and put all Defendants on notice that the Section 1983 claims set forth in Count I are part of the basis for their conspiracy claim.

386.     This Count is brought as a class action pursuant to Fed.R.Civ.P. Rule 23. Plaintiffs repeat and re-allege the allegations set forth in Count I. Each of the Defendants had and have (1) actual knowledge that some or all of the conspiratorial wrongs that were and would be committed against the Plaintiffs and the class, (2) the power to prevent or to aid in preventing the commission of those wrongs, (3) are deliberately neglected and/or refused to prevent the Section 1985 conspiracy, (4) the wrongful acts were committed, and (5) the wrongful acts could have been prevented by reasonable diligence.

387.     As set forth above, Defendants are and have been aware that female employees have been subjected to sexual assaults, that all employees are subjected to frequent batteries by inmates, and that all employees have been working in unsanitary and hostile conditions. This is part of a targeted campaign of harassment for more than two years. Defendants have worked hand in hand and had ongoing discussions about the understaffed jail conditions that have led to sexual assaults of employees, employee injuries, violations of TCJS regulations, and the endangerment of staff and inmates.

388.    Defendants knowingly encouraged, allowed, and incentivized policies that deliberately underfunded the jail and create perverse employment situations in the jail.

389.    Each of the Defendants could have stepped in to stop and prevent the complete collapse of the jail, by ensuring the proper funding and operation of the jail over the last twenty years and continuing to the present but continued to fund personal pet projects and failed to ensure that Harris County met its own statutory obligations.

390.    Defendants together reached an understanding, and together engaged, and continue to engage in, conduct and or have reached an understanding by among themselves to by voting to deny increased funding or staffing which conduct committed the unconstitutional acts set forth in the facts above. No actions of Harris County and or Commissioners Court can be accomplished without a majority of Defendants voting together. Upon information and belief, the Commissioner court dockets appear to show unanimous voting by Defendant Commissioners regarding the reduction and or failures to provide basic ministerial funding necessary to meet minimum jail standards. Defendants have voted and approved the current lack of funding and have refused to increase staffing for the jail facilities.

391.     Due to the fact that said conspiracy and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiffs and employees of the equal protection of the laws and or of equal privilege and immunity under the law, the Defendants also deprived the Plaintiffs and the class of their right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. §§1983.

**III. Harris County does not have sovereign immunity**

392.     Harris County has waived its immunity to claims such as those brought by the Plaintiffs either traditionally or individually *ultra vires*.

393.     In *Will v. Michigan Department of State Police,* 491 U.S. 58, 71 (1989), the Court held that "neither a State nor its officials acting in their official capacities are `persons' under § 1983." Local governmental bodies and their officials, by contrast, are regarded as "persons" amenable to suit under § 1983. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, (1978); U.S. Const. amend. XI. Sovereign immunity extends to state agencies and state officers, "as long as the state is the real party in interest." *Fitchik v. N.J. Transit Rail Operations,* 873 F.2d 655, 659 (3rd Cir. 1989). It does not extend to counties and municipalities. *Bolden v. Se. Pa. Transp. Auth.,* 953 F.2d 807, 813 (3rd Cir. 1991) ("[A]lthough political subdivisions of a state, such as counties and municipalities, fall within the term `State' as used in the

Fourteenth Amendment, political subdivisions are not `State[s]' under the Eleventh Amendment.")

394.     Plaintiffs' claims are grounded in the Due Process Clause of the Fourteenth Amendment, which provides that no State shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. We have recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips,* 515 F.3d at 235. In general, this liberty interest does not require the state to affirmatively protect its citizens. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195-96 (1989). One exception to this general rule is the state-created danger theory, and it is under this theory that the Plaintiffs proceed on their due process claims.

395.     **Defendants in their official individual capacities are liable for their *ultra vires* acts and or omissions.**

396.     Suits to require state officials to comply with a statutory or constitutional provision are not prohibited by sovereign immunity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373-77 (Tex. 2009) (declaratory judgment claims alleging *ultra vires* actions are not barred by governmental immunity, reasoning that *ultra vires* claims do not seek to control the government, but rather to reclaim control from an official allegedly acting in violation of the

law.) Plaintiffs in *ultra vires* suits must essentially allege and prove, that the official failed to perform a purely ministerial act. *Ultra vires* legal actions seek to enforce existing policies, not control over the state. *See Heinrich*, 284 S.W.3d at 372. "[I]t does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions." *Heinrich*, 284 S.W.3d at 368-69. The Plaintiffs, both individually, and as a class have an ongoing relationship with the Defendants in that each is harmed by the actions or inactions or the Defendants and each are current and continuous employees of Harris County or are former employees with interests in Harris County.

397.    An official acts beyond the limits of their authority when they (i) misinterpret the enabling law that creates the authority for them to act or (ii) acts in conflict with the law that authorizes them to act or violates state law. *Hall v. McRaven*, 508 S.W.3d 232, at 238, 241(Tex. 2017).

398.    County business is generally conducted by and through the Commissioners Court, which can "exercise such powers and jurisdiction over all county business" as mandated by the Texas Constitution and by statute. Tex. Const. art. V, § 18. The County Sheriff is an independent constitutional officer, with independent rights and duties. Tex. Const. art. V, § 23. The Commissioners Court must provide "safe and suitable" county jails. Tex. Loc

Gov't Code § 351.001(a). The sheriff, is "the keeper of the county jail," and must "exercise supervision and control over the jail." Loc. Gov't Code §351.041. The Sheriff's duty "cannot be avoided by delegating authority over the jail to deputies or other subordinates." *Whirl v. Kern*, 407 F.2d 781, 795 (5th Cir. 1969). The Office of the Texas Attorney General has opined that, "the authority of the commissioners court over the jail is limited to providing the jail, adequate funding, and broad operational guidelines which leave the actual operation of the jail with the sheriff." Attorney General Opinion DM-072 (1998); Attorney General Opinion H-1190 (1978) at 3; *see also* Attorney General Opinion JM-1098 (1989) at 3.

399.     Harris County is statutorily required to fund the jail in order to meet Texas jail standards. *See* Tex. Admin Code §275.4. "As the main governing body of Harris County, the Commissioners Court plays a critical role that is part administrative, part legislative, and part judicial. Its many responsibilities include adopting a budget; setting tax rates; calling for bond elections; building and maintaining county infrastructure such as roads and bridges; and overseeing county courthouses, jails, libraries, parks, and the Harris County Flood Control District.[32]" Harris County refuses to perform its ministerial duties by failing to properly fund the jail, by denying funding requests for the

---

[32] About Judge Lina Hidalgo, (last accessed Sep 3, 2021) https://cjo.harriscountytx.gov/about.

jail, and by being deliberately indifferent to the horrid working conditions in the jail its own employees are subjected to. Harris County Commissioners purposefully underfund the jail and fail in their duties to administer oversight.

400.     Plaintiffs seek to "reassert the control of the state" by requiring the Defendants to comply with their mandatory statutory and or constitutional provisions and to authorize sufficient county funds and or resources to bring the jail to the Texas minimum jail standards and to create a safe and humane working environment for its employees.

401.     The Defendants (collectively and individually) have failed to perform their statutory ministerial duty to maintain jail standards and sufficient funding for manpower and operational costs to comply with Texas jail standards. Defendants have a mandatory ministerial duty imposed by the state jail standards. By refusing to provide adequate basic funding the individual Defendants exhibited their intent to not comply with the statute. *See Southwest Bell Telephone, L.P. v. Emmett*, 459 S.W.3d 578 (Tex. 2015).

402.     The Defendants (collectively and individually) consistently voted to preclude any proper funding for the county jail and have allowed available funds to be directed to discretionary activities.

403.     Defendants (collectively and individually) have known that proper funding is not discretionary or subject to interpretation and their lack of

funding decisions were with legal authority. See *Houston Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154 (Tex. 2016). Failure to properly fund the operations of the county jail are acts that exceed the bounds of the Defendants granted authority and conflict with the state jail standards.

404.     The Defendants (collectively and individually) are directly involved in failing to ensure the proper operations and funding of the Harris County jail facilities and minimum staffing requirements to comply with TCJS. Defendants have a duty to act and have consistently failed to properly provide for adequate personnel to safely operate the jail and comply with the TCJS. *See City of New Braunfels v. Tovar,* 463 S.W.3d 913 (Tex. App.—Austin 2015, no pet).

405.     Defendants (collectively and individually) have ministerial duties for the operation of the county jail pursuant to the TCJS to be performed with precision and certainty without the exercise of discretion. Plaintiffs are seeking prospective relief in this action. Defendants have acted beyond the TCJS specified limits and they are without lawful authority or discretion. *See Houston Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154 (Tex. 2016).

406.     A Commissioners' Court has the power "necessarily implied to perform its duties." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex.

2003). Such power must, however, be "indispensable" to perform such an express grant of authority, *Foster v. City of Waco*, 255 S.W. 1104, 1105–06 (Tex. 1923). "Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." *Id.; also, City of San Antonio v. Int'l Ass'n, Local* 624, 582 S.W.3d 455 (Tex. App.—San Antonio 2018, no pet.

407.     There is no power or discretion to refuse to properly fund the operations of the county jail facilities. See *White Deer Indep. Sch. Dist. v. Martin*, 596 S.W.3d 855 (Tex. App.—Amarillo 2019, pet. filed March 13, 2020).

408.     Upon information and belief, federal funding exists through programs such as the Federal American Rescue Plan Act of 2021 (ARPA), a $1.9 trillion stimulus package, was signed on March 11, 2021 to which it is believe Defendants have been approved for approximately $915 million which can be used for staffing at the jail to ensure safety for both staff and inmates.

**V.     Exhaustion of administrative remedies**

409.     Plaintiffs have no administrative process to address the issues raised in this petition other than the Sheriff's Civil Service Commission which does not have authority to grant any relevant relief to Plaintiffs.

**VI.     Plaintiffs have "Whistleblower" protections**

410.    This Court has jurisdiction because the Texas Whistleblower Act waives any immunity that might otherwise deprive this Court of jurisdiction. Tex. Gov't Code §554.0035 ("A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter"). Furthermore, none of the Plaintiffs are required to exhaust any administrative remedies by having to seek prospective injunctive relief and are protected as they have participated in identifying and seeking relief on matters of public concern. Plaintiffs also have federal protections as Defendants have been provided and utilize federal funding.

411.    Venue is proper in this Court because the Texas Whistleblower Act provides that a public employee of a state governmental entity may sue in a district court of the county in which the cause of action arises. Tex. Gov't Code §554.007(a). This cause of action arises in Harris County, Texas as all Plaintiffs are currently employed in Harris County and worked for Harris County, Texas, and can be subject to acts of retaliation in Harris County. Venue is also proper under §15.002 Tex. Civ. Prac. & Rem Code because all or a substantial part of the events or omissions giving rise to this claim occurred in Harris County, Texas.

412.     Plaintiffs do not seek monetary relief only declaratory and injunctive relief.

413.     Plaintiffs intend for discovery to be conducted in accordance with a discovery control plan.

414.     Plaintiffs are all current public employees employed by the Harris County Sheriff's Office which is a state governmental entity and unit of the State of Texas.

415.     Plaintiffs, by and through their counsel, have made good faith contemporaneous whistle blowing reports to state and federal law enforcement authorities of violations of law by the Defendants. The Defendants at the time of this filing are now aware of Plaintiffs' good faith reports to law enforcement as identified herein. Defendants have been made aware that Plaintiffs are being forced to seek relief due to the deplorable actions of Defendants.

416.     Plaintiffs will be, unless Defendants are enjoined, subjected to adverse personnel and disciplinary actions by Defendants for reporting the violations and dangerous conditions of the Harris County jail facilities to state and federal law enforcement, the TCJS, and the public. Adverse employment actions include but not limited to demotion, suspension, reassignment, removal of current work assignments, hostile work environment, constructive

termination, and termination of employment. The adverse employment actions cannot be taken against them for the reason they now have made the good-faith reports to law enforcement authorities. Plaintiffs who have come forward to report violations of Harris County policy and the law will also be subjected to investigation based on their outcries and based on the conditions of the jail created by the deliberate indifference of the Defendants. Plaintiffs should be protected from any and all adverse employment actions from the Defendants.

417.    Under Texas law, there is a presumption that adverse employment actions have been taken because the employee made the report to law enforcement. Tex. Gov't Code §554.004(a) (the circumstances of the potential adverse employment actions would be presumed would be taken because of the reports of Defendants conduct to law enforcement).

418.    Under Federal law, Plaintiffs are protected against retaliation in any manner for reporting violations of the constitutional rights of inmates as herein described under 42 U.S.C. §1997d.

419.    The potential adverse employment actions would cause substantial harm to Plaintiffs, including but not limited to lost wages, future lost benefits, loss of future earnings and earning capacity, harm to their reputations, emotional pain, mental anguish, and loss of enjoyment of life.

420.     Plaintiffs seek legal and other equitable remedies including declaratory and injunctive relief and protection from adverse employment actions.

421.     Plaintiffs have invoked the equitable powers of the court because no prospective relief is available or adequate to them in bringing this matter of public concern and dangerous conditions to the attention of the appropriate law enforcement and or regulatory authorities.

422.     All conditions precedent have been met, waived, or otherwise been satisfied by Plaintiffs' prior to filing suit.

## **RELIEF**

The allegations contained above are incorporated by reference as if fully set forth.

## I.     **Injunctive Relief**

423.     Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 against Defendants, for themselves and the class, to require Defendants to provide the funding and staffing necessary for the jail to be brought and sustain jail standards and thereby create safe working conditions for all employees of the Harris County jail and for the inmates in Harris County's care, custody, and control.

424.     Plaintiffs and other employee members of the class are entitled to injunctive and declaratory relief to end this unlawful treatment and discrimination and require Defendants to perform the essential functions of their official positions.

425.     The Fourteenth Amendment to the United States Constitution guarantees public employees a substantive due process right to be free from state created danger. That is, a right to be free from any governmental/employer policies, practices and/or customs that increase the risk of bodily harm or death from third parties like violent inmates.

426.     Defendants continue to allow the cover-up of violations of Texas jail standards and regulations which takes many forms, increases the likelihood of serious bodily harm or even death to Plaintiffs and or inmates, and such violation creates an oppressive atmosphere and thus violates the Fourteenth Amendment.

427.     **Plaintiffs do not seek monetary damages.**

428.     Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct with blatant disregard for federal and state legal mandates. They will continue to endanger the lives and welfare of their current and future employees as well as the inmates at all detention facilities within Harris County without this injunction.

429.     Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein and have no avenue by which to raise these complaints. When Plaintiffs have attempted to raise their concerns and to ask for help from the Defendants, their pleas have been ignored. The only result of these attempts has been longer working hours and further intolerable conditions.

430.     Plaintiffs ask that the Court enjoin Defendants to maintain proper staffing levels that will allow for the proper management of the inmates and for Plaintiffs to average less than fifty hours a week.

431.     Plaintiffs ask that this Court order Defendants to retain all documents, reports, and emails for the inspection of the Texas Jail Commission and for purposes of discovery in this case.

432.     Plaintiffs request this Court to appoint a federal ombudsman to oversee jail staffing and to ensure Defendants provide proper staffing in order to protect the Harris County employees assigned to the jail as well as to maintain the care, custody, and control of Harris County inmates.

433.     Plaintiffs request that an employee representative be appointed, approved by the Plaintiff representatives, who will liaison and work with the federal ombudsman in monitoring Defendants' compliance with Court orders.

434.     Plaintiffs request this Court to enjoin Defendants from retaliating

against Plaintiffs for speaking out in this lawsuit and to speaking to law enforcement and other state agencies about the unlawful conditions within the Harris County Jail.

435.    Plaintiffs requests that this Court order Defendants to:

436.    Order Defendants to:

a. Provide a staffing plan and take immediate steps to recruit and retain qualified employees to staff the jail facilities. Provide for an approved representative of the Plaintiffs to participate and or have the ability to monitor the compliance of Defendants in the remedies ordered.

b. Provide adequate mental health staffing and mental health professionals on staff and or adequate and equal training for all jail employees in order to handle mental health inmates.

c. Develop and implement reasonable policies, procedures, and practices to ensure that Plaintiffs are protected from harm and deplorable, inhumane treatment and abuse from inadequate staffing to include regular bathroom breaks, lunch breaks, policies on inmate escorts, and a partner system for entering inmate dormitories.

d. Provide for an adequate system that ensures the protection of employees from dangerous chemicals and smoke being used by inmates including removal of hot pots in dormitories that break contraband rules

and or access to outside mail that is being used to smuggle in the dangerous chemicals.

e.  Provide accurate and honest reports of staffing and jail conditions to TCJS.

f.  Provide sufficient training and staffing to prevent the continuing dangerous conditions.

g.  Provide oversight for on-going constructions along with additional security personnel to oversee construction workers coming into facility.

h.  Eliminate preestablished rounding times to avoid inmate planned assaults.

i.  Provide an inmate discipline program that is effective and applied uniformly to meaningfully address acts of sexual violence against staff.

## II.    Declaratory Relief

437.    Section 1983 authorizes a plaintiff to seek declaratory relief. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 673 (2010) (§ 1983 suit brought for violations of First and Fourteenth Amendments sought injunctive and declaratory relief). Plaintiff seeks declaratory relief on the following issues:

a. Whether the Defendants are allowed to violate TCJS and create a dangerous environment by refusing to follow TCJS and or properly fund the jail; and,

b. Whether the enforcement of TCJS permits state actors to create a dangerous environment without providing Plaintiffs' notice and an opportunity to be heard before taking such actions.

438.   Plaintiffs seek a declaration that Defendants must stop violating TCJS, eliminate the dangerous environment, and must properly fund the jail.

439.   Plaintiffs seek a declaration stating they are entitled to notice and an opportunity to be heard when Defendants engage in actions designed to circumvent the TCJS.

## III.   Irreparable Harm

440.   Plaintiffs are seeking injunctive or declaratory relief as they have (1) suffered an injury-in-fact that is concrete and actual or imminent, and not hypothetical; (2) the injuries are fairly traceable to the Defendant's actions; and (3) that is likely to be redressed by a favorable decision. *See also BroadStar Wind Systems Group Ltd. Liability Co. v. Stephens*, 459 F. App'x 351, 356, at *3 (5th Cir. 2012) (*per curiam*).

441.   The Defendants' ongoing and continuous policies, practices, and or customs of non-reporting, underreporting, misreporting, or downgrading of violations of TCJS cause the Plaintiffs irreparable harm and is a violation of law. The underfunding and understaffing will continue to result in an ever-

increasing incidence of violence by inmates on staff and inmates upon each other. The complete failure to hold violent inmates accountable for their actions as a means of covering up the true nature, frequency, and magnitude of understaffing will soon result in increased violence in the Harris County jail against the officers and between inmates as described above.  The harms as shown in the fact section are injuries-in-fact, traceable to the Defendants conscience actions with regards to the funding of the Harris County jail, and ultimately Plaintiffs believe their actions will be redressed favorably by the courts.

442.     Plaintiffs and class members will be subjected to real, immediate, and irreparable injury for which no adequate remedy at law exists in that members of the Plaintiffs' class will suffer continued violations of their rights under the Fourteenth Amendment to the United States Constitution with action from this Court.

## **CLASS CERTIFICATION**

The allegations contained above are incorporated by reference as if fully set forth.

**I.     Plaintiffs along with all Harris County Jail employees, should be designated as a class.**

443.     Plaintiffs bring this claim individually and on behalf of the following putative class: All Harris County employees who have been assigned to work

in the Harris County Jail Facility currently or in the last two years.

444.    To obtain class certification a litigant must satisfy four threshold requirements found in Rule 23(a) of the Federal Rules of Civil Procedure by establishing that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 606-607 (1997).

445.    The Class is so numerous that joinder of all the individual members in one action would be impracticable, given the expected size and the relief sought by this action. It is estimates by counsel that this class size would be approximately 3,000 members with approximately 2,500 current Harris County employees working in the jail as civilians, medical staff, detention officers, peace officers, and clerks. This class comprises all current and former jail employees of the Harris County Jail.

446.    Class members can be identified through Defendants' records.

447.    Plaintiffs' claims are typical of the claims for all potential class members. The Harris County Jail is in a crisis and the root cause is

understaffing. This causes a dangerous and harmful environment for Plaintiffs as well as all Harris County employees assigned to the jail.

448.     All Plaintiffs seek relief that would be beneficial to all potential class members. The action seeks specific relief to force Harris County to do their ministerial duties and properly fund, manage, and oversee the Harris County Jail to bring it up to minimum state standards and create a non-toxic, non-hazardous, and non-hostile work environment that all Plaintiffs and all potential class members would greatly benefit from.

449.     All Plaintiffs would fairly and accurately represent the potential class members and no conflict of interest exists among the class members.

450.     This action should be maintained as a class action because the prosecution of separate actions by individual class members would create confusion, inconsistency, and be a drain of resources for both the Plaintiffs and the Defendants.

## **ATTORNEYS FEES**

The allegations contained above are incorporated by reference as if fully set forth.

451.     Plaintiffs are entitled to an award of attorney fees and costs. *See* Tex. Civ. Prac. & Rem. Code § 37.009. In *City of San Antonio v. Int'l Ass'n, Local 624*, 582 S.W.3d 455, 467 (Tex. App.—San Antonio 2018, no pet.) the court expressly held that "a public official does not have governmental immunity from a claim for attorneys' fees ancillary to an award of prospective relief in

Page **195** of **196**

an ultra vires action brought under the UDJA."

452.     Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and court costs, including expert costs.

> "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, (1998). "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence is a matter for closer calls." *Id*. at 849, 118 S.Ct. 1708 (internal quotation omitted). "[A]n exact analysis of circumstances [is required] before any abuse of power is condemned as conscience shocking." *Id*. at 850, 118 S.Ct. 1708.

> "a reminder that liability for a constitutional tort requires proof that the defendant acted (or failed to act) not merely negligently but recklessly (equivalently, with `deliberate indifference' to the risk of harm that he was creating)." *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.,* 548 F.3d 595, 599 (7th Cir.2008).

## RESERVATION OF RIGHTS

453.     Pursuant to the rules of pleading and practice, Plaintiffs reserve the right to assert additional violations of federal and or state law associated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

1. Enter a declaratory judgment that Defendants' policies and practices violate the Fourteenth Amendment of the Constitution of the United States.

2. Certify this action as a Class Action on behalf of the class of Harris County employees assigned to the jail facilities in the last two years.

3. Appoint a federal ombudsman and Plaintiffs' representative to oversee the implementation of Court orders and compliance.

4. Enter an order both temporarily and permanently enjoining the Defendants their officers, agents, employees, subordinates, and successors in office from continuing the acts and omissions and practices related to refusals to properly fund and or staff the Harris County jail facilities in overcrowded dangerous conditions.

5. Enter an order both temporarily and permanently enjoining the Defendants from taking adverse employment actions that is attributed to or as part of a retaliation regarding Plaintiffs reporting of wrongdoing by Defendants. Order Defendants to cease violations of Plaintiffs rights including ensuring reasonable work hours and conditions.

6. Order Defendants to:

    a. Provide a staffing plan and take immediate steps to recruit and retain qualified employees to staff the jail facilities.

    b. Provide adequate mental health staffing and mental health professionals on staff and or adequate and equal training for all jail employees in order to handle mental health inmates.

    c. Develop and implement reasonable policies, procedures, and practices to ensure that Plaintiffs are protected from harm and deplorable, inhumane treatment and abuse from inadequate staffing.

    d. Provide for an adequate system that ensures the protection of employees from dangerous chemicals and smoke being used by inmates.

    e. Provide accurate and honest reports of staffing and jail conditions to TCJS.

    f. Provide sufficient training and staffing to prevent the continuing dangerous conditions.

    g. Provide oversight for on-going construction along with additional security personnel to oversee construction workers coming into facility.

    h. Eliminate preestablished rounding times to avoid inmate planned assaults.

    i. Provide an inmate discipline program that is effective and applied uniformly to meaningfully address acts of sexual violence against staff.

7. Any other relief as the Court finds warranted to ensure the safety of Plaintiffs and or inmates.

8. Award Plaintiffs their attorney fees and costs.

Respectfully submitted,

By: /s/ *David J. Batton*
David J. Batton
LEAD COUNSEL
Texas State Bar No. 24124813
OK State Bar No. 11750
U.S. D.C., SD TX: 438542
dave@dbattonlaw.com
3130 N. Fwy
Houston, TX 77009
P: (713) 659-0005
F: (281) 205-0426


J. Marcus "Marc" Hill
OF COUNSEL
Texas Bar No. 09638150
U.S. D.C., SD TX: 4640
marc@hillpclaw.com
1770 St. James Place, Ste 115
Houston, Texas 77056
2116 Church Street
Galveston, Texas 77550
Phone: (713) 688-6318
Fax: (713) 688-2817


Robin McIlhenny Foster
OF COUNSEL
Texas Bar No. 24072992
U.S. D.C., SD TX: 1552147
robin@legalrobin.com
3130 N. Fwy
Houston, Texas 77009
P: (713) 659-0005
F: (281) 205-0426
**Attorneys for Plaintiffs**

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

John Doe 1 & John Doe 2 and on behalf of a Class of John and Jane Doe employees of Harris County

**(b)** County of Residence of First Listed Plaintiff   Harris County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David J. Batton
3130 North Freeway, Houston TX 77009

## DEFENDANTS

Harris County, Lina Hidalgo, Rodney Ellis, Adrian Garcia, R. Jack Cagle, Tom S. Ramsey and Edward Gonzalez

County of Residence of First Listed Defendant   Harris County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Christian D. Menefee
1019 Congress, 15th Floor, Houston, TX 77002

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

|   |   |   |   |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Fourteenth Amendment; 42 USC §§ 1983 and 1988;

Brief description of cause:
Injunction, Declaratory Judgement, Class action relief, whisleblower; Protective orders for Plaintiffs

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
No Money

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
09/19/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ David J. Batton

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 04/21)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions.</u>

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.