**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DALLAS GARCIA,** *Individually***, and** *as* | § | **Civil Action No. 4:22-cv-3093** |
| *representative of the estate of* **FRED** | § | **(Jury Trial)** |
| **HARRIS,** *deceased,* | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HARRIS COUNTY, TEXAS;** *et al.* | § | |
| *Defendants.* | § | |

## CORRECTED PLAINTIFF'S THIRD AMENDED ORIGINAL COMPLAINT

**TO THE HONORABLE ALFRED H. BENNETT:**

On October 29, 2021, Michael Ownby stabbed, slammed, beat, and kicked Fred Harris to death in the Harris County Jail as Harris County Detention Officers—who delivered Fred to Ownby and created the opportunity for the murder—looked on, doing nothing. And they did so because that was standard operating procedure for the Harris County Jail. Overcrowded, underfunded, and understaffed, the Jail had no hope for the health and safety of inmates like Fred, so they delivered him to a violent murderer, quite literally leaving him for dead rather than caring for him at all. On that basis, DALLAS GARCIA, *Individually,* and as a representative of the estate of FRED HARRIS, deceased, pursuant to court order adding parties and complains of HARRIS COUNTY, TEXAS; DEBORAH WASHINGTON, NICOLAS GUZMAN, HEAVEN RATLIFF, DARIUS BRIGHTMAN, LOGAN SHORTER, DOMIQUE ROBERSON, DEMITRE JOHNSON, SHERIFF EDWARD GONZALEZ, LINA HIDALGO, RODNEY ELLIS, JACK CAGLE, ADRIAN GARCIA, and TOM R. RAMSEY and will show the following:

# TABLE OF CONTENTS

1. JURISDICTION AND VENUE ......................................................................................... 3

2. PARTIES ............................................................................................................................ 3

3. FACTS ............................................................................................................................... 4

3.1. Fred's Death and Overview of the Harris County Jail ................................................... 4

3.2. Policies, Customs, Patterns, and Practices of the Harris County Jail .......................... 11

   3.2.1. Overview of Policies, Customs, Patterns, and Practices — chronic understaffing and underfunding consistently leads to inmate-on-inmate violence, jailer-on-inmate violence and excessive uses of force, and inadequate medical care. ............................................... 11

   3.2.2. Harris County and its policymakers had specific knowledge of these Policies, Customs, Patterns, and Practices, as well as the resulting constitutional violations. ......... 15

   3.2.3. Numerous reports have consistently outlined these very problems in great detail. . 26

   3.2.4. Other victims of Harris County Jail's rampant constitutional violations ................. 41

3.3. Former employees and witnesses of Harris County Jail further corroborate these ongoing and pervasive issues. ............................................................................................... 87

4. CAUSES OF ACTION ..................................................................................................... 90

4.1. Americans with Disabilities Act (ADA) ..................................................................... 90

4.2. Chapter 42 U.S.C. § 1983 Claims Against Harris County ........................................... 92

4.3. Chapter 42 U.S.C. § 1983 Claims against Individual Officers ..................................... 97

4.4. Damages ...................................................................................................................... 98

5. JURY DEMAND .............................................................................................................. 98

6. PRAYER FOR RELIEF ................................................................................................... 98

## 1. JURISDICTION AND VENUE

1.      This Court has jurisdiction over the federal claims of Plaintiff in this action, under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C §§ 1983 and 1988, the 4th, 5th and 14th Amendments to the U.S. Constitution and under Title II of the Americans with Disabilities Act ("ADA"), the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"). Venue is proper in this Court pursuant to 28 USC § 1391(b) as most material facts out of which this suit arises occurred in Harris County, Texas within the U.S. Southern District of Texas, Houston Division.

## 2. PARTIES

2.      DALLAS GARCIA, *Individually,* and as a representative of the estate of Fred Harris, deceased, is an individual residing in Harris County, Texas.

3.      Defendant HARRIS COUNTY, TEXAS is a governmental body existing under the laws of the State of Texas and was served with process and have responded to the complaint.

4.      Defendants Detention Officers DEBORAH WASHINGTON, NICOLAS GUZMAN, HEAVEN RATLIFF, DARIUS BRIGHTMAN, DOMIQUE ROBERSON, LOGAN SHORTER, and DEMITRE JOHNSON, are sued individually and can be served with process at 1200 Baker Street, Houston, Texas 77002.

5.      Defendant SHERIFF EDWARD GONZALEZ is sued individually and can be served with process at 1200 Baker Street, Houston, Texas 77012.

6.      Defendants LINA HIDALGO, RODNEY ELLIS, JACK CAGLE, ADRIAN GARCIA, and TOM R. RAMSEY are sued individually and can be served with process at 1001 Preston, Houston, Texas 77002.

## 3. FACTS

### 3.1. Fred's Death and Overview of the Harris County Jail

7.      Fred Harris, 19, has never been convicted of a crime in his entire life. Fred was a special needs student, had an IQ (intelligence quotient) in the bottom 1% of the population, and suffered from mental illness. Fred lived most of his life with his mother Dallas Garcia.

8.      Despite his severe intellectual handicap Fred attended Stafford High School where he was very well liked by other students due to his cheery and outgoing personality, so much so the students elected him part of homecoming royalty. During high school Fred was well-behaved and had no discipline problems. Fred graduated from Stafford High School in 2020.

9.      Even as an adult high school graduate, Fred was the size of a small child, weighing in at a diminutive 98 pounds.



10.     For many years, the Harris County jail (the Jail), the third largest county jail in the United States, has been understaffed, underfunded, and overcrowded. The Harris County jail is operated by the Harris County Sheriff's Office (HCSO). Due to these well-known conditions, the Jail has become a very dangerous place for inmates and staff alike. For example, there are not enough staff to properly handle violent inmates—even those who are known to be a threat to others—and special needs inmates (like Fred) who require escorting from one area of the Jail to another, so as to, among other things, prevent, dissuade, or intervene in assaults upon staff and inmates, thereby lessening the occurrence of such assaults, reducing the risk of injury, and preventing death. A horrific example of these extreme conditions, and the widespread knowledge of them, is the violent sexual assault by unescorted Jeremiah Williams of a female Jail sergeant who was *in her office*. Williams was wearing a colored Jail wristband indicating he is to be escorted by Jail staff and not allowed to roam due his violent behavior.

11.     In response to the assault Sheriff Ed Gonzalez (Sheriff Gonzalez), who is the elected sheriff of Harris County and top official in charge of the Jail operations, said on December 8, 2021 "the jail needs 550 to 700 new employees" merely to meet the absolute minimum standard of care and to adequately protect and defend the health and safety of the inmates.

> *https://www.fox26houston.com/news/concerns-raised-after-inmate-brutally-attacked-sexually-assaulted-harris-county-sergeant-at-jail*

12.     The Jail is so dangerous, and the danger is so well known by Defendants, that two anonymous Jail employees, on behalf of themselves and other Jail employees, including the members of the Harris County Deputies Organization (Deputies Union), took the unprecedented step of filing a federal lawsuit on September 20, 2022 asserting that, despite years of warnings about safety concerns about inmate-on-inmate and inmate-on-staff violence to Sheriff Gonzalez and the Harris County Commissioners Court (Commissioners Court) for understaffing and underfunding, nothing was done. The Commissioners Court is in charge of funding and staffing at

the Jail and can earmark funds specifically for staffing. See **Exhibit 1**, *John Doe 1, et al. v. Harris County, Texas, et al.*, No. 4:23-cv-2886.

13.     Confronting these issues directly, Deputies Union President David Cuevas stated:

*"It's unfortunate we're in that position, but that's what it is. All the assaultive behaviors from inmates on staff, over **6,000 inmate-on-inmate fights**. We are not able to maintain security of the facility and we're not able to maintain security for our personnel as we've seen with this brutal attack that happened on one of our sergeants, one of our sisters," says Cuevas. "We've heard from our detention staff. They've called our union, crying, upset, shaken; and it's rang loud and clear to us. They need help and nobody's listening. We need Commissioners Court to do their damn job, provide us the resources, the funding."*

The aforementioned 6,000 inmate-on-inmate assaults were for the short period from January 1, 2021, until sometime in September 2021. The Harris County Commissioners Court is comprised of Lina Hidalgo, Rodney Ellis, Jack Cagle, Adrian Garcia, and Tom R. Ramsey.

14.     These concerns are not merely anecdotal, they are supported by extensive data known to Defendants.  For example, a late 2021 inspection by a Texas government agency revealed that the Harris County Jail is under-staffed, which inspectors believed contributed to more than 1,000 staff members that had been assaulted by inmates in 2021. In 2017, there were only 46 reports of inmates assaulting staff members, according to the Deputies Union. In December 2021 it was reported that there have already been 1,265 staff assaults in the year. *"Minimal staffing has a direct impact on the ability to provide a safe and secure environment for inmates and jail staff in areas such as enforcing inmate rules, ensuring inmates' clean housing areas provide for sufficient staff to support housing officers, and has possibly contributed to an increase in inmate-on-inmate assaults and inmate-on-staff assaults,"* the Texas agency report reads. Even during the Texas agency inspection, inspectors feared for their safety after interacting with some inmates in such unsafe conditions.

15.     The report also specifically addressed other issues relevant to this case—the need to constantly monitor and assess dangerous inmates, like the one who killed Fred.  According to

the report, all inmates should be accounted for by face-to-face checks, no less than once every hour. Inmates who are assaultive, potentially suicidal, or have any other concerning behaviors should be checked every 30 minutes. But this isn't happening. Instead, some face-to-face observations happen between 90 to 144 minutes between rounds, if they happen at all. To explain this clear deficiency—and the Jail's failure to comply with its own stated policies and minimum standards—*officers admit that they are just too short-staffed*.

16.     The Jail is also supposed to have one officer to every 48 inmates. It did not. Instead, the way the Jail fraudulently claimed to satisfy this ratio was, according to the inspection report, troubling (and intentionally false). Simply, the Jail used supervisors and non-officer essential workers (*e.g.,* janitors) to address housing unit assignments, taking untrained, non-officer employees away from their jobs, if in fact they even took them from their jobs, to meet the required *officer* ratio. Even doing so, however, there is still not even one person for every 48 inmates at all times.

17.     State Senator—and now Houston mayor—John Whitmire said in 2021 that the horribly dangerous and out-of-compliance conditions at the Jail were such that a state take-over of the Harris County Jail could be an option: "Consider all options, including state intervention, bringing constables, DPS."

18.     On October 10, 2021, Fred, although having never been arrested in his life, was arrested for allegedly "*exhibiting* [] a knife." No one was injured. Fred was placed in the Harris County Jail. Based upon the case facts, it is not clear that there was ever any reasonable basis for Fred to have been incarcerated in the first place, and it is unlikely Fred would ever have been charged, much less convicted, nor was there probable cause.

19.     Due to Fred's Jail intake evaluation and Harris County records, Defendants immediately knew that Fred was severely intellectually disabled and mentally ill and in need of special care. The existing public records left no possible doubt as to Defendants' knowledge and/or their necessary conclusion: on October 11, 2021, a magistrate judge found, and put in Fred's record, that Fred "is a person with mental illness or intellectual disability."

20.     On October 12, 2021, the Hon. Kelli Johnson (Judge Johnson) of the 178th District Court of Harris County, Texas found Fred indigent and assigned Fred a court-appointed lawyer for his defense. October 21, 2022, his court appointed lawyer filed a motion for Fred to undergo psychiatric examination for competency due to signs of mental illness such as talking to an imaginary person and family history of schizophrenia and other mental health history. October 28, 2022, Judge Johnson ordered Fred to undergo psychiatric examination for competency.

21.     At the same time Fred was in the Jail, so was the known-to-be extremely violent inmate, 240-pound Michael Paul Ownby (Ownby).

22.     On October 25, 2021, Ownby was convicted and sentenced to prison for felony Continuous Violence Against the Family.

23.     A mere two days before he murdered Fred, on October 27, 2021, Ownby viciously attacked and injured a Jail detention officer.

24.     Due the assault, and the known extreme danger posed by Ownby, the Jail fitted him with a wristband that clearly stated the danger posed by Ownby and required that he be escorted by a jailer escort at all times.

25.     Despite the Jail's knowledge, and despite the safety requirements imposed against Ownby by the Jail, October 29, 2021, at around 8:20 pm Ownby assaulted another individual in the Jail, this time an inmate, stabbed him with a shank (stabbing instrument) and put him in a chokehold, because Ownby wanted to be in a single cell due to his assaultive behavior. Due to Ownby's violence, two detention officers then escorted Ownby to the 3rd Floor holding cell and the guards removed his handcuffs. Detention Officer Deborah Washington directed Ownby to be taken to the 3rd Floor holding cell. At the time he did so, Washington and the escorting guards knew Ownby was exceedingly dangerous, knew about the shank, knew of the attacks by Ownby, and that Ownby purposely attacked inmates so he could be in a single cell.

26.     Fred Harris was escorted to the 3rd floor holding cell around 10:41 P.M. by Detention Officer Nicolas Guzman.

27.     On October 29, 2021, as on many days before, at around 11 P.M. the Jail did not have the staff to perform all the duties necessary for safety including keeping extremely violent inmates like Ownby away from much weaker smaller inmates like Fred and anyone else, to watch inmates in cells for assaultive behavior, and to intervene in inmate-on-inmate assaults. As a result Jail staff put Ownby and Fred in the same holding cell, with virtually no oversight.

28.     Not surprisingly, given his known prior behavior (which is why he was put in the holding cell in the first place), once he was in the cell with Fred, Ownby knocked Fred to the concrete floor and began smashing Fred's head on the concrete.

29.     Then Ownby repeatedly kicked Fred in the head as he lay on the concrete floor.

30.     For the entirety of Ownby's violent assault on Fred, Detention Officer Darius Brightman stood by and watched, but did not enter the cell, did not attempt to restrain Ownby, did not do anything to protect Fred or ensure the health and safety of the inmates in his care. During the kicking and slamming of Fred by Ownby Detention Officer Domique Roberson did exactly the same-stood by and watched, but did not enter the cell and certainly did not do anything to protect the defenseless Fred. During the kicking and slamming of Fred by Ownby Detention Officer Logan Shorter similarly watched, but did not enter the cell.

31.     Detention Officer Demitre Johnson saw Fred lying on the floor, through video monitor, after hearing a "thud," which was Ownby's initial attack. Despite seeing the assault and aftermath, however, Johnson did not investigate, leaving Ownby to continue his vicious and deadly attach on Fred, Ownby slamming Fred's head and stomping it into the hard concrete floor of the Jail.

32.     DO Johnson was in charge of who went into the 3rd Floor holding cell and ordered and allowed Ownby and Fred to be put together in the cell. At the time DO Johnson knew that Ownby had just attacked an inmate on another floor. DO Johnson had received word from DO Heaven Ratliff that Fred Harris was being attacked in his previous cell and allowed Fred Harris to be put in with Ownby. DO Ratliff escorted Fred Harris into the cell where Ownby was.

None of the Detention officers checked the classification status of inmates before moving them, because it's just not something they do when they are so dismally understaffed and undertrained. None of the Detention officers intervened when an inmate, Ownby, violently attacked another inmate, Fred. None of the Detention officers did anything when Ownby stabbed Fred with a weapon made from a sharpened utensil.

33.     As there was not enough Jail staff, when detention officers eventually showed up and entered the cell Fred was bloody, beaten, stabbed, and already near death.

34.     Fred did not instigate a fight with Ownby.

35.     Fred was taken to Ben Taub hospital and put on life support. Fred was declared brain dead. Fred was kept on life support so his organs could be donated and died within a few days of arriving at Ben Taub. Mother Dallas Garcia has suffered immensely since Fred's death.

36.     These events are described in a Texas Rangers report, and were also captured on a truly horrifying, gut-wrenching video. The report, video of the incident, and videos of Ownby's previous violent jail assaults are hand-delivered to the Court Clerk to be put in the file attached as a **SEALED EXHIBIT #4.**

37.     Harris County does not require and does not have insurance for Constitutional and civil right violations of their employees including deputies, jailers and others and including for incidents such as what happened to Fred Harris. Harris County has never required its officers to obtain other means to satisfy a judgment against them such as a bond, surety, or other means. Harris County, unlike multiple other municipalities in Texas and throughout the United States, has no requirement to satisfy judgments entered against its jailers, deputies, or other employees for violations of civil rights, including failure to protect inmates. It is the official policy, or unofficial custom of Harris County Sheriff's deputies, jailers, and other employees to not obtain such insurance or indemnification so that they remain "judgment proof" in the event of litigation. This actively discourages litigants and attorneys from filing lawsuits because there is often no ability to recover just compensation for violations of constitutional rights such as the failure to protect or the for the violations that happened to Fred Harris. Because they are not held accountable for

Constitutional and civil rights violations, this creates an official policy, or unofficial custom, of normalizing the Constitutional and civil rights violations by Sheriffs, deputies, jailers, and other employees. The Commissioners Court, and Sheriffs know it is extremely unlikely they will be sued in most instances and even if they are sued many litigants dismiss their cases or settle for small amounts. This was a moving force of the violence on Fred as stated in this complaint.

## 3.2. Policies, Customs, Patterns, and Practices of the Harris County Jail

### 3.2.1. Overview of Policies, Customs, Patterns, and Practices — chronic understaffing and underfunding consistently leads to inmate-on-inmate violence, jailer-on-inmate violence and excessive uses of force, and inadequate medical care.

38.    Several customs, patterns, and practices by Defendants led directly to Fred's death. All of these customs, patterns, and practices are both a direct result of, or are severely exacerbated by, Harris County's policy or practice of chronically and severely starving its Jail of money and staff, while continuing to further overcrowd the Jail.

39.    Those customs, patterns, and practices are: encouraging violence between detainees (like Fred's murder at the hands of Ownby); abiding violence generally, including inmate-on-inmate and jailer-on-detainee violence; and inadequate provision of care, including failing to account for detainees' protective designations, delaying or refusing to break up fights, as well as failing to speedily provide emergency medical care, failure to train and supervise, and to adequately classify special needs, disabled individuals like Fred and extremely repeatedly violent inmates like convicted murderer Michael Ownby. Beyond the issues themselves, Harris County has staunchly refused to even address any of these problems through training, and does not adequately train its jailers with respect to responding to detainee-on-detainee violence, or protective protocols for vulnerable detainees like Fred and violent detainees like Ownby. Furthermore, the failure to stop and to allow the massive number of inmate-on-inmate violence is a custom of the Harris County jail.

40.    Individually and collectively, these policies, customs, patterns, and practices all directly led to Fred's death. The lack of resources, lack of training, and inadequate provision of

care led to the series of decisions resulting in Fred and Ownby being placed alone together, unsupervised, in a holding cell; meanwhile, the pervasive culture of violence emboldened Ownby to senselessly and ruthlessly murder Fred, seemingly for sport, while it also encouraged the jailers' decisions to sit idly by and do nothing.

41.     Harris County's culture, pattern, practice, and policy of allowing and encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainees' assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, failing to respond to requests for aid to be protected from detainees, failing to discipline detainees who instigate violent attacks on other detainees, failing to observe or monitor detainees, deliberately refusing to interfere with ongoing assaults, and encouraging detainee assaults to resolve interpersonal problems led to the injuries and deaths of Fred Harris and the other victims described herein.

42.     Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, caused additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevented a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring," impedes Plaintiffs' access to medical care, impedes the officers ability to provide medical care timely, impedes the jailer's ability and/or willingness to observe and monitor detainees, impedes the jailer's ability and/or willingness to deter detainee on detainee or officer on detainee violence, reduces the ability of officers to escort detainees safely, and results in insufficient officers to carry out even minute functions of the jail safely, which resulted in the injuries and deaths of Fred Harris and the other victims described herein.

43.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in the injuries and deaths of Fred Harris and the other victims described herein.

44.     Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

45.     It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

46.     Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Plaintiff's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Fred Harris's injuries and death.

47.     As exemplified by the claims herein and in stories of other victims noted below, Harris County has a history encouraging officers to use excessive force, not supervising them in the use of force, not training them on proper de-escalation techniques, encouraging them to use techniques that result in unnecessary harm, encouraging and ratifying false reports, encouraging and ratifying summary investigations, and ultimately charging detainees with the false charges to cover up the use of force.

48.     Harris County has also a history of failing to train and supervise employees in the handling of detainee violence and detainee conflicts and responding to requests for aid and protection from detainees. Harris County's training policy and practice encourages officers to not interfere with detainee fights until after the fight is over, encourages officers to not act preemptively to prevent fights between detainees, ratifies officer conduct of encouraging detainees to fight prior to getting involved, and not responding timely to prevent further injury to detainees.

49.     As exemplified in the repeated TCJS reports and numerous prior incidents, Harris County also has a rampant policy of not training or supervising their employees in the proper observation and monitoring of detainees. Harris County employees routinely fail to observe detainees within the minimum jail standards, fail to conduct complete cell checks, fail to monitor detainees while they are in areas with no video cameras, fail to monitor video cameras, and falsify documentation and reports pertaining to observations and cell checks. Harris County was aware of this in the DOJ Report and was made aware of it again through each TCJS report; yet, Harris County has not made any change to their policy and does not hold their employees accountable.

50.     As shown herein, Harris County also has an inadequate training policy and practice for providing medical treatment to detainees. Harris County employees in accordance with their policy will not provide medications regularly, employees may skip detainees who are being punished, employees will not respond to requests for medical help timely or at all, employees will not conduct sufficient testing or analysis of detainees with injuries which are known to have serious consequences, they falsify records pertaining to the detainee's symptoms and care to make it appear as if the detainee received care, and they fail to adequately monitor and observe detainees

with known injuries and medical conditions to ensure proper medical care. Despite knowing about these failures in their training, Harris County has not made a change to this training policy.

51.     Sheriff Gonzalez was well aware of the consequences of failing to train the jail employees in the areas of medical care, observation, detainee violence, and use of force. Sheriff Gonzalez knew or should have known that this failure to train employees who are tasked with the care and control of the detainees would result in the deaths or injuries of detainees.

52.     The need for a different training policy and practice to address the discrepancies raised by the DOJ, the TCJS, and the numerous prior incidents has been obvious for years with knowledge that continued failure to address this policy will result in additional constitutional violations.

53.     Harris County's failure to implement new and additional training policies was the direct cause of Fred's injuries and death.

54.     On August 7, 2023, twenty-two plaintiffs filed a lawsuit in this Court against Defendant Harris County for violations of their rights as detainees in the Harris County Jail stemming from injury or death in an action styled *Wagner, et al. v. Harris County*, No. 4:23-cv-2886. For the convenience of the Court, the live complaint is attached here as **Exhibit 2**.

> 3.2.2.   Harris County and its policymakers had specific knowledge of these Policies, Customs, Patterns, and Practices, as well as the resulting constitutional violations.

55.     Each of the policies, customs, patterns, and practices taken above and in context of Fred Harris's injuries and death were promulgated, enforced, ratified, and created by Harris County's policymakers including Sheriff Gonzalez. Harris County has been aware of these policies, practices, and customs since at least 2009 as shown below.

56.     Harris County's rampant constitutional failures go back for the better part of two decades. When looking back at the Jail's most recent history, the records and information available to the public creates a trail of constitutional violations that has steadily grown year over year. The information available to the public only shows the tips of the icebergs that make up this trail, but the tips of the icebergs are more than sufficient to draw the conclusion that Defendant Harris

County has ongoing policies, practices, procedures, and customs that are the moving force behind the violation of Fred Harris's constitutional rights leading to his death.

57.     Harris County attempts to hide what happens behind the doors of the Jail, but a few public records are available to give insight into the ongoing pervasive nature of the deplorable conditions behind those doors. These records include an investigation by the Department of Justice, numerous investigations and non-compliance reports by the Texas Commission on Jail Standards, multiple admissions by the Harris County Sheriffs of the "culture" within the Jail, statistics gathered and reported by the Harris County Sheriff showing the violent nature of the Jail, and numerous incidents involving similar facts and injuries suffered by other Harris County Jail detainees over the years. Then on top of these public records, the eighteen detainees involved in this action also exemplify the policies of Harris County.

58.     The deplorable conditions and nature of Harris County Jail grew to such a degree that the Department of Justice was forced to investigate the Jail for constitutional violations beginning in March 2008.

59.     What the officials found were "systemic deficiencies" throughout the Jail. To summarize their findings, the DOJ found:

> *[W]e also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards.*

60.     Notably, the Jail had over 9,400 detainees at the time the DOJ inspected.

61.     One main area that the DOJ found as unconstitutional was "significant and often glaring operational deficiencies" in security matters including lacking: "(1) a minimally adequate system for deterring excessive use of force, and (2) an adequate plan for managing a large and sometimes violent detainee population."

62.     In addressing this area, tellingly, the DOJ started their analysis with: "We have serious concerns about the use of force at the Jail."

63.     "Indeed, we found significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors." The staff would fail to properly investigate the use of force when used with inaccurate documentation and relying exclusively on officer statements. "Jail data regarding use of force levels cannot be considered reliable." "We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility."

64.     "As a result of systemic deficiencies. . . the Jail exposes detainees to harm or risk of harm from excessive use of force." The DOJ provided numerous examples of the use of force resulting in life altering injuries or death.

65.     In relation to the Jail's unconstitutional history of violence, the DOJ discussed the impact of overcrowding has on the conditions of the Jail which are the exact same issues that have faced the Jail from 2009 until today.

66.     Jail crowding affects multiple Jail systems. For instance, it impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner. How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding.

67.     With overcrowding, the DOJ found that detainee violence increased with the Jail having no plan to deter violence or provide better oversight and supervision of detainees. Many areas of the Jail lacked video surveillance, which has still not been addressed fully.

68.     Each of these constitutional violations noted by the DOJ should have caused immediate and permanent change within the Jail itself. The Sheriff as the policymaker for the Jail was on actual notice of these issues and precludes any excuse for allowing these constitutional violations to occur. The trend of deaths and injuries in the Jail should have sloped downward. Instead, it has spiraled upward as each of the deficiencies noted by the DOJ have only worsened.

69.     Harris County should not need the DOJ to come into the Jail each year to point out its problems. Unfortunately, the Sheriff has shown that without significant oversight the Jail will continue its policies, practices, and customs that violate the detainee's constitutional rights. The lack of permanent change following the DOJ Report is illustrated perfectly by the violations of Fred's constitutional rights.

70.     No later than 2016, the Harris County Sheriff as the policymaker for Harris County Jail was well aware of the unconstitutional culture, patterns, and practices that are prevalent in the Harris County Jail, which continues to get worse.

71.     Each politician that runs for Harris County Sherriff says that the Jail has a culture of violence, overcrowding, understaffing, and lack of medical care; yet, after being elected, that culture only grows worse.

72.     In 2016, when Sheriff Gonzalez was running against the former Sheriff Ron Hickman, they both participated in a publicized debate discussing key questions concerning Harris County and the Jail itself. In this debate, both Sheriff's acknowledged the rampant issues within the Jail. Sheriff Hickman pointed the finger at his predecessor while also acknowledging that things needed to change. Sheriff Gonzalez attacked the state of affairs in the Harris County Jail and attacked the policies of Sheriff Hickman.

73.     The second question in the debate was directed toward Sheriff Gonzalez: "Mr. Gonzalez, a concerning number of people have died in the Harris County Jail, that's a number that has, that's not new, it's going on for some time, how can those kinds of deaths be prevented?"

74.     Sheriff Gonzalez's answer reveals his actual knowledge concerning the ongoing constitutional issues that were depriving the detainees of their constitutional rights which were present in the DOJ Report, and which are continuing to be present in recent detainee's claims and this action:

> *Well, I think we need to change the culture. I think here recently there was another civil rights lawsuit of an inmate that was beaten so severely it required reconstructive facial surgery. So the culture needs to change. Uh and so, we need to also that we are leveraging technology, there's technology available that could*

*help reduce suicides uh for example by measuring when there is a decreased pulse inside the jail cell. We need to be pursuing that. We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in. . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well. Make sure that we are creating opportunities to learn better de-escalation techniques so things don't get out of control, but it starts with leadership. We've got to end this culture that quickly leads to physical altercation, and we also need to better address mental illness in the community.*

75. When asked about the Jail's efforts to prevent issues with mentally ill detainees, Sheriff Gonzalez specifically cited to an incident in 2015 where the Texas Commission on Jail Standards found the Jail as non-compliant for refusing to provide treatment to a mental health patient on four different occasions.

76. Sheriff Gonzalez continued that if proper treatment and access would have been provided for another detainee, "then I don't think she would have spent 27 days inside that jail being beaten not only by an inmate but by a deputy as well." "[T]his is nothing new this is a culture. . .something should have been done rather then just letting her be in [the Jail] beaten by a deputy and by an inmate and come out worse than what she went in. that's wrong that could be your daughter, your granddaughter, it could have been one of our loved ones."

77. Continuing with their questions about the Harris County Jail, the moderators asked Sheriff Gonzalez what he was going to do with the "overcrowding problem" in Harris County Jail. To summarize his position, he stated, "I'm gonna fight to make sure that we lower our jail overpopulation."

78. Sheriff Gonzalez recognized that the Jail's overpopulation was a problem and that "this is not a new problem, we've had overpopulation before," and "if the jail overcrowding is such an issue as we've talked about quite a bit here tonight, then we need to be changing that system. If not, we're going to continue to see a lot of the same problems." Yet, when looking at

the Jail population statistics, the Jail is at a higher population now, and for the majority of the tenure of Sheriff Gonzalez than it was during Sheriff Hickman's tenure.

79.    Sheriff Gonzalez recognized the staffing issues within the Jail by pointing out the requirements for staff to work overtime and by criticizing Sheriff Hickman by claiming that there were too many people in laundry and the kitchen and other areas when they should only be focusing on the positions that must meet the 1:48 ratio. This practice of pulling unqualified staff from other positions to meet the 1:48 ratio is the exact sort of policy that the Texas Commission on Jail Standards found was non-compliant in its November 2021 Report and Notice of Noncompliance.

80.    In his closing argument, Sheriff Gonzalez reiterated that he had the skills to "clean up our county jail too many inmates are losing their lives or are less safe."

81.    This debate exemplifies the prolonged public discussion and high degree of publicity concerning the unconstitutionality of the policies of Harris County Jail. Sheriff Gonzalez himself showed that he had actual knowledge of these ongoing issues when he entered the Jail, but remarkably, the deaths and injuries of detainees has only grown since Sheriff Gonzalez took over this position.

82.    Upon winning the election, Sheriff Gonzalez's public statements have become far more guarded and political but ultimately, he cannot hide behind a veil of ignorance when it comes to the wrongdoing occurring in the Jail.

83.    In a recent interview, Sheriff Gonzalez admitted that the overcrowding in the Jail has caused significant problems and that they are in need of 700 additional staff members. Sheriff Gonzalez stated that even though they try to meet the state staffing ratio standard, that standard is "not always sufficient. . . . because minimum isn't always going to be what we really need."

84.    Sheriff Gonzalez's toned-down talk about the issues with Harris County exemplifies one of the roadblocks facing victims and their families. Harris County has tried for years to hide what is happening within the Jail's walls which prevents plaintiffs, victims, and their families from discovering all of the facts and information pertaining to their loved ones.

85.     Sheriff Hickman claimed accountability and touted a multi-million-dollar camera system implemented in the Jail to help with accountability and transparency. Although some of the atrocities were caught on camera (such as this case), the officers and detainees quickly learned that many parts of the jail are without cameras providing them areas to conduct beatings, hazings, and where they can act with absolute impunity to any oversight or accountability.

86.     When some video evidence is available of the death or injuries of a detainee, it usually results in Harris County being cited for non-compliance with minimum jail standards.

87.     Ultimately, some insight can be seen into the horrors within the Jail now that Harris County along with every other county jail in Texas are required to provide a "Serious Incident Report" to the Texas Commission on Jail Standards every month on the fifth day of the month. The only reports available start in 2018.

88.     These statistics tell a gruesome story that underlies the widespread practice of violence, lack of medical care, and lack of observation and supervision that has only grown worse since the 2009 DOJ Report.

89.     The Serious Incident statistics are solely reliant on the self-reporting from the County. With Harris County's history of false reporting and underreporting of assaults and use of force, this would mean that Harris County's Serious Incidents are likely far higher than what is reported.

90.     Texas has 252 county jails. Harris County is the highest populated county jail, but even with its history of overpopulation, it has only accounted for 14% of the jail population across the entire state at its highest.

91.     Each report contains a breakdown of what the law defines as a Serious Incident. This includes suicides, attempted suicides, death in custody, escapes, assaults, sexual assaults, serious bodily injuries, and use of force resulting in a bodily injury. If a detainee is injured or placed in a hospital due to injuries suffered or lack of medical care in the jail but is "released" from custody prior to passing away, then those individuals are not counted as "death in custody."

92.     Assaults encompass many different assaults including detainee-on-detainee and jailer-on-detainee. Use of force encompasses when an officer uses force on a detainee; however, it is not a serious incident if the use of force does not result in a bodily injury. These reports are reliant on the county and officers to report the use of force, report an injury, and/or permit a detainee to report an injury which is precarious as detainees are often scared to report officer abuse for fear of additional abuse.

93.     Despite the likely underreporting of Harris County Jail's Serious Incidents, these reports reveal the abhorrent reality that Harris County's culture of violence, death, and excessive use of force has grown out of control and exemplifies the ongoing policies that Harris County promotes within its system.

94.     From 2018 until today, the number of assaults occurring in Harris County continues to grow. The easiest way of seeing this growth is a breakdown of the number of assaults that occur in Harris County compared to all other Texas counties combined. In 2018 and 2019, Harris County accounted for 44% of all assaults that occurred in the state. In 2020, Harris County accounted for 55% of all assaults in the state. In 2021, Harris County accounted for 56% of all assaults in the state. In 2022 and for the first six months of 2023, Harris County accounted for 52% of all assaults in the state. Thus, for the past four years, Harris County Jail has had hundreds to thousands of more assaults than the 251 other Texas county jails **combined.**

95.     These numbers are even more shocking when comparing Harris County's monthly numbers to the other large counties in Texas. In April 2018, Harris County Jail had 426 reported assaults. The next closest county was Bexar County with 113 which is the only other county in Texas that ever has over 100 assaults. No other county, including Dallas, Tarrant, or Travis, had more than 26 assaults in that month. In January 2020, Harris County had 633 reported assaults. Dallas, Tarrant, and Travis Counties only had 15 assaults in that month combined.

96.     Fast forward to January 2021, Harris County had 711 reported assaults. Dallas, Tarrant, and Travis Counties only had 33 assaults in that month combined. In January 2022, Harris County had 565 reported assaults. Dallas, Tarrant, and Travis Counties only had 23 assaults in that

month combined. In January 2023, Harris County Jail had 665 reported assaults. Dallas, Tarrant, and Travis Counties only had 8 assaults in that month combined. Since 2020, Harris County Jail has only had one month (April 2020) with less than 500 assaults during that month.

97.     The chart below shows the yearly comparison of assaults in Harris County Jail versus all other Texas county jails *combined*.



98.     The disturbing number of violent incidents in Harris County Jail only scratches the surface of the horrors facing the detainees within the Jail. The Use of Force statistics paint even more detail into the Harris County Sheriff's ratified "culture that quickly leads to physical altercation" due to their insufficient training, understaffed and overpopulated Jail, and deliberate indifference to the human lives placed within their care.

99.     The use of force statistics shows a pattern, practice, and culture of excessive force by officers against detainees in the Harris County Jail. In 2018 when the statistics first started to be reported, Harris County Jail accounted for 23% of all Use of Force resulting in bodily injury in Texas. In 2019, that number grew to 27%. In 2020, Harris County Jail accounted for 30% of all

use of force. In 2021, the use of force number grew to 34%. In 2022, Harris County Jail's proportion of the use of force jumped to 51% of all use of force in Texas. In the first six months of 2023, Harris County is on pace to account for 52% of all use of force in Texas.

100.    When looking at the sheer number of uses of force incidents in Harris County in the past six years, the total number of use of force incidents continues to eclipse astronomical records. In 2018, 2019, and 2020, Harris County had 628 use of force incidents combined. In 2022 alone, Harris County had 653 use of force incidents. In 2023, Harris County is on pace to have over 722 use of force incidents.

101.    The monthly totals continue to tell the shocking difference between Harris County and other counties in Texas that have patterns of unconstitutional conditions. In July 2021, Harris County had 42 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined. In July 2022, Harris County had 54 use of force incidents. For that same month, Bexar, Dallas, Travis, and Tarrant Counties only had 8 use of force incidents. In January 2023, which was one of the most violent months in Harris County history, Harris County had 87 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined.

102.    The chart below compares the yearly number of uses of force incidents in Harris County Jail versus the number of use of force incidents in all Texas county jails *combined*.



**Use of Force in Harris County Jail vs. All Other Texas County Jails Combined**

| Year | Harris County Jail | All Other Texas Counties Combined |
|------|--------------------|-----------------------------------|
| 2018 | 206 | 709 |
| 2019 | 202 | 544 |
| 2020 | 220 | 503 |
| 2021 | 359 | 703 |
| 2022 | 653 | 640 |
| 2023 | 361 | 331 |

■ Harris County Jail   ■ All Other Texas Counties Combined

103.    Many of the detainees in this action were assaulted by an officer and suffered bodily injuries or ultimately death as a result of Harris County's policy, practice, and custom of using excessive and unnecessary force against detainees.

104.    Since 2009, 190 pre-trial detainees have died in Harris County Jail with a record 28 dying in 2022 alone. Only 160 individuals in all of Texas were executed during that same time period. Out of the 252 county jails in Texas, in 2022, Harris County accounted for 18% of all in custody deaths. Death row is safer than Harris County Jail.

105.    The twenty-eight detainee deaths in 2022 is even higher than the eighteen who died in New York's widely-criticized Rikers Island. Unlike Harris County, New York has at least responded to their deaths by seeking a complete reformation of their system.

106.    Each of these statistics show the ongoing and growing pattern, practice, and culture of excessive force in the Harris County Jail which includes officer on detainee force and the failure to interfere, discourage, or stop detainee on detainee violence which has caused many of the deaths and injuries in the Jail. The Jail's culture of inadequate medical care compounds these issues by

being inundated with injuries on a daily basis and not providing sufficient care for those in need. Further, exasperating the situation is the fact that the Jail promotes a culture of overcrowding and understaffing vital positions which then leads to inadequate observation and monitoring of the detainees.

107.    These statistics further show that the Harris County Sheriff as the policymaker for the Jail is actually aware of the widespread practices within the Jail that are the moving force in constitutional violations because the Sheriff is the officer charged with gathering and submitting the Serious Incident Reports each month. The Harris County Sheriff would be hard pressed to say that the Jail does not have a culture of excessive force when it has twenty-five times more assaults than 250 other Texas counties on average per month.

### 3.2.3.    Numerous reports have consistently outlined these very problems in great detail.

108.    The widespread practices evidencing Harris County's unconstitutional policies, customs, and de facto policies have been the subject of numerous investigations, reports, and non-compliance notices from the Texas Commission on Jail Standards (TCJS). The TCJS inspects county jails to determine if they meet certain minimum standards. The TCJS may conduct reviews of in custody deaths.

109.    Plaintiff incorporates the Texas Commission on Jail Standards' Reports cited within this Complaint and asks that the Court take judicial notice of the TCJS Reports.

110.    The TCJS has found Harris County consistently non-compliant with minimum standards in their practices, policies, and customs which are some of the same policies and customs which were the moving force in the deprivation of Fred Harris's constitutional rights. The TCJS issued its most recent notice of non-compliance on February 20th, 2024 (**Exhibit 3**) and held that Harris County was still in non-compliance at their November 2023 meeting in which Sheriff Gonzalez appeared and admitted that the Jail was violating the minimum jail standards.

## A. Texas Commission on Jail Standards March 11, 2016, Report.

111.    On March 11, 2016, TCJS issued a notice of non-compliance when the Jail failed to provide medical services to a detainee, despite the detainee making 5 different medical requests. These requests spanned over the course of an entire month, yet the detainee was not provided any medical services within the minimum 30-day requirement.

112.    The TCJS report states as follows:

*Documentation received and reviewed by the Commission revealed that Harris County did not provide MHMR services within thirty days after the requests had been submitted by the inmate. The inmate in question requested MHMR services on 10/30/2015, 11/2/2015, 11/8/2015, 11/10/2015 and 11/23/2015. The inmate in question had the paperwork triaged on each occasion and the inmate was deemed a level 3. Per Harris Co. policies and procedures, level 3 type inmates are to be seen by the clinician within 30 days of the triage which failed to occur.*

113.    This report shows an official record that the Harris County Sheriff as the policymaker for the Jail was aware of the lack of rapid and sufficient medical care to detainees. This is almost identical to the DOJ Report which found a similar incident of a detainee not receiving medical care despite four different requests. This report is also consistent with several similar incidents at or around this time of detainees failing to receive any medical care.

## B. Texas Commission on Jail Standards February 21, 2017, Report.

114.    On February 21, 2017, TCJS issued another notice of non-compliance in a special inspection report while inspecting the in-custody death of Vincent Young.

115.    In this report, TCJS noted that the Jail was required to conduct face-to-face observations with detainees "known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior. . ."

116.    Vincent Young was known to be suicidal. He had mental illnesses and had made numerous suicidal statements. Unfortunately, Harris County, in accordance with its policies,

practices, and procedures failed to properly and timely conduct face-to-face observations of Mr. Young.

117.     TCJS found the Jail non-compliant as follows:

*After reviewing both written documentation and video evidence from Harris County officials, it was determined that the jailer exceeded the 30-minute visual face-to-face observations of I/M Vincent Young by 44 minutes. IIM Young was observed at 1756 hours. The next completed welfare check was completed at 1910 hours.*

118.     Ultimately, by failing to properly conduct the face-to-face observations, Mr. Young hung himself in his cell.

119.     This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

## C. Texas Commission on Jail Standards April 3, 2017, Report.

120.     On April 3, 2017, TCJS issued a notice of noncompliance to the Jail based on a special inspection report when two detainees were left in a transport van at the jail for ten hours.

121.     TCJS found that the Jail had failed to properly observe and monitor the two detainees because they were left in an unsupervised van. Harris County did not conduct any face-to-face observations during that time. Additionally, Harris County did not account for the missing detainees.

122.     The only way Harris County became aware of the detainees being left in the vehicle was a report from a member of the public who passed by the vehicle and heard banging on the walls.

123.     This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

124.     These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**D. Texas Commission on Jail Standards December 19, 2017, Report.**

125.    On December 19, 2017, TCJS conducted a special inspection of the Harris County Jail following the in-custody death of Maytham Alsaedy.

126.    Mr. Alsaedy had a history of mental illness and suicidal ideations which went untreated while in the Harris County Jail.

127.    Despite his known suicidal intentions, Mr. Alsaedy was largely ignored by the jailers and allowed to place paper over his window and attempt to hang himself with a sheet.

128.    TCJS found that the Jail was non-compliant with minimum standards because they failed to conduct proper and timely face-to-face observations of Mr. Alsaedy.

129.    Further, the Jail permitted Mr. Alsaedy to cover his window with paper, so even though a jailer did pass by Mr. Alsaedy's cell, the jailer did not properly observe him or make him remove the paper.

130.    This non-compliance was a moving force behind Mr. Alsaedy's suicide. The DOJ warned about these dangers in their DOJ Report as explained above.

131.    TCJS report states as follows:

*After reviewing documentation and video evidence in conjunction with self-reporting of facility administration, it was determined that the 30-minute face-to-face observation, prior to the inmate being discovered, did not occur due to the inmate obstructing the view of the jailer by placing paper in the view panel. While the jailer made a round within the required time period, the jailer did not view the inmate face-to-face as required by minimum jail standards.*

132.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

**E. Texas Commission on Jail Standards August 23, 2018, Report.**

133.    On August 23, 2018, TCJS conducted another special inspection of the Harris County Jail in response to the in-custody death of Debora Ann Lyons where they found the Jail in non-compliance.

134.    Ms. Lyons had a history of mental illness and suicidal ideations. Yet, the detention officers failed to ensure that they observed Ms. Lyons face-to-face within the required time limits.

135.    Instead, Ms. Lyons was able to sneak into an empty meeting room for several hours where she was able to hang herself.

136.    Despite the face-to-face observation requirements, the officers did not look for Ms. Lyons. Ms. Lyons was not found until other detainees attempted to use the meeting room and found her unresponsive hanging from a sheet.

137.    By failing to properly observe and monitor Ms. Lyons, the Jail failed to prevent Ms. Lyons from committing suicide and failed to provide timely medical care.

138.    TCJS found Harris County Jail non-compliant and stated the following:

*After reviewing documentation and video evidence in conjunction with self-reporting by facility administration, it was determined that the inmate was not observed every 30 minutes prior to being discovered. While the jailed made a round within the required time period in the inmates' cellblock, the jailer did not view the inmate face-to-face due to the inmate leaving the cellblock for medicine call and never returning.*

139.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

**F. Texas Commission on Jail Standards December 9, 2020, Report.**

140.    On December 9, 2020, TCJS issued their report after its annual inspection of Harris County Jail and found the jail in non-compliance in multiple areas.

141.     First, TCJS noted that "it was determined that staff are routinely not completing the initial classification assessment and re-assessments properly." Classification of detainees is important to help prevent violent criminals from being placed with high-risk detainees or those suffering from a mental illness. Unfortunately, throughout its history, Harris County Jail has a pattern, practice, and policy of placing violent detainees with mentally ill detainees resulting in injuries or death of the mentally ill detainee, e.g., Fred Harris.

142.     Second, TCJS noted that the jail staff were not filling out the detainee medication files correctly with many detainees' records being blank. The records did not show if the medication was issued or if it was refused. Harris County Jail continues to use this same pattern, practice, and policy as many detainees do not receive their medication and their files are either blank or filled out incorrectly.

143.     Third, TCJS found that the jail staff were not filling in mental health screening forms correctly resulting in many detainees not being classified within the proper mental health category. This is consistent with Harris County's current policies and customs as many detainees are not properly categorized resulting in a lack of medical care or incorrect medical care for those detainees which lead to serious injuries and death.

144.     Fourth, TCJS found significant failures by Harris County in conducting face-to-face observations of inmates ranging from 3 minutes to 464 minutes.

145.     This report is additional evidence that the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

146.     It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing medications to their detainees.

147.     These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### G. Texas Commission on Jail Standards April 6, 2021, Report.

148.     On April 6, 2021, TCJS issued its report and notice of noncompliance to the Harris County Jail for its investigation into the in-custody death of Jaquaree Simmons.

149.     Mr. Simmons was beat to death by multiple detention officers within the Harris County Jail and then was left inside of his cell alone without any observation.

150.     TCJS found that the jail was still in non-compliance with minimum observation requirements as identified in the December 9, 2020, report.

151.     The detention officers had not observed any of the detainees within the pod that also contained Mr. Simmons.

152.     Mr. Simmons was suffering from his injuries during this time and needed continuous medical treatment.

153.     By failing to provide proper face-to-face observation and monitoring of Mr. Simmons and the other detainees, Harris County Jail failed to provide sufficient and timely medical care which was a moving force in Mr. Simmons death.

154.     At the time of TCJS's report, it had not been revealed that the use of force documentation leading to Mr. Simmons' death was falsely filled out.

155.     This report is additional evidence that the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

156.     It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

### H. Texas Commission on Jail Standards December 7, 2021, Report.

157.     Despite being in non-compliance in 2017, 2018, 2020, and April 2021, TCJS found Harris County to be in continuous non-compliance in multiple areas in its annual inspection report on December 7, 2021.

158.     Namely, TCJS found that Harris County Jail continued to not conduct face-to-face observations in a timely and sufficient manner with as many as 90 to 144 minutes between rounds. The excuses included short staffed and no rover.

159.     TCJS also found that compounding these issues is Harris County's use of supervisors and essential personnel including intake personnel to work housing to meet their 1:48 ratio requirements. This was part of the plan and policy discussed by Sheriff Gonzalez in the debate five years previously.

160.     TCJS specifically commented on this issue with the following:

*The Harris County Jail is utilizing supervisors and essential personnel such as intake personnel to work housing unit assignments in order to meet the officer to inmate 1:48 ratio. This is being done on a regular and ongoing basis which does not allow these personnel to perform their regular duties. Minimal staffing has a direct impact on the ability to provide a safe and secure environment for inmates and jail staff in areas such as enforcing inmate rules, ensuring inmates clean housing areas, provide for sufficient staff to support housing officers and has possibly contributed to an increase in inmate on inmate assaults and inmate on staff assaults.*

161.     TCJS's inspector even went a step further and noted the increased violence and assaults within the Jail which is directly correlated with the staffing issues within the Jail.

162.     This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

163.     It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

164.     Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

165.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**I.    Texas Commission on Jail Standards September 7, 2022, Report.**

166.    On September 7, 2022, TCJS issued another Notice of Non-compliance to the Harris County Jail.

167.    Under Texas law, a jail is not permitted to place detainees in temporary holding cells for longer than 48 hours as the holding cells are not supposed to be permanent housing. Detainees are supposed to be brought in, evaluated, and processed quickly to be placed in housing that meets their needs and provides appropriate medical attention and observation.

168.    TCJS inspected the jail in relation to one detainee's complaint that she was kept in an intake cell for longer than the 48 hours allowed. During the course of this inspection, TCJS found that 64 detainees had been kept in their holding cells while waiting admission for longer than 48 hours. One particular detainee had been kept in her holding cell for 99 hours with no records showing that she was provided items for personal hygiene.

169.    Many of the victims described herein, including Fred Harris, were injured and/or died in the Harris County Jail while in this same type of holding cell as they were not properly cared for, observed, or monitored.

170.    The overcrowding and understaffing of the Jail have also led to numerous individuals being left in holding cells unsupervised for significant periods of time. As recognized by the DOJ, solitary holding cells and speedy admission were two of the areas that the Jail needed to improve on especially as it downgrades the mental health of detainees.

171.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care as detainees were permitted to remain in holding cells without proper processing and observation.

172.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and processing detainees.

173.    Further, this report exemplified the staffing and overcrowding issues which are part of Harris County's ongoing policy which inhibits proper medical care and proper supervision. It also invokes additional resentment between detainees and officers as detainees do not get timely care or processing.

174.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**J.  Texas Commission on Jail Standards December 19, 2022, Report.**

175.    On December 19, 2022, TCJS issued a notice of non-compliance after a special inspection of the Harris County Jail following the in-custody death of Matthew Shelton.

176.    Mr. Shelton passed away in March 2022 due to a failure to receive his diabetes medications.

177.    TCJS found that the Harris County Jail failed to provide, prescribe, or follow doctor's orders for providing medication to Mr. Shelton.

178.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees and failure to properly document and provide medical care and medications to their detainees resulting in their deaths.

179.    Further, this report exemplifies the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care and proper supervision of detainees.

**K.  Texas Commission on Jail Standards March 8, 2023, Report.**

180.    On February 13–17, 2023, TCJS conducted a special investigation of the Harris County Jail in response to the numerous deaths within the jail in December 2022 and January 2023.

181.     On March 8, 2023, TCJS issued its report which found Harris County Jail in non-compliance with numerous minimum jail standards. Notably, TCJS noted that these same areas were supposed to have been corrected by Harris County after the previous non-compliance reports; yet, they had not been fixed.

182.     First, TCJS found that numerous detainees that were supposed to be booked, medically evaluated, and placed in detainee housing within 48 hours, had been in holding cells without proper evaluation for longer than the 48-hour minimum. TCJS noted that this should have been addressed following the September 2022 notice of non-compliance.

183.     Second, TCJS found that the Harris County Jail continued to be in non-compliance with providing timely and sufficient medical care to detainees. Specifically, TCJS found that detainees were not being seen within 48 hours after placing medical requests in the medical kiosks.

184.     Additionally, TCJS found that several officers who were supposed to have received suicide prevention training had not received that training in accordance with jail policies.

185.     Notably, TCJS found that the Jail continued to be in non-compliance with the minimum observation requirements. Jail staff on a "routine basis" exceeded the minimum observation requirements for detainees that required 60-minute intervals by up to 1 hour and 13 minutes.

186.     For detainees that were known to be assaultive, suicidal or mentally ill, they require observations every 30 minutes. However, the Jail routinely exceeded those requirements by up to 2 hours and 9 minutes.

187.     This is a continued pattern of failing to provide sufficient observation and monitoring of detainees which leads to a failure to provide sufficient and timely medical care, to provide intervention in use of force, and fails to deter wrongful acts and prevent attempted suicides. Unfortunately, Harris County in accordance with its policies, practices, and procedures continued to fail to properly and timely conduct face-to-face observations of detainees.

188.     Instead of conducting face-to-face observations, TCJS noted that jailers were documenting that they had conducted observations by simply scanning QR codes within the

housing area. This is another example of Harris County's pattern, practice, and policy of failing to properly document observations and records which leads to false reporting.

189. TCJS found that "staffing was not sufficient to perform required functions" despite Harris County's documentation which alleged that they did have enough staff. Particularly, on the day of the inspection, the third floor of 701 Baker had only thirteen officers working when fourteen were needed. The fourth floor was worse when it only had thirteen officers and fifteen were needed.

190. As has been seen in the numerous reports previously and can be seen in Harris County's history, the Jail does not have sufficient staff to perform required functions which include "transporting of inmates, medication passes, face to face observations and feeding." Many of the deficiencies in conducting face-to-face observations, in intervening in detainee fights, and in the increase in the use of force by officers against detainees can be traced to Harris County's long-running policies, practices, and procedures of understaffing the Jail.

191. This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

192. It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

193. Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

194. These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**L.  Texas Commission on Jail Standards April 17, 2023, Report.**

195.    Despite repeated efforts, inspections, and notices of non-compliance within only a few years, the Harris County Jail failed to make any effort to correct its issues or make any significant change in its policies, practices, customs, or culture. Instead, on April 17, 2023, TCJS found Harris County in non-compliance with minimum standards after inspecting the in-custody death of Fabien Cortez.

196.    TCJS found that Mr. Cortez was permitted to enter a restroom and not be observed for over 88 minutes before he was discovered with a pant string wrapped around his neck.

197.    Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights. Specifically, in this report, it showed that Harris County's policies of failure to observe permitted Mr. Cortez to commit suicide and prevented a timely provision of medical care.

198.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

199.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

**M. Texas Commission On Jail Standards Board Meeting August 3, 2023.**

200.    TCJS met on August 3, 2023, for their quarterly meeting. TCJS at this meeting noted that despite giving Harris County almost a year to get the Jail back into compliance with minimum jail standards, the County had continued to fail to be in compliance specifically with the minimum face-to-face observation requirements, the minimum ratios of detainees to officers, the requirements to classify and book detainees efficiently and properly, and the understaffing and overcrowding of the Jail.

201.    TCJS noted that Sheriff Gonzalez failed to appear at the hearing and demanded that he appear at the November hearing to address these issues. Additionally, TCJS stated that the County would be subjected to serious sanctions should they not show increased improvement to get the Jail back into compliance. TCJS also stated that the Jail would be subjected to an additional surprise inspection. Unsurprisingly, the Jail failed this inspection as well which led to the August 28, 2023, notice of non-compliance and the sanctions imposed in the November 2023 TCJS quarterly meeting.

### N.  Texas Commission On Jail Standards August 28, 2023, Report.

202.    On August 28, 2023, TCJS issued another notice of non-compliance for the Harris County Jail. This notice of non-compliance found that the Jail was still deficient in numerous areas that were raised in previous inspections and notices of non-compliance.

203.    First, Harris County held detainees in holding cells for longer than the 48-hour maximum. In some cases, Harris County exceeded the standard by one hour to up to two days. These items were identified in the September 2022 notice of non-compliance and the March 2023 notice of non-compliance; yet, Harris County has not changed anything. This further exemplifies the ongoing pervasive patterns, practices, and procedures promulgated, ratified, and enforced by Harris County over the Jail.

204.    Second, TCJS found that Harris County continues to be in non-compliance with minimum observation requirements. For areas requiring face-to-face observations on a 60-minute basis, officers routinely exceeded these requirements by 1 minute to 1 hour and 18 minutes. For the areas with high risk detainees such as assaultive, potentially suicidal, and mentally ill detainees which require face-to-face observations on a 30-minute interval, jail staff "routinely exceeded" the 30-minute requirement by 1 minute to 2 hours and 38 minutes.

205.    Egregiously, even when officers were logging their rounds timely, many of the officers did not actually conduct a face-to-face observation but simply scanned a QR code next to the cell without actually observing the detainee. When the Jail did not have enough officers to

conduct these rounds, an officer would remain in the control station without conducting a face-to-face observation. At times, the officer would simply scan a QR code in the control station to log a face-to-face observation when none occurred. The lack of timely and routine face-to-face observations leads to detainee unrest, failure to properly discipline and interfere with detainee violence, encourages officers to use excessive force to get responses quickly, and leads to the failure to provide proper medical care to detainees. This is another example of the ongoing policies, practices, and culture within the Harris County Jail as promulgated and ratified by the Harris County policymakers that are the moving force in the injuries and deaths of Plaintiffs.

206.    TCJS also found that the Jail continued to fail to meet the minimum staffing ratio requirements. Harris County's non-compliance is ongoing. This rampant practice and policy of understaffing and overcrowding the jail is another moving force in the injuries and deaths of Plaintiffs.

## O. TCJS Quarterly Meeting on November 2, 2023

207.    On November 2, 2023, TCJS met to have their quarterly meeting. One of the meeting agendas was to discuss Harris County's continued non-compliance with minimum jail standards. Sheriff Gonzalez did appear at the meeting and testified as to the ongoing issues facing the Jail. Sheriff Gonzalez admitted that the Jail was not in compliance with minimum jail standards.

208.    Specifically, Sheriff Gonzalez admitted that the Jail was overcrowded and understaffed and could not meet the minimum officer-to-detainee ratio required by TCJS. Sheriff Gonzalez and his staff admitted that the number of vacant officer positions continues to grow each month. TCJS noted that simply meeting the ratio is not enough when the Jail continues to fail to meet observation requirements and to provide necessary services to the detainees.

209.    Ultimately, Sheriff Gonzalez admitted that Harris County has "been grappling with [understaffing and overpopulation] for years now." Because of the years-long policies, practices, and procedures of Harris County's non-compliance with minimum jail standards, TCJS

recommended that they begin removing the approved bed amounts from Harris County to force them to finally address the issues.

210.    As shown above, Harris County and its policymaker, Sheriff Gonzalez, have been aware of the Jail's rampant culture of violence, excessive use of force, lack of medical care, and lack of observation for over seven years; yet, despite being made aware of their deficiencies, Sheriff Gonzalez has continued with the same training policies and practices and has not implemented new policies or practices that would correct the failure of the Jail employees. These issues have not been addressed by any Harris County Sheriff.

211.    Specifically, Sheriff Gonzalez recognized in 2016 that the Jail had a culture of employees resorting to excessive use of force too quickly and that this was a training problem. Yet, since 2016, as exemplified in the specific detainee incidents and the Serious Incident Reports, the use of force has increased exponentially since 2016. This same issue was noted in the 2009 DOJ Report, but it has only grown worse.

### 3.2.4.    Other victims of Harris County Jail's rampant constitutional violations

212.    Evan Lee had a history of mental illnesses known by Harris County jail, but he was often denied his medication, ultimately leading to an altercation with another detainee that left him with severe blunt force trauma to his head, leading to his death in the hospital days later.

213.    William Barrett also had mental health issues known by Harris County jail, but was put in solitary confinement at one point and was also assaulted, not treated by Harris County, and found dead from blunt force trauma.

214.    Ramon Thomas also had mental health issues known by Harris County jail, and was given assurances that he would be kept safe and put in the mental health section of the jail, he was placed in general population on the sixth floor of 1200 Baker, which was known for its violence. He was threatened by other detainees and found severely beaten, at which point the jailers were slow to respond, did not perform any lifesaving measures, and caused further damage by dropping him, ultimately resulting in his death.

215.     Additionally, Antonio Radcliffe, much many of the other victims mentioned herein, Harris County has a video of the incident leading to his injuries but it has not been produced to the victims or their families.

### A. Vincent Young

216.     On February 2, 2017, Vincent Young was booked into the Harris County Jail.

217.     Mr. Young had a history of mental illness when he entered the Jail.

218.     Mr. Young's mental illness and drug withdrawal was not treated while he was in the Jail. Mr. Young was not provided his medications which he needed to function normally.

219.     Mr. Young had made suicidal statements while in the Jail.

220.     Mr. Young had made statements that he was becoming depressed without his medication which were unanswered by Harris County staff.

221.     Another detainee told jail staff that Mr. Young might be suicidal, which prompted the officers to place him in a holdover cell by himself.

222.     On February 13, 2017, Mr. Young was found in an infirmary cell after guards making their rounds spotted him hanging from a bed sheet wrapped around his neck.

223.     Mr. Young was taken to the hospital where he was declared deceased.

224.     Upon investigating Mr. Young's death, the Texas Commission on Jail Standards issued Harris County a notice of non-compliance finding that Harris County had failed to meet the minimum jail standards by exceeding the required 30-minute face-to-face observation minimum by 44 minutes.

225.     Harris County staff had not stepped inside Mr. Young's cell for over six hours.

226.     The jailer responsible for checking Mr. Young's cell had recorded numerous cell checks that never happened stating that he was too busy doing other jobs to conduct proper rounds.

227.     The Texas Rangers found numerous discrepancies in round sheets where rounds were said to be conducted when in fact, they were not conducted at all or were done improperly.

228.     The jailer was ultimately fired for his actions.

229.     Failure to properly observe and monitor Mr. Young and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Young's death.

230.     Failure to provide Mr. Young with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Young's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Young's death.

231.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Young's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Young's death.

232.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Young died due to the jail's unconstitutional policies, customs, and practices.

**B.  Maytham Alsaedy**

233.     On February 27, 2015, Maytham Alsaedy was booked into the Harris County Jail.

234.     Mr. Alsaedy had a history of mental illness and had made suicidal statements and previous suicide attempts while in the jail.

235.     Although Mr. Alsaedy was on the mental health floor, he was not placed on suicide watch despite his suicidal statements and suicide attempts.

236.     Mr. Alsaedy was not being treated properly for his mental illness.

237.     On November 30, 2017, Mr. Alsaedy had covered his window with paper. No Harris County officer noticed the paper, made him remove the paper, or attempted to observe him in his cell.

238.     The jailer making rounds failed to make any face-to-face or any other visual observation of Mr. Alsaedy.

239.     Ultimately, Mr. Alsaedy was discovered with a sheet around his neck hanging from a smoke detector.

240.     Mr. Alsaedy was later declared deceased at the hospital.

241.    The Texas Commission on Jail Standards once again found that Harris County was not in compliance with the minimum observation requirements as the jail permitted Mr. Alsaedy to place paper over his view panel, failed to make him remove the paper, and failed to make any visual check on Mr. Alsaedy for the required time period.

242.    Failure to properly observe and monitor Mr. Alsaedy and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Alsaedy's death.

243.    Failure to provide Mr. Alsaedy with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Alsaedy's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Alsaedy's death.

244.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Alsaedy's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Alsaedy's death.

245.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Alsaedy died due to the jail's unconstitutional policies, customs, and practices.

### C. Debora Ann Lyons

246.    On August 14, 2018, Debora Ann Lyons was booked into Harris County Jail.

247.    Ms. Lyons had a history of mental illness and making suicidal statements while in the jail.

248.    Ms. Lyons had been approved for a PR bond this same day.

249.    On August 14, 2018, at 1758 hours, Ms. Lyons exited her cell to receive insulin at which time she grabbed a sheet and placed it around her waist.

250.    At 1804 hours, she entered a multi-purpose room on the fourth floor of 1200 Baker and closed the door behind her.

251.    Harris County jailers failed to observe Ms. Lyons throughout this timeframe and did not conduct a face-to-face observation with Ms. Lyons during normal rounds.

252. At 1848 hours, detainees attending a church service in the multi-purpose room opened the door to discover Ms. Lyons handing inside the door.

253. At 1858 hours, the Houston Fire Department was finally notified to transport her to Ben Taub hospital.

254. On August 15, 2018, Ms. Lyons was pronounced deceased by medical staff at the hospital.

255. The Texas Commission on Jail Standards issued another notice of non-compliance for failure to properly observe Ms. Lyons in the proper timeframe.

256. Failure to properly observe and monitor Ms. Lyons and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Lyons' death.

257. Failure to provide Ms. Lyons with her medications and medical attention for her ongoing mental and physical issues led to the deprivation of Ms. Lyons' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Lyons' death.

258. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Lyons' access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Ms. Lyons' death.

259. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Lyons died due to the jail's unconstitutional policies, customs, and practices.

**D. Tracy Whited**

260. On January 12, 2019, Tracy Whited was booked into the Harris County Jail with a $3,000 bond.

261. Ms. Whited had a history of mental illness and making suicidal statements while in the jail.

262.     On January 14, 2019, despite being in a general population cell, jailers did not observe Ms. Whited attempting to hang herself. Instead, an inmate advised the guards that Ms. Whited was hanging from a sheet in her cell.

263.     Ms. Whited was transported to the hospital unconscious.

264.     Later that day, Ms. Whited was granted a personal bond, releasing her from custody.

265.     Ms. Whited was pronounced deceased after being taken off life support on January 16, 2019.

266.     Failure to properly observe and monitor Ms. Whited and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Whited's death.

267.     Failure to provide Ms. Whited with medical attention for her ongoing mental issues and suicidal ideations led to the deprivation of Ms. Whited's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Whited's death.

268.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Whited's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Whited's death.

269.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Whited died due to the jail's unconstitutional policies, customs, and practices.

**E.  Wallace Harris**

270.     On May 1, 2020, Wallace Harris was booked into the Harris County Jail.

271.     Mr. Harris had a history of hypertension which required ongoing medication and medical care.

272.     Mr. Harris did not receive adequate medical screening or medical care during his time in the jail.

273.    On May 6, 2020, Mr. Harris was discovered on his cell floor unresponsive with shallow breathing.

274.    After being taken to the hospital, Mr. Harris was declared deceased due to his medical condition.

275.    Failure to properly observe and monitor Mr. Harris and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Harris's death.

276.    Failure to provide Mr. Harris with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Harris's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Harris's death.

277.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Harris's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Harris's death.

278.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died due to the jail's unconstitutional policies, customs, and practices.

### F.  David Perez

279.    On September 9, 2020, David Perez was booked into the Harris County Jail.

280.    On September 13, 2020, Mr. Perez was found in his single-cell unresponsive, and CPR was started before he was transported to the hospital.

281.    On September 15, 2020, Mr. Perez was declared deceased. The medical cause of his death "could not be determined."

282.    Failure to properly observe and monitor Mr. Perez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Perez's death.

283.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Perez's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Perez's death.

284.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Perez died due to the jail's unconstitutional policies, customs, and practices.

### G. Israel Lizano Iglesias

285.    On February 8, 2021, Israel Lizano Iglesias was booked into the Harris County Jail.

286.    Mr. Iglesias was not immediately screened for medical or mental health concerns.

287.    Instead, he was placed in a holding cell in the jail's clinic to await the proper screening prior to receiving any medical treatment.

288.    Jail staff did not properly observe Mr. Iglesias; instead, other detainees had to inform jail staff that Mr. Iglesias needed medical attention.

289.    Mr. Iglesias was found alert but non-verbal.

290.    After waiting in the clinic, Mr. Iglesias became unresponsive and was transported to the hospital.

291.    At 5:08 A.M., Mr. Iglesias was pronounced deceased.

292.    Failure to properly observe and monitor Mr. Iglesias and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Iglesias's death.

293.    Failure to provide Mr. Iglesias with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Iglesias's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Iglesias's death.

294.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Iglesias's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Iglesias's death.

295.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Iglesias died due to the jail's unconstitutional policies, customs, and practices.

**H.  Jim Franklin Lagrone**

296.     On July 26, 2022, Jim Franklin Lagrone was booked into the Harris County Jail.

297.     Mr. Lagrone had a history of drug usage and abuse and was booked for possession of drugs.

298.     Mr. Lagrone's known history, however, did not result in a further screening of Mr. Lagrone for medical conditions and additional treatment while in the jail.

299.     Around 4 A.M. on July 31, 2022, Mr. Lagrone was found vomiting into his toilet by detention officers, but he was not provided any medical care or additional monitoring.

300.     A few hours later, a detention officer discovered Mr. Lagrone unresponsive inside his single cell.

301.     Mr. Lagrone was transported to the clinic and eventually transported to the hospital.

302.     The doctors declared Mr. Lagrone deceased shortly after arriving at the hospital.

303.     Failure to properly observe and monitor Mr. Lagrone and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Lagrone's death.

304.     Failure to provide Mr. Lagrone with medication and medical attention for his known medical needs including potential drug overdose led to the deprivation of Mr. Lagrone's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Lagrone's death.

305.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Lagrone's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Lagrone's death.

306.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Lagrone died due to the jail's unconstitutional policies, customs, and practices.

**I.  James Earl Gamble**

307.   On August 26, 2021, James Earl Gamble was booked into the Harris County Jail.

308.   While in the jail, Mr. Gamble was not receiving medical screening, care, or medication for his medical conditions including hypertension.

309.   On August 25, 2022, detention officers were distributing dinner trays when detainees informed them that Mr. Gamble was unresponsive in his bunk.

310.   The detention officers had not properly observed him as unresponsive.

311.   After taking him to the clinic, the Houston Fire Department was called who took him to LBJ Hospital.

312.   Later that day, Mr. Gamble was declared deceased.

313.   Failure to properly observe and monitor Mr. Gamble and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Gamble's death.

314.   Failure to provide Mr. Gamble with medication and medical attention for his known medical needs including hypertension led to the deprivation of Mr. Gamble's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Gamble's death.

315.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Gamble's death.

316.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Gamble died due to the jail's unconstitutional policies, customs, and practices.

**J.  Victoria Margaret Simon**

317.   On September 29, 2022, Victoria Margaret Simon was booked into the Harris County Jail and placed into a single quarantine cell.

318.   Ms. Simon was placed in a single quarantine cell.

319.    On October 2, 2022, nurses and a jail officer found Ms. Simon unresponsive in her cell when they came to conduct a tuberculosis test.

320.    After being transported to the clinic, Ms. Simon was pronounced dead by a jail doctor.

321.    Failure to properly observe and monitor Ms. Simon and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Simon's death.

322.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Simon's death.

323.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Simon died due to the jail's unconstitutional policies, customs, and practices.

### K. Alan Christopher Kerber

324.    On October 9, 2022, Alan Christopher Kerber was booked into the Harris County Jail in a single quarantine cell which lacked proper observation and monitoring by Harris County officials.

325.    On October 12, 2022, Mr. Kerber was found unresponsive with a tube of toothpaste stuck in his throat in his cell during breakfast distribution.

326.    Mr. Kerber was left unobserved and unmonitored by jail staff for a significant enough time to force the tube of toothpaste in his mouth and suffocate to the point where he became unresponsive. If jail staff had properly observed and monitored Mr. Kerber, the jail staff would have seen him attempting to harm himself and/or seen him become unresponsive within enough time to render aid that would have prevented his death.

327.    Upon being transported to the clinic, Mr. Kerber was pronounced deceased by Houston Fire Department paramedics.

328.    Failure to properly observe and monitor Mr. Kerber and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Kerber's death.

329.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Kerber's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Kerber's death.

330.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Kerber died due to the jail's unconstitutional policies, customs, and practices.

**L. Damien Lavon Johnson**

331.    On July 27, 2022, Damien Lavon Johnson was booked into the Harris County Jail.

332.    On November 13, 2022, Mr. Johnson was left unobserved and unmonitored by jail staff for a significant enough time to tie a sheet in his cell, place it around his neck and hang himself until he was unresponsive.

333.    Jail staff in fact did not observe Mr. Johnson; instead, a detainee had to inform the officer that Mr. Johnson was hanging in his cell.

334.    On November 15, 2022, Mr. Johnson was declared deceased.

335.    Proper face-to-face observations would have observed either Mr. Johnson attempt to use the sheet, or him hanging in his cell to render aid within a sufficient time that would have prevented Mr. Johnson's death.

336.    Failure to properly observe and monitor Mr. Johnson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Johnson's death.

337.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Johnson's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Johnson's death as there was insufficient staff to handle the

necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers.

338.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Johnson died due to the jail's unconstitutional policies, customs, and practices.

### M. Jaquaree Simmons

339.     On February 10, 2021, Jaquaree Simmons was booked into the Harris County Jail.

340.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encourage officers to resort to violence quickly and to forego reasonable non-violent techniques.

341.     This leads to jailers using force to injure detainees for minor offenses and to use more force than necessary to meet penological purposes.

342.     This culture also encourages jailers to use force as a means of communication and unnecessarily exert their power and authority over detainees for any act that the jailer does not like. A common example is punching detainees in the face even while the detainee is restrained when the detainee talks back to the jailer. This force is unnecessary but encouraged by Harris County because Sheriff Gonzalez is aware of the incessant use of force by his officers and the dangers this imposes on the detainees but fails to make any changes to address these constitutional violations. Essentially, just like the inmates at Shawshank, the detainees of Harris County can just wait to see which detainee will be beaten for crossing the guards.

343.     The example of Harris County's culture of violence is seen in the beating and death of Mr. Simmons which included "significant policy violations" as admitted by the Harris County Sheriff's Office over two years following his death.

344.     On February 16, 2021, at 9:40 A.M. seven detention officers including Eric Morales responded to water flowing under Mr. Simmons' cell door from his clogged toilet.

345.    The only report about this incident disciplined Mr. Simmons and stated that he was removed from his cell while it was cleaned and placed back into his cell "without further incident" and with no report of any use of force being used.

346.    Upon an investigation into this incident, the detention officers had falsified this report and the actions that were taken against Mr. Simmons by those officers in an attempt to cover up this incident.

347.    During the investigation, Mr. Morales lied under oath stating that he placed Mr. Simmons against the wall because he was squirming but did not slam him or use any force and that he did not observe anyone else use force against Mr. Simmons.

348.    Contrary to Mr. Morales' testimony, the other detention officers testified that the officers forced Mr. Simmons to the ground, handcuffed him, stripped him of his clothing, threw him against the wall and the ground with significant force, hit him on the face, and then Mr. Morales dropped his knee on Mr. Simmons face with all of his 6'5" 300 lbs. frame which caused Mr. Simmons to stop moving. The other officers testified that it was excessive use of force. Mr. Simmons was 5'10" and 130 lbs. at most.

349.    One officer testified that Mr. Simmons was not resisting when he was being stripped of his clothing; yet two officers including Mr. Morales remained in the cell after the other officers left when they heard banging coming from Mr. Simmons' cell.

350.    The officers then placed Mr. Simmons with a lacerated lip and eye and swelling above his left eye back into his cell without any clothing during Winter Storm Uri while the jail was less than 50 degrees Fahrenheit.

351.    The officers did not provide Mr. Simmons with any medical aid despite his obvious injuries and did not report this use of force as required by law.

352.    At 6:45 P.M. on the same day, four detention officers were distributing food to the detainees in Mr. Simmons' cell block.

353.    When the officers reached Mr. Simmons' door, he swiped up at the food tray causing it to hit one of the officers. Mr. Simmons then allegedly lunged at the officer who allegedly

hit Mr. Simmons two times in the face, which caused Mr. Simmons to stumble and allowed the officer to close the cell. At this point, Mr. Simmons seemed to be under control as he was confined to his cell.

354.    Yet, eighteen detention officers entered the cellblock outside of the view of any cameras for five minutes and emerged with Mr. Simmons, handcuffed, nude, with obvious face injuries. Mr. Morales was the officer holding Mr. Simmons up as he was escorted out of the cell.

355.    Mr. Morales did not submit a use of force report but issued a false report charging Mr. Simmons with a violation of jail policies after Mr. Simmons had already died. This report falsely stated that no officer punched, struck, or kicked Mr. Simmons.

356.    In those five minutes inside Mr. Simmons' cell after they opened the cell back up, officers hit Mr. Simmons over twenty-five times to his head, face, and ribs.

357.    Some officers claimed that they took Mr. Simmons to the ground easily, restrained him, and then other officers came into the cell and began hitting Mr. Simmons.

358.    Upon being escorted out of his cell, another officer punched Mr. Simmons in the head and torso two to three times despite him being restrained.

359.    Mr. Morales then picked Mr. Simmons up by the arms, slammed him to the ground, and began punching him multiple times while he was on the ground. Mr. Simmons' head hit the concrete floor.

360.    Officers observed that Mr. Simmons was bleeding from his facial area and a pool of blood had accumulated in his cell. Mr. Simmons had to be carried out of his cell due to his loss of consciousness.

361.    Many officers falsified their reports and lied concerning the use of force. Officers used unnecessary force as part of the rampant policy, customs, and practices within the Jail to resort to force as punishment, as retaliation to detainees that offend the guards, and to a greater extent than necessary to control detainees.

362.    Despite his significant and obvious injuries, Mr. Simmons was prescribed medications and was sent back to his cell without any further medical care.

363.     The next day, February 17, 2021, Mr. Simmons had not been properly observed for over four hours when he was finally found face down, unresponsive in his cell. Upon being taken to the hospital, Mr. Simmons was pronounced dead.

364.     On April 6, 2021, the Texas Commission on Jail Standards issued a notice of non-compliance finding that the jail had failed to conduct proper observations for over four hours on the date of Mr. Simmons death which could have found Mr. Simmons earlier had they been conducted.

365.     The Harris County Sheriff's office then terminated eleven officers for their involvement and their history of falsified use of force reports and suspended six others.

366.     Despite the significant evidence, many of the facts surrounding Mr. Simmons' death were not made public until after two years following his death.

367.     Ultimately, Mr. Morales was charged in 2023 with felony manslaughter for his involvement in Mr. Simmons' death.

368.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Simmons' death.

369.     Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, prevented the rendering of sufficient medical aid, and reduced the jailer's ability to properly observe the detainees which was a moving force in Mr. Simmons' death.

370.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Simmons died due to the jail's unconstitutional policies, customs, and practices.

## N. Rory Ward, Jr.

371.    Rory Ward Jr.'s family has filed a suit against Harris County Jail in this District asserting similar claims for the death of Mr. Ward.

372.    On May 8, 2021, Rory Ward Jr. was brutally assaulted by detainee Melvin Johnson while being held in Harris County Jail.

373.    Despite a duty to prevent detainees from assaulting each other, Detention Officer Kelsey Chambers observed Johnson stand over Mr. Ward and punch him six times in the head while Rory was lying defenseless on the ground. No officer interfered with this senseless beating. Mr. Ward only received minor treatment for his injuries without sufficient diagnostic studies in the jail's medical clinic, which has been cited as inadequate to treat serious injuries by the Department of Justice.

374.    Mr. Ward was then placed back in a single cell without any further medical attention or sufficient observation or monitoring in light of his condition and known head injuries.

375.    Despite the continued failure to observe Mr. Ward either through video or face-to-face observations, Mr. Ward was discovered on May 11, 2021, slumped over in his cell.

376.    After being transported to the hospital, Mr. Ward was pronounced deceased due to the blunt force head trauma he received from Harris County's failure to interfere with the assault from a fellow detainee.

377.    The jailers failed to properly observe and monitor Mr. Ward through minimum face-to-face checks, video monitoring, and intermittent medical checkups despite the jailers' awareness of Mr. Ward's head injuries.

378.    Failure to properly observe and monitor Mr. Ward and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care

being provided to him in a timely manner and ultimately caused Mr. Ward's death as timely intervention would have prevented Mr. Ward's injuries to begin with, and adequate monitoring would have noticed Mr. Ward's continuous need for medical attention.

379.     Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Ward's injuries and death when the Jail staff either failed to observe or monitor

380.     Mr. Ward or the detainee's beating Mr. Ward, or deliberately refused to interfere with the ongoing assault.

381.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Ward's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Ward's death.

382.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Ward died due to the jail's unconstitutional policies, customs, and practices.

### O. Adael Gonzalez Garcia

383.     Adael Gonzalez Garcia filed suit against Harris County asserting similar claims.

384.     After allegedly falling off of his bunk, Mr. Garcia was being escorted back from the clinic when one or more detention officers used excessive force against Mr. Garcia to cause severe injuries to his head, neck, eye and other areas of his body.

385.     The officers' attack on Mr. Garcia was unwarranted, unprovoked, and was in conjunction with Harris County's pattern, practice, policies, and culture of officers handling matters of disrespect and minor discipline issues with life threatening force.

386.     "Falling off of a bunk" is a common excuse created by guards and detainees for a detainee's injuries to cover up officer use of force and detainee assaults.

387.     Mr. Garcia's injuries were so severe that he was placed into a coma in which he remained for several weeks before being placed in a rehabilitation hospital.

388.     While in the hospital, Mr. Garcia's warrant was dropped which meant that he was no longer in custody, so if he had died, he would not be counted against Harris County's quotas.

389.     Mr. Garcia was never charged with assaulting an officer, which is unusual for Harris County when an inmate is beaten by an officer.

390.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Garcia's injuries.

391.     Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Garcia's injuries.

392.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Garcia was injured due to the jail's unconstitutional policies, customs, and practices.

**P.  Jerome Bartee**

393.     Jerome Bartee, Jr. was a pretrial detainee at the Harris County Jail on September 4, 2016.

394.     While Mr. Bartee was being escorted from the clinic to his cell, the detention officer pushed Mr. Bartee out of the door into the hallway.

395.     When Mr. Bartee verbally reacted to the unnecessary push, several detention officers began to assault Mr. Bartee by throwing him against a chair and podium in the hallway and throwing him to the ground. Once on the ground the officers laid on top of him.

396.     Although Mr. Bartee was subdued, around ten detention officers punched, kicked, and stomped on Mr. Bartee while he was on the ground. Other officers watched and encouraged the beating.

397.     Once the officers stopped beating Mr. Bartee, the officers handcuffed him and pulled him up from a pool of his own blood.

398.     Due to this vicious and unnecessary assault, Mr. Bartee suffered bilateral nasal bone fractures, orbital fractures, cuts, bruises, and a closed head injury along with unconsciousness.

399.     This beating was one of the few beatings actually recorded by the camera system in the jail because it had just been installed. One jailer even attempted to have the video stop recording once they determined that they were on video.

400.     Following the beating, Mr. Bartee was charged with assaulting an officer and was taken for minimal treatment at the local hospital.

401.     The Harris County Sheriff as the policymaker for the jail expressly stated to the media that the jailers used "an unnecessary application of force," that more jailers than necessary

were involved in trying to subdue Mr. Bartee, that jailers failed to de-escalate the situation, and that jailers failed to stop using force when it became unnecessary.

402.     Ultimately, Mr. Bartee was released the following day and the charges against him were dismissed for lack of evidence as it was determined he did not initiate the assault.

403.     Three employees were suspended, and five detention officers were indicted for various felonies for their actions in beating Mr. Bartee.

404.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Bartee's injuries.

405.     Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law.

406.     Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages

officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Bartee's injuries.

407.    The Harris County Sherriff policymaker for Harris County with respect to the jail when Mr. Bartee was injured due to the jail's unconstitutional policies, customs, and practices.

408.    Mr. Bartee filed suit against Harris County, which settled the claims.

## Q. Terry Goodwin

409.    Terry Goodwin was a pretrial detainee in Harris County Jail who suffered from mental illnesses.

410.    When a jail compliance team entered his cell on October 10, 2013, they found Mr. Goodwin filthy with a shredded jail uniform with shards of his clothing hanging from the ceiling where he had attempted to hang himself.

411.    His sink, toilet, and shower were clogged with feces, toilet paper in an attempt to cover up his feces, and orange rinds to cover the smell.

412.    The cell had not been opened for months with observations not being conducted other than placing food under his door with a sign on the door telling officers not to open the cell. Officers, supervisors, medical staff, and the head of the jail knew for weeks about Mr. Goodwin's position.

413.    During this time, Mr. Goodwin's mental and physical health deteriorated, which ultimately required a stay at a mental health facility.

414.    The jail did not begin an investigation until almost a year after Mr. Goodwin was discovered by a whistleblower.

415.    Sheriff Hickman who had been recently appointed following this investigation said that more investigations would be conducted, that the culture of the jail would be changed under his watch, and that "breakdowns in leadership in previous administration led to an atmosphere of non-confrontational deference." Ron Hickman, Twitter, 10:42 A.M., June 2, 2015. As can be seen

in all of the cases and incidents since this time, this atmosphere and culture has not changed but has gotten worse under the supervision of the policymaker, the Harris County Sheriff's Office.

416.    Failure to properly observe and monitor Mr. Goodwin and conduct proper face-to-face observations led to inadequate medical care being provided to him and allowed him to be stuck in inhumane conditions in his own feces and waste that was the moving force in the cause of his injuries.

417.    Failure to provide Mr. Goodwin with medication and medical attention for his known medical needs including his mental illnesses led to the deprivation of Mr. Goodwin's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his injuries.

418.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Goodwin's access to medical care, reduced the jailer's ability to properly observe the detainees, led to the deliberate indifference to the needs of human decency by allowing Mr. Goodwin to remain in the cell for over two months as it was more convenient to leave him in the cell by himself rather than providing him with basic care which was a moving force in Mr. Goodwin's injuries.

419.    The Harris County Sheriff was the policymaker for Harris County with respect to the jail when Mr. Goodwin was subjected to the jail's unconstitutional policies, customs, and practices.

420.    Harris County paid Mr. Goodwin $400,000 in a settlement for his injuries.

### R.  Gregory Barrett

421.    On June 30, 2021, Gregory Barrett was booked into the custody of Harris County Jail with pre-existing medical conditions.

422.    On August 26, 2021, Mr. Barrett told his wife during a visitation that he did not feel well and was vomiting blood.

423.     On August 27, 2021, Mr. Barrett was still vomiting blood and had not received any medical attention despite the obvious need for medical treatment.

424.     On August 28, 2021, Mr. Barrett was staying in a solitary quarantine cell in lieu of receiving treatment for his non-Covid symptoms and pre-existing medical attention.

425.     That morning Mr. Barrett was discovered in his cell dead on the floor.

426.     Failure to properly observe and monitor Mr. Barrett and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Barrett's death.

427.     Failure to provide Mr. Barrett with medication and medical attention for his known medical needs including pre-existing medical conditions and his vomiting of blood led to the deprivation of Mr. Barrett's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Barrett's death.

428.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Barrett's access to medical care and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Barrett's death.

429.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Barrett died due to the jail's unconstitutional policies, customs, and practices.

724.     Mr. Barrett's family filed suit against Harris County with similar to claims to Plaintiffs which is incorporated herein by reference.

### S.  Christopher Johnson

430.     On July 25, 2015, Christopher Johnson was booked into Harris County Jail.

431.     During the booking process, Mr. Johnson posed to take his booking photo in which he smiled for the camera.

432.     The detention officers did not like that Mr. Johnson was smiling for his photo, so they commanded that he not smile or "We gon' to make you stop smiling."

433. When Mr. Johnson stated that he was going to smile because he had nothing to worry about, two officers grabbed Mr. Johnson's neck choking him for over 30 seconds while another officer took his picture. Mr. Johnson was handcuffed the entire time.

434. Other Harris County employees were standing by and witnessed the assault but refused to intervene and/or encouraged the officers' conduct. This approach is consistent with Harris County's policies of allowing, encouraging, and not deterring officers using force unnecessarily when detainees refuse to comply with petty and needless commands.

435. Mr. Johnson was refused any medical treatment for his injuries and feared that if he pressed the issue he would be met with a beating from the officers.

436. The officers present falsified reports on what transpired which is consistent with false and incorrect reporting by officers to cover up or mask excessive use of force against detainees and which encourages officers to continue using excessive force.

437. Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Johnson's injuries.

438.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

439.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Johnson's injuries.

440.    The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Mr. Johnson was injured due to the jail's unconstitutional policies, customs, and practices.

### T.  Matthew Shelton

441.    On March 22, 2022, Matthew Shelton was booked into the Harris County Jail with a history of diabetes and blood pressure problems to which he required insulin and blood pressure medication.

442.    Although he was required to take his medications for his conditions, Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Mr. Shelton not receiving his at all after being placed into his cell.

443.    Mr. Shelton entered the jail having insulin and needles to treat his diabetes with an order that he was to keep his medications on his person.

444.    Ultimately, on March 27, 2022, Mr. Shelton was found in his cell unresponsive due to failing to get his medications.

445.    The detention officers were not properly observing or monitoring Mr. Shelton as they did not observe Mr. Shelton struggling for medical attention or become unresponsive.

446. Mr. Shelton was declared deceased in the jail clinic later that day.

447. On December 19, 2022, the Texas Commission on Jail Standards issued a Notice of Non-Compliance finding that Harris County had failed to meet even minimum jail standards by not providing Mr. Shelton with his medications despite orders to do so.

448. Failure to properly observe and monitor Mr. Shelton and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Shelton's death.

449. Failure to provide Mr. Shelton with medication and medical attention for his known medical needs including diabetes and high blood pressure led to the deprivation of Mr. Shelton's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Shelton's death.

450. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Shelton's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Shelton's death.

451. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Shelton died due to the jail's unconstitutional policies, customs, and practices.

**U. Michael A. Alaniz**

452. On October 23, 2015, Mr. Alaniz was booked into the Harris County Jail.

453. When arriving at the jail, Mr. Alaniz was escorted by two larger detention officers. When they arrived at a window visible to other detainees, Mr. Alaniz was forced to face the wall and be stripped searched.

454.     When Mr. Alaniz asked for the officers' names and badge numbers, they refused and took him to a vacant single cell where they slammed him to the ground, sat on top of his back

455.     with their knees, and was repeatedly kicked by the officers. Mr. Alaniz lost consciousness, but instead of being taken to medical, he was left alone in the cell for over two hours.

456.     When Mr. Alaniz requested medical treatment for his injuries, one officer forcibly grabbed his throat with both hands and cut off his airways. Mr. Alaniz still requested medical despite the officer's response.

457.     Mr. Alaniz's request for medical treatment was refused until thirty-six hours after he was assaulted. The clinic only gave him some ibuprofen and sent him on his way.

458.     Once released from jail, Mr. Alaniz went to the hospital where they diagnosed him with a fractured nose and a concussion.

459.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Alaniz's injuries.

460.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

461.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Alaniz's injuries.

462.    The Harris County Sheriff was the policymaker for Harris County with respect to the jail when Mr. Alaniz was injured due to the jail's unconstitutional policies, customs, and practices.

463.    Mr. Alaniz filed suit against Harris County which Plaintiffs incorporate by reference herein in which Harris County settled Mr. Alaniz's claims. Order of Dismissal, *Michael A Alaniz v. Harris County*, 4:16-cv-01495, Dkt. No. 53 (S.D. Tex. filed Aug. 24, 2018).

### V.  Natividad Flores

464.    On July 27, 2019, Natividad Flores was booked in the Harris County Jail with a history of epilepsy requiring constant medical attention and medications.

465.    Mr. Flores disclosed his condition and stated that he needed his medications and needed to stay on a bottom bunk for fear of falling out of the bunk due to his medical condition.

466.    Consistent with Harris County's policies and practices of ignoring medical requests of detainees and withholding medical attention and medications from detainees, the detention officers never provided Mr. Flores with his medication and placed him on a top bunk.

467.    On July 29, 2019, because of the failure to provide him with his medications, Mr. Flores began experiencing several seizures. The officers failed to observe these seizures and failed

to monitor Mr. Flores, otherwise they would have noticed his seizures and would have had to render aid.

468.    Instead, Mr. Flores continued to suffer seizures on July 30, 2019, and fell from his top bunk suffering a serious head injury.

469.    Although some other detainees rendered aid, the officer on duty laughed at Mr. Flores and failed to call for medical assistance or help render aid.

470.    Ultimately, Mr. Flores lost consciousness and was taken to St. Joseph Hospital.

471.    Failure to properly observe and monitor Mr. Flores, conduct proper face-to-face observations, and failed to complete intake documents properly led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Flores' injuries.

472.    Failure to provide Mr. Flores with medication and medical attention for his known medical needs including epilepsy led to the deprivation of Mr. Flores's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Flores that he would suffer seizures without medication and would fall from his seizures by being on a top bunk.

473.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Flores's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical

474.    issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Flores's injuries.

475.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Flores suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

476.    Mr. Flores filed a complaint against Harris County for similar claims as Plaintiff, which Harris County eventually settled.

## W. Kareem Jefferson

477.    On May 29, 2019, Kareem Jefferson was in the process of being released from the Harris County Jail.

478.    While waiting in line to leave, detention officer Alexandro Ramos confronted Mr. Jefferson that he was past a "line" on the ground.

479.    When Mr. Jefferson spoke to Officer Ramos, Ramos hit Kareem and then slammed him on the ground, injuring him and placing him back in custody.

480.    Ramos then filed a false report that Kareem attacked an officer which resulted in him being in Harris County Jail for almost two more years before the case was dismissed for lack of evidence.

481.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion that leads to discipline, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Jefferson's injuries.

482.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of

their policies, procedures, and the law. Harris County also encourages false reports against detainees preparing to be released from the jail by provoking them and using force against the detainee and writing a report charging the detainee with a false crime. This same action was taken against Mr. Pillow as shown above.

483.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Jefferson's injuries.

484.    The Harris County Sherriff Ed Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Jefferson was injured due to the jail's unconstitutional policies, customs, and practices.

## X. Henry Williams

485.    On or about February 21, 2022, Henry Williams was in the Harris County Jail with a known medical condition specifically gout, high blood pressure, and arthritis.

486.    Around this time, Mr. Williams suffered a gout attack and notified the jail through the medical kiosk. Mr. Williams did not get a response to this request.

487.    When Mr. Williams talked with the nurse, the nurse said that he would not receive his medication because they were short-staffed, and they had closed the clinic.

488.    On February 22, 2022, Mr. Williams submitted another request through the medical kiosk for medical assistance and medication for his gout attack. Once again, Mr. Williams did not get a response from the jail.

489.    On February 28, 2022, Mr. Williams filed a grievance for not receiving any of his medications for three and a half weeks. Mr. Williams did not receive a reply.

490.	When Mr. Williams talked with another nurse, the nurse stated that she had asked for his medication but was told that they would not give it to her.

491.	On March 2, 2022, Mr. Williams again asked the detention officer for medication who informed him that the clinic would not be providing him with his medication because they were short staffed.

492.	The repeated failure to provide Mr. Williams with his medications led to him suffering bodily injuries including pain and suffering.

493.	Failure to provide Mr. Williams with medication and medical attention for his known medical needs including gout, high blood pressure, and arthritis led to the deprivation of Mr. Williams' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Williams' injuries.

494.	Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Williams' access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Williams' injuries.

495.	Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Williams suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

496.	Mr. Williams filed a *pro se* complaint against Harris County for similar claims as Plaintiffs.

### Y.  Loron Ernest Fisher

497.	On November 7, 2020, Loron Ernest Fisher was booked into the custody of Harris County Jail with a known medical condition specifically sickle cell.

498. On June 15, 2022, Mr. Fisher was in his cell when he became in the need of medical attention.

499. Detention officers were not properly monitoring and observing Mr. Fisher as they did not observe him needing medical attention and were only made aware of his condition by other detainees. Upon getting to Mr. Fisher, they took Mr. Fisher to the clinic.

500. After being in the clinic for three hours with likely only a portion of that being examined by a clinic staff member, Mr. Fisher was cleared and returned to his floor.

501. Instead of placing Mr. Fisher with other detainees to allow better observation of Mr. Fisher, the officers placed Mr. Fisher in a holding cell that lacked sufficient windows or cameras to observe him.

502. Later that day, Mr. Fisher was not properly observed until an officer entered the cell after he did not answer the knocks on his door. The officer found Mr. Fisher unresponsive.

503. Mr. Fisher was declared deceased that night at the hospital due to his sickle cell disease.

504. Failure to provide Mr. Fisher with medication and medical attention for his known medical needs including sickle cell and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Fisher went to the clinic led to the deprivation of Mr. Fisher's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Fisher's death.

505. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Fisher's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, failure to have sufficient medical staff be able to perform full examinations and testing on detainees, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Fisher's death.

506.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Fisher died due to the jail's unconstitutional policies, customs, and practices.

**Z. Benjamin Pierce**

507.    On May 20, 2022, Benjamin Pierce was booked into the Harris County Jail.

508.    Instead of receiving a full medical screening for any health issues upon entering the Jail, Mr. Pierce was placed into a solitary holding cell.

509.    Detention officers were not properly monitoring and observing Mr. Pierce as they did not conduct face to face observations to determine if he was in need of medical attention upon being placed in the solitary cell that lacked sufficient windows or cameras to observe him.

510.    On May 21, 2022, at 4:24 a.m., Mr. Pierce was found unresponsive in his cell.

511.    Mr. Pierce was declared deceased that night at the hospital due to his heart condition that would have been discovered and treated had Mr. Pierce been properly screened and observed. Failure to provide Mr. Pierce with medication and medical attention for his known medical needs and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Pierce was booked into the Jail led to the deprivation of Mr. Pierce's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Pierce's death.

512.    Failure to properly observe and monitor Mr. Pierce and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Pierce's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Pierce become unresponsive.

513.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Pierce's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and

testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Pierce's death.

514.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Pierce died due to the jail's unconstitutional policies, customs, and practices.

## AA.    Gilbert Allen Nelson

515.    On February 10, 2021, Gilbert Allen Nelson was booked into the Harris County Jail.

516.    Due to the lack of medical care and hygiene within the Jail, Mr. Nelson contracted a urinary tract infection. Mr. Nelson was not receiving medical treatment for this infection despite the obvious need for medical treatment.

517.    Detention officers were not properly monitoring and observing Mr. Nelson as they did not conduct face-to-face observations to determine if he was in need of medical attention within a sufficient amount of time.

518.    On May 11, 2022, detention officers were not monitoring Mr. Nelson as other detainees had to inform them that Mr. Nelson was unresponsive in his bunk.

519.    Mr. Nelson was declared deceased a few hours later with sepsis due to his untreated urinary tract infection.

520.    Failure to provide Mr. Nelson with medication and medical attention for his known medical needs led to the deprivation of Mr. Nelson's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Nelson's death.

521.    Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Nelson's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Nelson become unresponsive.

522.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Nelson's access to medical care, including not having sufficient staff to pass

out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Nelson's death.

523.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Nelson died due to the jail's unconstitutional policies, customs, and practices.

**BB.    Kevin Alexander Sanchez-Trejo**

524.    On November 21, 2021, Kevin Alexander Sanchez-Trejo was booked into the Harris County Jail.

525.    Detention officers were not properly monitoring and observing Mr. Sanchez-Trejo as they did not conduct face to face observations to determine if he was in need of medical attention within a sufficient amount of time and for failing to prevent his acquiring and ingestion of fentanyl and heroin.

526.    On February 12, 2022, Mr. Sanchez-Trejo was found unresponsive in his bed by a supervisor.

527.    Mr. Sanchez-Trejo was declared deceased a few hours later due to a drug overdose.

528.    Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and led to inadequate supervision permitting the distribution and use of illicit drugs within the Jail which has become a significant pattern within the Jail, and ultimately caused Mr. Sanchez-Trejo's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice the distribution and ingestion of the illicit drugs and sufficient time to notice Mr. Sanchez-Trejo become unresponsive.

529.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Sanchez-Trejo's access to medical care, including not having sufficient staff

to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to properly observe the use and distribution of drugs amongst detainees in the Jail, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Sanchez-Trejo's death.

530.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Sanchez-Trejo died due to the jail's unconstitutional policies, customs, and practices.

### CC.    Simon Peter Douglas

531.    On February 10, 2022, Simon Peter Douglas was booked into the Harris County Jail with known mental illnesses.

532.    While in booking, Mr. Douglas immediately began exhibiting erratic and aggressive behavior consistent with his mental illness, so the detention officers placed him in a single isolation cell that did not have any protections or sufficient avenues of observing and monitoring Mr. Douglas.

533.    While in this cell, Mr. Douglas took a piece of his clothing and attempted to hang himself.

534.    Detention officers then entered Mr. Douglas's cell and forcibly handcuffed him and placed him in a single padded room. This room though still had hard objects on the door and wall and a metal grate in the middle of the floor.

535.    Despite knowing Mr. Douglas's behavior, the officers did not restrain Mr. Douglas any further, did not place him in a suicide vest, and did not attempt to remove damaging items.

536.    Mr. Douglas then began ramming his head against the door, walls, and the metal grate continuously while the detention officers watched. The detention officers did not interfere with Mr. Douglas despite knowing the harm he was causing to himself and his mental condition.

Instead, the officers waited until Mr. Douglas knocked himself out and then went in and carried Mr. Douglas out on a stretcher.

537.    Mr. Douglas was declared deceased shortly thereafter at the hospital.

538.    Failure to provide Mr. Douglas with medication and proper medical care for his known mental condition and failure to provide sufficient examination and observation when Mr. Douglas was booked into the Jail led to the deprivation of Mr. Douglas's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Douglas's death.

539.    Failure to properly observe and monitor Mr. Douglas and conduct proper face-to-face observations including failure to interfere with Mr. Douglas's attempts at self-harm led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Douglas's death as proper observation and interference would have provided sufficient time to prevent his death.

540.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Douglas's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known mental conditions, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Douglas's death.

541.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Douglas died due to the jail's unconstitutional policies, customs, and practices.

**DD.    Robert Terry Jr.**

542.    On May 13, 2023, Robert Terry Jr. was booked into the Harris County Jail.

543. On May 16, 2023, Mr. Terry pressed the intercom button in a multi-occupancy cell, fell to the floor clutching his stomach, began to foam at the mouth, and tried crawling to the dayroom.

544. The officers failed to notice Mr. Terry's initial need for medical attention; however, it took medical personnel 90 minutes to arrive. The jailers did not attempt to render aid but stood around, laughed, and taunted Mr. Terry.

545. Mr. Terry passed away later that morning.

546. Failure to provide Mr. Terry with medication and medical attention for his known medical needs but instead laughing and taunting him for 90 minutes led to the deprivation of Mr. Terry's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Terry's death.

547. Failure to properly observe, monitor, and intervene for Mr. Terry led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Terry's death.

548. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Terry's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff to respond quickly to medical emergencies, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Terry's death.

549. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Terry died due to the jail's unconstitutional policies, customs, and practices

### EE. Fabian Cortez

550. On March 21, 2023, Fabien Cortez was in the processing center of the Harris County Jail where he was being booked.

551.    While in the processing center, Mr. Cortez went to the bathroom.

552.    In accordance with their customs and policies, Harris County Jail failed to observe, monitor, or conduct any face-to-face observations with Mr. Cortez for at least 88 minutes. Further, the Jail failed to ensure that Mr. Cortez did not have any items which would permit him to attempt to commit suicide.

553.    The Jail did not even know that Mr. Cortez had been gone until another detainee informed them that he had been in the bathroom for a long time.

554.    Eventually, officers went into the bathroom and found Mr. Cortez with a drawstring from his jacket wrapped around his neck. At this point, it was too late to save Mr. Cortez. Mr. Cortez was declared deceased at the hospital a few hours later.

555.    On April 17, 2023, the Texas Commission on Jail Standards, as laid out below, found that the Jail violated minimum jail standards by failing to conduct face-to-face observations with Mr. Cortez for over 88 minutes. This led to a severe constitutional violation as Mr. Cortez was given more than enough time to hang himself and the lapse in time prevented timely medical care.

556.    Failure to properly observe and monitor Mr. Cortez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Cortez's death.

557.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Cortez's access to medical care, impeded providing medical care timely, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Cortez's death.

558.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Cortez died due to the jail's unconstitutional policies, customs, and practices.

### FF. Elijah Gamble

559.    Around November 2020, Elijah Gamble was booked into the Harris County Jail.

560.    Mr. Gamble's mother is the wife of Plaintiff Taylor Euell.

561.     Mr. Gamble is part of the LGBQT+ community which is a vulnerable group in the Harris County Jail.

562.     Mr. Gamble got into an argument with another detainee when that detainee threatened to fight him. Mr. Gamble went to the officers watching outside of the room and asked to be removed from the room due to the threat of violence. Unfortunately, the officers refused to remove him from the room until he told them who had threatened him. The detainee that threatened him was standing right next to him, so out of fear of getting beat up for snitching, Mr. Gamble did not tell them who had threatened him.

563.     However, right in front of the officers, the other detainee punched Mr. Gamble in the face knocking him out for a few seconds. When he woke up, he was being stomped on the face by this detainee. The officers did not interfere.

564.     After several minutes, the officers finally came into the cell only after Mr. Gamble was crawling to the door.

565.     Upon going to the clinic, Mr. Gamble was told that his jaw was broken but that the clinic would not wire his mouth shut. Eventually, Mr. Gamble was sent to the hospital where they wired his mouth shut. Upon returning to the Jail, Mr. Gamble was not provided with a liquid diet but had to buy his own ramen soup at the commissary when available.

566.     Eventually on the eve of his surgery for his jaw, the Jail released him which forced him to have to use his own insurance to pay for his surgery.

567.     In his time at Harris County, Mr. Gamble saw a common trend where detainees would not be provided medical treatment or medications regularly. When a detainee needed to be taught a lesson, the detainee would be taken to a place with closed doors and no cameras and would be beaten up by several officers. Each floor had four cells where these lessons would be taught. Many cells had blood and feces on the walls and floor.

568.     Failure to properly observe, monitor, and intervene when Mr. Gamble was beat up by the other detainee despite requesting to be removed from the presence of that detainee led to inadequate protection and inadequate medical care being provided to him in a timely manner and

ultimately caused Mr. Gamble's injuries as timely intervention would have prevented Mr. Gamble's injuries to begin with, and adequate monitoring would have allowed immediate medical intervention.

569.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Gamble's injuries when the Jail staff either failed to observe or monitor Mr. Gamble or the detainee beating Mr. Gamble, or deliberately refused to interfere with the ongoing assault.

570.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, caused jailers to not properly place detainees in appropriate holding cells in accordance with known threats, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Gamble's death.

571.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died due to the jail's unconstitutional policies, customs, and practices.

### GG.    Kenneth Lucas

572.    On February 14, 2015, Kenneth Lucas was arrested for keeping his children too long during a scheduled visit and was booked into the Harris County Jail.

573.    On February 17, 2015, Mr. Lucas was upset in his locked single cell unarmed and did not pose a threat to anyone. However, Harris County organized several officers to forcibly

enter his cell, knock him to the ground, handcuff his arms behind his back, and drag him from his cell by his face. Once pulled out of the cell, the officers continued to sit on his back and legs while he was restrained. Mr. Lucas was not resisting their efforts.

574.     Despite his cries that he was going to pass out and could not breathe, the officers continued their trained tactics of sitting on his back preventing him from breathing and causing him immense trauma and pain. No medical staff were informed of this situation. Eventually, Mr. Lucas stopped breathing due to the officer's actions. Yet, nobody noticed that he stopped breathing and continued to sit on his back and legs.

575.     When Mr. Lucas was taken to the clinic, he was not taken there to receive medical care or evaluation; instead, while officers were still sitting on his back and legs, a nurse gave Mr. Lucas a sedative. This sedative was unnecessary as everyone could see that Mr. Lucas was unconscious. Many officers and supervisors saw the officers' actions and did not attempt to

576.     interfere or suggest a different way to restrain him or that they should stop sitting on Mr. Lucas's back. These same tactics were prevalent during the 2009 DOJ Report.

577.     The officers continued to hold Mr. Lucas down for several minutes after he became lifeless. The medical staff tried to take his blood pressure but could not find any. Ultimately, due to the ongoing restraint and unnecessary use of force, Mr. Lucas passed away. In one of the few moments of transparency, the prior Sheriff of Harris County released the full video of the incident but found that the officers did nothing wrong. Instead of condemning these actions, the Sheriff condoned these actions as part of the policies, practices, and procedures of the County.

578.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create

scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Lucas's death.

579.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (sitting on the back of detainees) were justified and within the guidelines of their policies, procedures, and the law.

580.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Lucas's death.

581.    The Harris County Sherriff policymaker for Harris County with respect to the jail when Mr. Lucas died due to the jail's unconstitutional policies, customs, and practices.

582.    Mr. Lucas's family filed suit against Harris County which Plaintiffs incorporate by reference herein. First. Am. Complaint, *Salcido v. Harris Cnty., Tex.*, 4:15-cv-02155 (S.D. Tex. filed July 30, 2015). Harris County settled the claims against them for $2.5 million.

### HH.     Rachel Hatton

583.    On or around May 7, 2016, Rachel Hatton was booked into the Harris County Jail.

584.    While waiting in line with other detainees, an officer ordered her to go back to her cell. Despite moving in that direction, the officer charged and punched her causing her to lose

consciousness and required her to get stiches for her injuries. Ms. Hatton suffered a concussion due to this excessive and unnecessary use of force.

585.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Ms. Hatton's injuries.

586.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed hand fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law.

587.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence,

588.    and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Ms. Hatton's injuries.

589.     The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Ms. Hatton suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

### 3.3. Former employees and witnesses of Harris County Jail further corroborate these ongoing and pervasive issues.

#### A. Harris County Detention Officer J. Valdiviez

590.     Throughout Sheriff Gonzalez's tenure as the Harris County Sheriff, numerous jail employees and staff have been injured due to Harris County's ongoing practice and policies of understaffing and overcrowding the jail. Some of these employees have filed suit against Harris County while others have bravely stepped forward to talk with the media.

591.     Officer J. Valdiviez was a detention officer with Harris County.

592.     On July 21, 2023, Officer Valdiviez was working on a double lockdown floor in the jail. Officer Valdiviez told the media that the pod he was working in was supposed to have at least three officers, but with the systemic understaffing of the jail, the pod only had two officers including himself.

593.     While Officer Valdiviez was making rounds, a detainee who was supposed to be escorted at all times was left unsupervised and assaulted Officer Valdiviez severely injuring him. Officer Valdiviez suffered injuries all of over his body and eventually had to be resuscitated.

594.     As stated by Officer Valdiviez, "If we would have had better control of how we staff our personnel, or how we staff every floor in general, I'm pretty sure the situation could have been avoided."

595.     Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Officer Valdiviez's injuries.

596.    Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Officer Valdiviez suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### B. Harris County Sergeant Jane Doe

597.    On December 6, 2021, Jane Doe was a sergeant within the Harris County Jail.

598.    While in her office on the fifth floor of 1200 Baker, a detainee entered her office and sexually assaulted her. This detainee's armband indicated that he was to be escorted anytime he was outside of his cell. Unfortunately for Ms. Doe, the detainee was not escorted.

599.    Despite crying for help, no other officer or employee ever arrived to help Ms. Doe. The detainee was able to walk out of the office without any officer interference. Sheriff Gonzalez failed to take responsibility for this action and instead solely blamed the detainee.

600.    Ms. Doe filed suit against Harris County on July 28, 2023, for their rampant policies, practices, and procedures of understaffing, underfunding, and overcrowding the jail. Ms. Doe's injuries directly resulted from this policy as an officer should have been able to hear her cries for help and should have been escorting the detainee.

601.    Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Ms. Doe's injuries.

602.    Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Ms. Doe suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

### C. Harris County Jail Employees

603.    In February 2023, two former employees of the Harris County Jail who had recently resigned did an anonymous interview with Fox 26 in Houston.

604.     In this interview, the employees repeatedly stated that the jail was extremely unsafe. The employees discussed the rampant culture where detainees are welcomed into the jail "through violence" and are "beaten to a bloody pulp."

605.     The employees specifically discussed the incident involving Sergeant Jane Doe mentioned above. They stated that before the sergeant was raped "these things happened before" and they were warning that something worse would happen if nothing changed and inevitably because Harris County did not change any of their policies or procedures Ms. Doe was assaulted. "After the sergeant was brutally raped and beaten, we expected something different to happen. It never did."

606.     Detainees were frequently left unattended and unescorted when they should have been escorted at all times.

607.     The Harris County Sheriff's Office issued a statement in response recognizing "The crisis in the Harris County Jail" and "the overcrowded conditions." Yet, nothing has changed throughout the history of the jail.

608.     These two jail employees provided an interview to the media in early 2023 but asked to remain anonymous. Part of their interview can be found at the following links. https://www.youtube.com/watch?v=unwfp72ASNY;   https://www.fox26houston.com/news/two-former-harris-co-jail-employees-say-inmates-are-running-the-show.

**D.  The Head of the Harris County Jail Resigns on January 9, 2023**

609.     Harris County's ongoing policies, practices, and procedures of overcrowding and understaffing the jail can also be seen in the resignation of the Head of the Harris County Jail.

610.     On January 9, 2023, shortly after the death of Jacoby Pillow, Shannon Herklotz who served as the Assistant Chief of Detentions with the Harris County Sheriff's Office submitted his resignation letter. In this letter, Mr. Herklotz cited numerous issues within the jail that they were seeking to overcome including overcrowding and staffing deficiencies.

611.    This letter serves as another reminder that the overcrowding and understaffing of the jail is a systemic issue that has not been resolved or addressed despite that issue being raised no later than 2009 in the DOJ Report.

## 4.    CAUSES OF ACTION

### 4.1. Americans with Disabilities Act (ADA)

612.    Harris County including the Sheriff's office and the Jail have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

613.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to Harris County, The Sheriff's office and the Jail have the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

614.    The Harris County jail is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes. Fred was otherwise qualified to participate in the programs and services at the Harris County jail provided by Harris County, Texas and the HCSO's office.

615.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Fred was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities. Defendant Harris County and knew Fred Harris suffered from extreme mental intellectual disability, IQ of 62, schizophrenia and/or its precursors, and other mental illness. These conditions, alone or in combination, made Fred a qualified individual with a disability. Despite this knowledge, Harris County's and the HCSO officers and employees intentionally discriminated against him, under the meaning of the ADA, ADAAA and Rehabilitation Act, by failing and refusing to protect him from Ownby who took his life and failing to make reasonable accommodations to safely house Fred and/or move him and Ownby about the

jail with the proper escorts and to observe Fred and Ownby when they are accessible to each other and other inmates and employees.

616.     These conditions made Fred significantly more vulnerable to inmates like Ownby for two main reasons. First, his mental conditions, in combination with his diminutive size, made him an easy target for violent inmates. Second, the severe intellectual disability and/or mental illness increased his risk of unintentionally drawing the ire of violent inmates or jailers. Harris County, through and as part of its awareness of its own violent culture, was aware of Fred's specific vulnerability that resulted from his disabilities, and gave him a wrist band acknowledging as much. By putting him in a cell with another detainee that was designated as violent, Harris County failed to provide Fred the reasonable accommodation of being kept away from violent inmates without proper supervision.

617.     As alleged above and herein, Harris County and the HCSO failed and refused to reasonably accommodate Fred's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his suffering and death.

618.     As alleged above, Harris County and the HCSO failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Fred's disability.  These failures and refusals caused his death.  Due to his injury and death Fred was not able to access the work programs, mental healthcare programs, education programs, commissary, court appointed or public defender lawyers programs, as well as any other program or service offered by Harris County.

619.     Among other things, Harris County and the HCSO failed to:

    a.   Provide safe housing;

    b.   Provide safe movement from one part of the jail to another;

    c.   Provide proper medication;

    d.   Provide protection from dangerous jail inmates;

    e.   Provide oversight in case of danger from other inmates;

f.   Provide medical treatment;

620.   As Fred died as a direct and proximate result of Harris County and the HCSO's intentional discrimination against him, Plaintiff is entitled to all damages allowed by law.

## 4.2. Chapter 42 U.S.C. § 1983 Claims Against Harris County

621.   The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

*Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.*

622.   The 4th Amendment to the United States Constitution provides:

*The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*

623.   The 5th Amendment to the United States Constitution provides:

*No person shall be [] deprived of life, liberty, or property, without due process of law;*

624.   The 14th Amendment to the United States Constitution provides:

*No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

625.   Harris County through its officials and employees engaged in deliberate and outrageous invasion of Plaintiff's rights violation of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Plaintiff re-alleges and incorporate all allegations of this Complaint as if fully set forth herein.

626.     Harris County and the HCSO by their acts and omissions alleged above, under color of law and pursuant to the customs, practices and policies of Harris County, Texas, deprived Fred of his rights thereby violating the Fourth Amendment to be secure in his person, the Fifth and Fourteenth Amendments right not to be deprived of life and liberty without due process and equal protection  under the Due Process and Equal Protection Clauses of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

627.     As a direct and proximate result of Defendants' acts, which were so outrageous in character and extreme in degree to be utterly intolerable in a civilized community, Plaintiff suffered severe emotional distress and was injured and damaged thereby.

628.     As shown below, the Individual Officers' actions were part of a policy and practice condoned by Harris County, Texas.

629.     In addition, Harris County (and its governmental branch, Harris County Sheriff's Office), including its officials and employees in an official capacity engaged in a policy and practice of deliberate indifference to the care and custody of citizens and detainees that resulted in the injury and death of Fred.

630.     In addition, and in the alternative, Harris County gave inadequate training to civilian and officer personnel, including but not limited to the jailers, deputies, and officials referenced herein and failed to supervise when detentions occurred.

631.     Plaintiff contends that policies, procedures, practices and customs of Harris County and the HCSO including but not limited to the deputies referenced herein (alone and in concert and/or individually) put Fred in an inherently dangerous situation and violated his rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States for which Plaintiff seeks recovery.

632.     Specifically, Plaintiff alleges that several customs, patterns, and practices led directly to Mr. Harris's death, all of which are either a direct result of, or are severely exacerbated by, Harris County's policy or practice of chronically and severely starving its Jail of money and staff, while continuing to further overcrowd the Jail. Those customs, patterns, and practices are:

encouraging violence between detainees (like Fred's murder at the hands of Ownby); abiding violence generally, including jailer-on-detainee violence; and inadequate provision of care, including failing to account for detainees' protective designations, delaying or refusing to break up fights, as well as failing to speedily provide emergency medical care. Beyond the issues themselves, Harris County has staunchly refused to even address any of these problems through training, and does not adequately train its jailers with respect to responding to detainee-on-detainee violence, or protective protocols for vulnerable detainees like Fred and violent detainees like Ownby.

633.    Individually and collectively, these policies, customs, patterns, and practices all directly led to Fred's death. The lack of resources, lack of training, and inadequate provision of care led to the series of decisions resulting in Fred and Ownby being placed alone together, unsupervised, in a holding cell; meanwhile, the pervasive culture of violence emboldened Ownby to senselessly and ruthlessly murder Fred, seemingly for sport, while it also encouraged the jailers' decisions to sit by and do nothing.

634.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainees' assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, failing to respond to requests for aid to be protected from detainees, failing to discipline detainees who instigate violent attacks on other detainees, failing to observe or monitor detainees, deliberately refusing to interfere with ongoing assaults, and encouraging detainee assaults to resolve interpersonal problems led to the injuries and deaths of Fred Harris and the other victims described herein.

635.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, caused additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevented a

correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring," impedes Plaintiffs' access to medical care, impedes the officers ability to provide medical care timely, impedes the jailer's ability and/or willingness to observe and monitor detainees, impedes the jailer's ability and/or willingness to deter detainee on detainee or officer on detainee violence, reduces the ability of officers to escort detainees safely, and results in insufficient officers to carry out even minute functions of the jail safely, which resulted in the injuries and deaths of Fred Harris and the other victims described herein.

636. As has been seen in the numerous reports previously and can be seen in Harris County's history, the Jail does not have sufficient staff to perform required functions. Many of the deficiencies in conducting face-to-face observations, in intervening in detainee fights, and in the increase in the use of force by officers against detainees can be traced to Harris County's long-running policies, practices, and procedures of understaffing the Jail.

637. Classification of detainees is important to help prevent violent criminals from being placed with high-risk detainees or those suffering from a mental illness. Unfortunately, throughout its history, Harris County Jail has a pattern, practice, and policy of placing violent detainees with mentally ill detainees resulting in injuries or death of the mentally ill detainee.

638. Plaintiff contends that the failures to train and supervise staff regarding the policies, procedures, practices and customs of Harris County and the deputies put Plaintiff and potentially others in a dangerous situation and violated their rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States for which Plaintiff seeks recovery.

639. During the relevant time period contemplated by this cause of action, Harris County and the HCSO, including but not limited to the deputies, jailers and other officials in an official capacity failed to follow state and federal laws, federal and state regulations with jail inmates especially Fred and Ownby.

640.     During the relevant time contemplated by this cause of action, Harris County and the HCSO, including but not limited to the deputies, jailers and other officials in an official capacity, in the alternative or in addition failed to follow their own written policies and procedures and those of the State of Texas and other authorities on standards of care, and protection of jail inmates.

641.     Facts at the time of filing this Complaint supporting each of the elements of a § 1983 claim against Harris County and the HCSO are found above and applicable to all claims, but may be summarized as follows:

a.   Failed to properly train, hire, control, discipline, including firing, and supervise employees;

b.   Promulgated, condoned, or showed indifference to improper policies or customs;

c.   Continued such practices of improper policies or customs as to constitute custom representing policy;

d.   Failing to investigate claims of assault, excessive force and other violations;

e.   Failure to investigate citizen complaints if a charge is pending;

f.   Failure to hire enough guards and other staff;

g.   Failure to fund the jail with enough funds;

h.   Failure to keep the jail at the appropriate number of inmates to keep the inmates safe;

i.   Failure to provide body worn camera and dash camera videos to the State and inmate criminal defense attorneys to decrease the number of inmates in the jail;

j.   Failure to classify inmates correctly.

642.     These actions by Harris County and the HCSO subjected Fred to confinement with constitutionally inadequate safety protections such as:

a.   Understanding and underfunding the Jail;

b.   Staffing the Jail with officers with no (or insufficient) training, oversight, supervision, or discipline;

c.   Not housing inmates with violent inmates;

d.   Not housing small vulnerable inmates with inmates who may injure them;

e.   Not housing inmates together without oversight;

f.   Not providing escorts for inmates deemed to require escorts;

g.   Not providing enough guards for oversight; and

h.   Not providing adequate mental health care.

## 4.3. Chapter 42 U.S.C. § 1983 Claims against Individual Officers

643.   Defendants Washington, Guzman, Brightman, Shorter, Roberson, and Johnson all individually violated Fred's rights through their deliberate indifference to his needs, and may all be held individually liable.

644.   Specifically, Defendants Brightman, Shorter, Roberson, and Johnson all *watched* as Fred was *savagely murdered* and had his face smashed in, but did not intervene whatsoever. All of them individually and collectively saw the need to intervene, but intentionally chose not to do so, directly causing Fred's murder.

645.   Defendant Johnson specifically approved Fred and Ownby being housed in the same cell together after Defendant Washington sent Ownby from the holding cell he was in on the 6th floor to an equivalent holding cell on the 3rd floor. They did so despite knowing that Ownby had *just* attacked other inmates in the 6th floor holding cell, directly causing Fred's murder.

646.   Defendants Ratliff and Guzman escorted Fred to the cell where Ownby was, despite seeing their respective wristband designations, and left them in the cell together, directly causing Fred's murder.

## 4.4. Damages

647.    Based upon the operative facts plead above, such acts and omissions rise to the level of deliberate indifference and conscious indifference constituting a violation of the First, Fifth, Fourth and Fourteenth Amendments of the Constitution of the United States for which Plaintiff seeks recovery as well as the ADA and Rehabilitation Act and their amendments.

648.    Each and every, all and singular of the foregoing acts and omissions, on the part of Defendants, taken separately and/or collectively, jointly, and severally, constitute a direct and proximate cause of the injuries and damages set forth herein. As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer damages in an amount to be proved at trial.

649.    As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, grief, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress in amounts within the jurisdictional limits of this Court, to be proved at trial.

650.    Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by 42 U.S.C. § 1988(b) and the ADA and Rehabilitation Act.

## 5.  JURY DEMAND

651.    Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff demands a trial by jury.

## 6.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A.    Enter a declaratory judgment that the policies, practices, acts, and omissions complained of herein violated Fred's and Plaintiff's rights;

B.    Award compensatory damages for Plaintiff against all individual Defendants, jointly and

severally;

C.    Award reasonable attorneys' fees and costs and all litigation expenses, pursuant to federal

and state law, as noted against Defendants, jointly and severally pursuant to 48 U.S.C. §

1988 and the ADA;

D.    Award pre- and post-judgement interest; and

E.    Award costs of court;

F.    Retain jurisdiction over Defendant Harris County such time that the Court is satisfied that

Defendants' unlawful policies, practices, acts, and omissions no longer exist and will not

recur; and,

G.    Grant such other and further relief as appears reasonable and just, to which, Plaintiff shows

herself entitled.

Respectfully Submitted,

/s/ *Randall L. Kallinen*
Randall L. Kallinen
KALLINEN LAW PLLC
State Bar of Texas No. 00790995
U.S. So. Dist. of Texas Bar No.: 19417
511 Broadway Street
Houston, Texas 77012
Telephone:    713/320-3785
FAX:            713/893-6737
E-mail:AttorneyKallinen@aol.com

Alexander C. Johnson
KALLINEN LAW PLLC
State of Texas Bar No. 24123583
U.S. So. Dist. of Texas Bar No.: 3679181
511 Broadway Street
Houston, Texas 77012
Telephone:    573/340-3316
Fax:            713/893-6737
Email:            alex@acj.legal

Brandon F. Renken

MAYER BROWN LLP
700 Louisiana St., Suite 3400
Houston, TX 77002
Telephone:     (713) 238-2602
Facsimile:     (713) 238-4602
Email:          brenken@mayerbrown.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify I have served this filing on this 24th day of April 2024, by filing with the Court's ECF System.

/s/ *Randall L. Kallinen*
Randall L. Kallinen